UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

FORT PIERCE DIVISION

| | | |
|---|---|---|
| PAMELA B. STUART | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  18-14244- CIV- |
| | ) | MARTINEZ/MAYNARD |
| | ) | |
| CATHERINE S. RYAN, | ) | |
| | ) | |
| DEBORAH A. STUART, | ) | |
| | ) | |
| TENNIS TOWNHOUSES CONDOMINIUM | ) | |
| ASSOCIATION, INC., | ) | |
| | ) | |
| JEFFREY R. SMITH, | ) | |
| | ) | |
| STATE OF FLORIDA, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF PAMELA STUART'S RULE 72 OBJECTIONS TO THE
## REPORT AND RECOMMENDATIONS OF MAGISTRATE JUDGE MAYNARD

Plaintiff *pro se* Pamela B. Stuart respectfully files her objections and recommendations to

the Report and Recommendations filed by Magistrate Judge Shaniek Maynard on December 26,

2018, pursuant to Rule 72 of the Federal Rules of Civil Procedure and Local Magistrate Judge Rule

1(d)(1)(D).  The Report and Recommendations were filed in response to various motions to dismiss

pursuant to Fed. Rule. Civ. Pro. 12(b)(6).  Because the defendants have raised the *Rooker-Feldman*

doctrine as a bar to jurisdiction in this court which is a factual attack on jurisdiction, this Court may

properly consider evidence outside the pleadings in determining whether the Complaint should be

dismissed. *See Echeverry v. Wells Fargo Bank, N.A* Case No. 16-cv-61635-GAYLES, at p. 4, (S.D. Fla. February 24, 2017).

Plaintiff objects to the Magistrate's recommendation that the case be dismissed for failure to state a claim (failure to plead a cause of action) for Counts I and II of her complaint.   In the event that the Court were to agree with the Magistrate, Plaintiff seeks leave to file an amended complaint adding allegations under the 4th Amendment to the US Constitution (unlawful and unreasonable seizures of property) and under the All Writs Act, 28 U.S.C. § 1651, which permits federal courts to employ all available writs to secure justice.   Plaintiff objects to the dismissal of her case which seeks protection from an unconstitutional judicial taking and/or seizure of her property by the state courts without the full and fair litigation as required by *U.S. v. Mendoza*, 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984) due to jurisdictional "doctrines"  which, contrary to the plain language of the US and Florida Constitutions,  including the Supremacy Clause in Art. VI, clause 2, counsel federal courts to not involve themselves in matters that criticize or challenge the final actions of state courts which may be subject to review by the US Supreme Court pursuant to a writ of certiorari under 28 U.S. C. § 1257(a).

**Introduction**

Plaintiff apologizes for the length of this document which was organized to respond individually to the paragraphs as set forth in the Magistrate's lengthy report.  Because of that organization, some of the content and arguments may be repeated from time to time.

Plaintiff has faced several challenges in timely producing this response which she will not recount.  In the event that she has not assembled all of the exhibits cited in this response by the time it must go to the FedEx office to meet the Court's deadline for a response, the exhibits will follow

by mail as soon as possible.

**Procedural Posture**

This case arose from a bitter family dispute over the administration of the trust left by J. Raymond Stuart, father of Plaintiff Pamela Stuart and defendants Catherine Ryan, MD, and Deborah Stuart. Pamela Stuart, the eldest child and only lawyer in the family was named by her father and mother as trustees of their trusts and executor of their wills in 1990. After Mr. Stuart died in 1998, Pamela Stuart was left with the responsibility of making sure that the trust objectives, the care of her elderly mother, Marion Stuart, and the residences titled in the name of the trust and the brokerage account that was to provide support for Marion Stuart, who was a homemaker, and the distribution of whatever remained to the three daughters, were carried out pursuant to the terms of the trust and Florida law. Pamela Stuart did that to the best of her ability under challenging circumstances.

In 2000, Plaintiff made what turned out to be a catastrophic mistake as trustee. The original independent trustee she appointed had resigned due to his ill health and, after two of her father's friends refused her request to serve as independent trustee, she appointed her brother in law, Edward Ryan, to serve as co-trustee. She knew that Mr. Ryan was not supposed to serve in that capacity under the terms of the trust because his wife was a remainder beneficiary and the terms of the trust (Article 21) prohibited his appointment. However, she had just acquired a residence in Vero Beach and the only people she knew in Vero Beach were friends of her parents. The lawyer she consulted about this issue, Michael Stafford, Esq., a Florida Bar member who was well-known in the Bar and in the Real Property, Probate and Trust Law Section (he recruited plaintiff to service on the RPPTL Executive Council) and who had advised her father before his death, considered her reasons for appointing Mr. Ryan despite the trust terms (that he was a lawyer and knew the family well) and

3

advised, "No one will complain." Mr. Ryan became co-trustee in April 2000 and served until he was removed by the court in March 2014. Mr. Ryan had been "fired" as co-trustee by Plaintiff and her mother in July 2009, but he refused to resign.  It was Mr. Ryan who was the real party in interest behind the litigation filed in Indian River County in the names of Plaintiffs' sisters.

Plaintiff made a second critical error in trust administration when, in 2001, after learning that she had been defrauded when the limited liability company she formed purchased a commercial building to use as a law office and rental property, she began borrowing against her inheritance, her right under Florida law to receive trustee fees (§ 736.0708) and her right under Florida law to repayment of trustee expenses (§ 736.0709) to pay the carrying costs of that building.  She had consulted with her mother and Mr. Ryan and her sisters about the matter, but the sisters and Mr. Ryan later claimed ignorance.  The terms of the trust permitted borrowing by the trustees (Article 18, ¶ 2) as did the Florida law which provided borrowing by a trustee,(§ 736.0816(6), Florida Statutes is the current iteration).   Plaintiff had placed a second mortgage against her Florida home and later refinanced it in 2006 to pay attorneys' fees for the litigation against the defrauding seller.  The building was finally sold in 2009 and Plaintiff repaid $750,000 she had borrowed for that purpose. The LLC that owned the building also repaid the refinanced loan against Plaintiff's Florida home at the time of closing.  Plaintiff thought that she would not have to borrow from the trust any further but she required ten surgeries between 2010 and 2014 that interfered with her ability to work at the same time that her mother's health was deteriorating and Plaintiff had to spend more time taking care of her mother and her affairs (she required in-home nursing care from 2006 through 2012).   Plaintiff unquestionably borrowed more from the trust than her share of the estate but expected to be able to repay whatever she owed (after accounting for the fees to which she was

entitled and the reimbursement credit for expenses she incurred as a trustee) from earnings from her law practice following the death of her mother in April 2012. Instead, she was sued, her brother in law filed a complaint with the Florida Bar that led to the suspension of her law license in Florida and then reciprocally in D.C., Maryland and Virginia which effectively erased Plaintiff's ability to earn income. To add insult to injury, the Florida state court refused to award Plaintiff any fees for the sixteen years of her labors as trustee and refused, contrary to applicable Florida law (§ 736.0709, Florida Statutes, "A trustee is entitled to be reimbursed out of the trust property, with interest as appropriate, for reasonable expenses that were properly incurred in the administration of the trust.") to give her credit for the $325,507.99 she had expended for the expenses she incurred as trustee in good faith reliance upon her eventual reimbursement. The Florida state court also charged her for the fees and expense reimbursements that had been properly paid according to the terms of the trust with the advice of counsel from 1998 to 2001. The result was a grossly inflated judgment against her to which the state court added 6% interest since 1998 and failed to credit the value of the properties the state court improperly awarded to her sisters.

On June 26, 2018, Plaintiff filed a 3 count complaint with this court along with a motion for a temporary restraining order seeking to halt the sale of her home at foreclosure. Count I addressed the unconstitutional judicial taking of her Florida residence which she purchased completely with her own funds, her interest in her father's Vero Beach homestead which she acquired by operation of Florida state law, § 732.401(1), at the time of her father's death in 1998[1] and her one-third interest

---

[1]  The title to her father's residence had been conveyed to his trust, but the applicable Florida case law rendered the fact that his homestead was titled in the name of a revocable trust irrelevant to its status as homestead property which descended by operation of law, § 732.401(1), Florida Statutes, to Mr. Stuart's three descendants *per stirpes* at the moment of his death. *Aronson v. Aronson,* 81 So.3d 515, 519 (Fla. 3d DCA 2012). Its homestead character was

in her parents' personal property which she acquired by inheritance pursuant to the wills of her parents, J. Raymond and Marion C. Stuart. Count II alleged violations of the Takings Clause of the 5th Amendment and the violation of Plaintiff's rights to due process of law in a second case brought against Plaintiff by the Tennis Townhouses Condominium Association, Inc. without complying with the conditions precedent to such a lawsuit contained in its Declaration of Condominium and by-laws. The trial judge in Indian River County was the same one who presided over the case described in Count I. That case was ongoing at the time that the federal complaint was filed and is currently on appeal to the Fourth District Court of Appeal in docket nos. 4D18-1904 and 4D18-2500 alleging that the trial court should have recused itself after plaintiff filed a motion to disqualify the trial judge, that the trial court ignored her evidence of the failure of the condominium association to comply with its own governing documents which made the collection action *ultra vires*, and challenging irregularities in the foreclosure sale. Count III, based upon diversity of citizenship between and among Pamela Stuart (who resided in Florida and DC) and her sister Catherine (a resident of New Jersey) and Deborah Stuart (a resident of Washington State) sought a declaration of rights in the homestead of J. Raymond Stuart and the personal property of Pamela Stuart's parents based upon applicable Florida law in order to quiet title, and an order for their partition and sale. The trustee of the J. Raymond Stuart trust which had no ownership rights in the property after Mr. Stuart's death in 1998 improperly deeded the property to Catherine Ryan and Deborah Stuart in a "trustee's deed" dated February 13, 2017. Purportedly for the sum of $275,000, Deborah Stuart provided a quitclaim deed to Catherine Ryan of her ownership interest in the former homestead of J. Raymond Stuart

---

established at death and protected the shares inherited by his heirs. *Engelke v. Estate of Engelke,* 921 So.2d 693, 697 (Fla. 4th DCA 2006).

dated January 20, 2018.   Thus, Edward Ryan's quest to defame Plaintiff and illegally acquire the fruits of her professional labors over a career spanning nearly 50 years was complete.

Pamela Stuart's property rights were unconstitutionally taken in violation of the 5th and 14th Amendments when Florida state courts ignored the applicable Florida law which required proof that Plaintiff acquired these properties by unjust enrichment or wrongful conduct and awarded those properties to her sisters in a case litigated in the Circuit Court of Indian River County against Plaintiff in her individual capacity and as trustee of the J. Raymond Stuart trusts. *Ryan v. Stuart, et. al.,* case no. 31-2013CA-001523. The cause of action for a judicial taking arises out of the Takings Clause of the 5th Amendment which makes it unconstitutional for a government to take a property from a private owner for another private owner without just compensation.   *Stop the Beach Renourishment v. Florida Department of Environmental Protection,* 560 U.S. 702, 713-715 (2010).

The complaint filed against Pamela Stuart in the case in Indian River County Circuit Court sought plaintiff's removal as trustee, an accounting, damages for alleged conversion and injunctive relief.   The complaint in that matter is attached as exhibit A.   Plaintiff was  not given the Constitutionally required notice that her ownership of her Florida home, her father's homestead or her parents' personal property was at issue in the case because they were not listed in the complaint as special damages as required by Florida Rule of Civil Procedure 1.120(g).  That failure to mention her home, her father's homestead and her parents' personal property meant that the Circuit Court had no subject matter jurisdiction over those properties according to well-established Florida law. *Lovett v. Lovett*, 93 Fla. 611, 112 So. 768, 775-76 (1927);  *In re Estate of Hatcher*,439 So.2d 977, 980 (Fla. 3d DCA 1983)(" Subject matter jurisdiction--the power of the court to adjudicate the class of cases to which the particular case belongs--is inchoate; the jurisdiction and power of a court

7

remain at rest until called into action by some suitor. The action of the court must be called into exercise by pleading and process."). Despite this lack of subject matter jurisdiction over the properties and the lack of notice that they were at issue in the case which rendered any subsequent order concerning them void, *Renovaship, Inc. v. Quatremain*, 208 So. 3d 280 (Fla.3d DCA 2016)*, citing Curbelo v. Ullman*, 571 So.2d 443 (Fla. 1990), the trial court imposed an equitable lien upon plaintiff's homestead, her interest in her father's homestead, and her interest in her parents' personal property in favor of Dr. Ryan and Deborah Stuart because the state trial judge thought it "appropriate." The state trial judge erroneously deemed plaintiff's conduct in connection with the trust "reprehensible." The trial judge's finding of reprehensible conduct from breaches of trust violated the standards set for such a finding by the US Supreme Court in *State Farm Mutual Auto Ins. Co. v. Campbell,* 538 U.S. 408, 419 (2003) and the Florida Supreme Court in *Schoeff v. R.J. Reynolds Tobacco Co.*, 232 So. 3d 294, 307 (Fla. 2017). Those precedents require a finding of both economic and physical harm flowing from conduct before it may be deemed "reprehensible." Notably, only one Florida case has found in dicta that a breach of fiduciary duty may be the basis for imposition of a constructive trust or equitable lien on a homestead property based upon a California court's decision. *Hirchert Family Trust v. Hirchert*, 65 So.3d 548 (Fla. 5th DCA 2011). This decision cannot be characterized as established Florida property law. There was no evidence in the case of *Ryan v. Stuart* any physical harm perpetrated by Pamela Stuart acting as trustee who was merely trying to take care of her elderly mother and administer the trust assets. The judge made the finding that plaintiff's conduct in administering the trust was "reprehensible" to support a finding that an equitable lien could be imposed upon Plaintiff's homestead claims under *Partridge v. Partridge,* 790 So.2d 1280, 1283 (Fla. 4th DCA 2001). The Fourth District Court of Appeals rejected

8

that analysis in *Stuart v. Ryan*, 232 So.3d 418 (Fla. 2017), *cert. den.*, docket no. 18-328 (Fla. April

9, 2018), finding that only the exceptions expressly set forth in Article 10, § 4 could prevent

protections of homestead forced sales, but the Fourth DCA upheld the ruling that Plaintiff was not

a permanent resident of Florida (and thus was not entitled to Constitutional homestead protection).

The Fourth DCA pointed to a purported statement of Ms. Stuart's intentions that she never said and

which appeared nowhere in the record on appeal, a statement that echoed a factual error in the trial

court's ruling about the number of days Ms. Stuart spent in Florida (the evidence was actually the

number of days she spent on trust administration activities in Florida), the fact that Ms. Stuart

claimed homestead interests in both her own home and that of her father,[2] as well as plaintiff's

reverse mortgage on her DC residence as the basis for its reasoning.  The Fourth DCA's reasoning

ignored the established Florida property law of what is a permanent resident entitled to homestead

protection[3] and how a person evidences domicile which Ms. Stuart had followed.  To arrive at its

erroneous conclusion, the Fourth DCA had to erroneously weigh Plaintiff's 17 year residency in the

state, the lack of evidence that she was abandoning her Florida residence, her statements under oath

in her Declaration of Domicile filed pursuant to § 222.17, Florida Statutes, and her Notice of

Homestead filed pursuant to § 222.01, Florida Statutes, her membership in the Florida Bar since

1994, her office in Vero Beach, her involvement in civic activities including Riverside Theater, the

---

[2]  The 4th DCA evidently did not recognize that one person may have both a personal homestead and an inherited interest in the homestead of a parent at the same time.

[3]  *Garcia v. Andonie*, 101 So.3d 339 (Fla.  2012), citing *Matter of Cooke,* 412 So.2d 340, 341 (Fla. 1982)( "[W]e hold that although it is not necessary that the head of the family reside in the state or intend to make the property in question his permanent residence, he must establish that he intended to make this property his family's permanent residence.") Durational residency requirements for domicile or eligibility to vote are unconstitutional in Florida.  *Ostendorf v. Turner,*

9

Vero Beach Museum of Art, the Community Church of Vero Beach, and the John's Island Community Service League. Thus, the Fourth District Court of Appeals found she was not entitled to the homestead protection afforded to homestead owners and heirs by Article 10, § 4 of the Florida Constitution. The October 21, 2016 ruling by the trial court was riddled with factual and legal errors but was nevertheless upheld by the Fourth District Court of Appeals based upon a reverse mortgage that plaintiff held on her unrelated residence in Washington, DC that had a residency requirement under the Federal Housing Act regulations applicable to such mortgages available to elderly homeowners. Notably, Article 10, § 4 of the Florida Constitution provides protection against forced sale of a homestead property except when a mortgage is an "obligations contracted for the purchase, improvement or repair" of the Florida homestead. § 196.015, Florida Statutes, makes the determination of permanent residency a factual determination by property appraiser in the first instance. It says: Intention to establish a permanent residence in this state is a factual determination to be made, in the first instance, by the property appraiser. Although any one factor is not conclusive of the establishment or nonestablishment of permanent residence, the following are relevant factors that may be considered by the property appraiser in making his or her determination as to the intent of a person claiming a homestead exemption to establish a permanent residence in this state under § 196.015, Florida Statutes:

(1) A formal declaration of domicile by the applicant recorded in the public records of the county in which the exemption is being sought.

(2) Evidence of the location where the applicant's dependent children are registered for school.

(3) The place of employment of the applicant.

10

(4) The previous permanent residency by the applicant in a state other than Florida or in another country and the date non-Florida residency was terminated.

(5) Proof of voter registration in this state with the voter information card address of the applicant, or other official correspondence from the supervisor of elections providing proof of voter registration, matching the address of the physical location where the exemption is being sought.

(6) A valid Florida driver license issued under s. 322.18 or a valid Florida identification card issued under s. 322.051 and evidence of relinquishment of driver licenses from any other states.

(7) Issuance of a Florida license tag on any motor vehicle owned by the applicant.

(8) The address as listed on federal income tax returns filed by the applicant.

(9) The location where the applicant's bank statements and checking accounts are registered.

(10) Proof of payment for utilities at the property for which permanent residency is being claimed.

As of the time of the hearings held by the trial judge in *Ryan v. Stuart* in the spring of 2016, Pamela Stuart had filed a Declaration of her Florida domicile under oath with the Circuit Court, had no dependent children (she has never married), had an office in Vero Beach for her solo law practice that had been in existence since 2006, had a permanent residence in Vero Beach that had an approved homestead tax exemption that she had owned and resided in since 2000 ( R. 3046), had proof of her  voter registration in Florida in 2004 ( R. 3034) and testified that she had voted and volunteered as a voter protection attorney in every federal election since 2004, had a valid Florida driver's license ( R. 3042) and registration ( R. 3044) for her vehicle, had not listed DC as her residence on a tax return since 2004 or 2005,  had bank accounts at Northern Trust in Vero Beach (as well as with Eagle Bank of Maryland) and paid utilities for over sixteen years to the City of Vero

11

Beach.   Nevertheless, the trial court and the appellate court found that Pamela Stuart's principal

residence (note, that is not the legal standard for homestead protection) was in D.C.

Judge Middlebrooks denied Plaintiff's motion for a TRO against the foreclosure sale of her

home on June 26, 2018, on the grounds that the trial court's ruling on domicile was an application

of existing law unfavorable to plaintiff.   Since there was no opportunity for oral argument on the

motion, Plaintiff was unable to explain to Judge Middlebrooks that the finding by the trial judge that

a DC reverse mortgage could not be the basis for an exception to homestead protection under the

Florida Constitution as established by the applicable cases such as  *Butterworth v. Caggiano*, 605

So. 2d 56, 60 (Fla. 1992) -- "a homestead is only subject to forced sale for (1) the payment of taxes

and assessments thereon; (2) obligations contracted for the purchase, improvement or repair thereof;

or (3) obligations contracted for house, field or other labor performed on the realty.";  *Chames v.*

*DeMayo,* 972 So.2d 850 (Fla. 2007)(homeowner cannot waive the exemption in unrelated, unsecured

promissory note as waiver is against public policy); and  *Havoco of Am., Ltd. v. Hill*, 790 So. 2d

1018, 1021 n.5 (Fla. 2001) (This provision [Art. 10, § 4 of the Florida Constitution] is liberally

construed; "the Florida constitutional exemption of homesteads protects the homestead against every

type of claim and judgment except those specifically mentioned in the constitutional provision

itself[.]").  A durational residency requirement for domicile is unconstitutional under both Florida

precedents and US Supreme Court precedents. *Ostendorf v. Turner,* 426 So.2d 539 (Fla. 1982),

*citing Sparkman v. State ex rel. Scott,* 58 So.2d 431 (Fla. 1952); *L'Engle v. Forbes*, 81 So.2d 214,

215-16 (Fla. 1955)(continuous residency not required for permanent residency). *Dunn v. Blumstein,*

405 U.S. 330 (1972).

**Jurisdiction**

In this case, Plaintiff seeks both legal and equitable relief from this court pursuant to her complaint for a declaratory judgment and for relief from Constitutional violations by the individual defendants and the state courts of Florida acting as agents of the State of Florida.   The action was brought pursuant to 42 U.S.C. § 1983 which authorizes a suit **in equity** to address deprivations of rights under color of state law secured by the Constitution.   It was also brought pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 which authorizes the federal courts to declare the rights and legal relations of any interested party.   Plaintiff will comment on each of the paragraphs of the Magistrate's report as follows:

In Paragraph 3 of the Report and Recommendations (hereinafter "Report"), the Magistrate discusses jurisdiction and venue.   "Federal courts have limited subject matter jurisdiction, or in other words, they have the power to decide only certain types of cases." *Morrison v. Allstate Indem. Co.*, 228 F.3d 1255, 1260-61 (11th Cir. 2000) (citing *University of South Alabama v. American Tobacco Co.*, 168 F.3d 405, 409-10 (11th Cir. 1999)). Lower federal courts can exercise this power only over cases for which there has been a congressional grant of jurisdiction, see *id.*, "[a]nd because the Constitution unambiguously confers this jurisdictional power to the sound discretion of Congress, federal courts should proceed with caution in construing constitutional and statutory provisions dealing with [their] jurisdiction." *University of South Alabama,* 168 F.3d at 409 cited in  *Smith v. GTE Corporation*, 236 F.3d 1292 (11th Cir. 2001).   There are two statutory bases for federal subject matter jurisdiction. First, diversity jurisdiction is governed by 28 U.S.C. § 1332(a)(1), which provides that "district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds . $75,000 and is between citizens of different states." Second, under 28 U.S.C.

13

§ 1331, federal district courts "have original jurisdiction of all civil actions arising under the Constitution, laws or treaties of the United States," or federal question jurisdiction. In addition, if the court has federal question or diversity jurisdiction over some claims, it may exercise supplemental jurisdiction over state law claims.  28 U.S.C. § 1367.   A court lacking jurisdiction must dismiss the case, regardless of the stage of the proceeding, when it becomes apparent that jurisdiction is lacking.    The party who seeks to invoke federal jurisdiction bears the burden of establishing that such jurisdiction is proper.

In this case, Plaintiff's claims are founded squarely upon the United States Constitution in that she alleges that property that she bought and paid for or inherited by operation of law or by the wills of her parents has been taken by the state courts of Florida acting contrary to established Florida property and procedural law in violation of the Takings Clause of the 5th Amendment to the Constitution as applied to the states by the 14th Amendment.  She further alleges that the takings occurred without due process of law.    In fact, the actions of the state courts may amount to an unreasonable seizure in violation of the 4th Amendment's prohibition, ""The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."[4]   A seizure of property occurs where there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). Fourth Amendment protection extends beyond the criminal realm to civil and administrative seizures. *Lenz v. Winburn*, 51 F.3d 1540 (11th Cir., 1995) Lenz v. Winburn, 51 F.3d 1540 (11th Cir. 1995).  The Supreme Court has emphasized

---

[4]   Plaintiff did not allege violations of the Fourth Amendment in her complaint but if the Court grants leave to amend her complaint, she will include such allegations which, upon reflection, appear to be "spot on" for what transpired in this case.

that, "at the very core" of the Fourth Amendment "stands the right of a man to retreat into his own home." *Soldal v. Cook County, Illinois*, 506 U.S. 56, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992). As the high Court said in Soldal which involved an eviction from a mobile home, "We fail to see how being unceremoniously dispossessed of one's home in the manner alleged to have occurred here can be viewed as anything but a seizure invoking the protection of the Fourth Amendment. Whether the Amendment was in fact violated is, of course, a different question that requires determining if the seizure was reasonable." *Soldal v. Cook County, Illinois,* 506 U.S. 56. In this case it is alleged that the state judges in question acted beyond the scope of their authority in ordering the dispossession of Plaintiff from her permanent home and its distribution to her two sisters who failed to allege that they were damaged by and Plaintiff unjustly enriched by her ownership of her home in Florida. Thus, the state court illegally seized and distributed Plaintiff's property without a foundation in the established property law of the State of Florida in violation of the 4th, 5th and 14th Amendments. Because they acted outside of the scope of their authority, no qualified immunity would exist for such actions.

Jurisdiction for Counts I and II of Plaintiff's federal complaint was founded upon federal questions presented, 28 U.S.C. § 1331. Diversity jurisdiction under 28 U.S.C. § 1332 is the asserted jurisdictional basis for Count III. At the time of filing, plaintiff was a resident of Florida and the District of Columbia but domiciled in Florida. Because the state court illegally took her residence in Florida, she is presently a resident in the District of Columbia only so complete diversity exists with her sisters who are the defendants in Count III. The All Writs Act, 28 U.S.C. § 1651 may be applicable here as well and Plaintiff seeks leave to amend her complaint to add it as a basis.

In Paragraph 4, the Magistrate notes that this Court may take judicial notice of documents

15

in the state court case files, but makes the assertion which Plaintiff believes to be erroneous that "the documents control when they conflict with what the Plaintiff pleads." Plaintiff agrees and that this Court may take judicial notice of the documents filed in the state cases in the Circuit Court for Indian River County which are documents on the public record. However, while it is generally acceptable to take judicial notice that a document was filed in a court action, it would be improper for this Court to take judicial notice assuming the truth of the contents of the document filed in the court action – such as facts found by the state court judge – because the facts found cannot be considered as beyond "reasonable dispute."

Federal Rule of Evidence 201 governs judicial notice and covers only adjudicative facts, not legislative facts. *United States v. Chapman,* case no. No. 15-15686, (11th Cir., 2017). A court's order in an earlier case which is a judicial act, may be the subject of judicial notice (that the order was entered and a particular ruling made) but judicial findings of fact in a previous case are not admissible under Federal Rule of Evidence 803(8) ) (the public records exception to the hearsay rule) or the proper subject of judicial notice. *Guice v. Postmaster General,* No. 18-10290 (11th Cir. December 13, 2018), citing *United States v. Jones,* 29 F.3d 1549, 1554 (11th Cir. 1994). Thus this Court may not judicially notice the orders entered in the state case at issue here as establishing "the truth of the matters asserted in the other litigation." *Id*

In Paragraph 5, the Report takes the position that the Court may consider matters outside the pleadings with respect to the issue of subject matter jurisdiction. According to *Williamson v. Tucker*, 645 F.2d 404, 412 (5th Cir.1981), cited in *McElmurray v. Consolidated Gov't, Augusta-Richmond*, 501 F.3d 1244 (11th Cir., 2007), a motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R.Civ.P. 12(b)(1) can be based upon either a facial or factual challenge to the complaint. If

the challenge is facial, "the plaintiff is left with safeguards similar to those retained when a Rule 12(b)(6) motion to dismiss for failure to state a claim is raised." *Id.* Accordingly, "the court must consider the allegations in the plaintiff's complaint as true." *Id.* A "facial attack" on the complaint "require[s] the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion." *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir.1990) (quoting *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir.1980)). "'Factual attacks,' on the other hand, challenge `the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits are considered.'" *Id.* Furthermore, in *Williamson*, the former Fifth Circuit held that "[t]he district court has the power to dismiss for lack of subject matter jurisdiction on any of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Williamson*, 645 F.2d at 413. In this case, the defendant make factual attacks on jurisdiction as more fully set forth below.

In Paragraph 6 of the Report, the Magistrate says that "At Page 11 of DE 46, the Plaintiff argues that the trust obtained only a 'nominal' title to the house [her father's homestead at 101 South Catalina Court, Vero Beach], with her and her sisters obtaining a joint tenancy property right to the house upon the father's passing. The father passed away in 1998. The mother received a life estate property interest in the Catalina Court home." It is critical that the Court understand what actually happened here as seen through the lens of the truly applicable Florida law which the state courts ignored or misunderstood and illegally ordered that ownership of her father's homestead to be distributed to Plaintiffs' two sisters with Plaintiff excluded. Because Plaintiff's interest in the

17

homestead of her father arose because of his death and by operation of Florida Statutes and the Florida Constitution, the state court could not place a lien against her interest in it because she acquired the interest without any wrongdoing on her part. *See Palm Beach Savings & Loan Association v. Fishbein,* 619 So.2d 267 (Fla. 1993)(equitable lien may be imposed on homestead interest only if there was fraud, egregious conduct or unjust enrichment).

Article X, § 4 of the Florida Constitution defines protections for homesteads and sets forth the circumstances that limits the rights of creditors, the extension of these Constitutional protections to the homestead owner's heirs, and limitations upon a homestead owner's ability to devise the property freely upon death.  It reads as follows:

Article 10, SECTION 4. Homestead; exemptions.—

(a) There shall be exempt from forced sale under process of any court, and no judgment, decree or execution shall be a lien thereon, except for the payment of taxes and assessments thereon, obligations contracted for the purchase, improvement or repair thereof, or obligations contracted for house, field or other labor performed on the realty, the following property owned by a natural person:

(1) a homestead, if located outside a municipality, to the extent of one hundred sixty acres of contiguous land and improvements thereon, which shall not be reduced without the owner's consent by reason of subsequent inclusion in a municipality; or if located within a municipality, to the extent of one-half acre of contiguous land, upon which the exemption shall be limited to the residence of the owner or the owner's family;

(2) personal property to the value of one thousand dollars.

(b) These exemptions shall inure to the surviving spouse or heirs of the owner.

(c) The homestead shall not be subject to devise if the owner is survived by spouse or minor

18

child, except the homestead may be devised to the owner's spouse if there be no minor child. The owner of homestead real estate, joined by the spouse if married, may alienate the homestead by mortgage, sale or gift and, if married, may by deed transfer the title to an estate by the entirety with the spouse. If the owner or spouse is incompetent, the method of alienation or encumbrance shall be as provided by law.

J. Raymond and Marion Stuart did their estate planning in 1990. Subsequently, on January 12, 1992, they deeded the house they jointly owned at 101 South Catalina Court in Vero Beach to J. Raymond Stuart as an individual. Mrs. Stuart did not retain any rights in the property. Two days later, Mr. Stuart deeded the property to the J. Raymond Stuart Trust. Both deeds are public record documents in Indian River County, are part of the state court record, and copies are attached as Exhibit 1. When Plaintiff took responsibility for the trust and the father's homestead upon his death, she saw no reason to investigate or quiet its legal title to the residence that was unquestionably her father's homestead at the time of his death. No formal order was necessary to pass title upon Mr. Stuart's death so there was no reason to expend money on a legal proceeding. *See, In re Estate of Hamel v. Parker,* 821 So.2d 1276, 1280 (Fla. 2d DCA 2002)(proceedings to determine whether a property is homestead are permissive, not required). Florida courts have continued to hold that homestead does not become part of the probate estate unless a testamentary disposition is permitted and is made to someone other than an heir, i.e., a person to whom the benefit of homestead protection could not inure. *Id.,* 821 So.2d at 1279. Plaintiff managed the maintenance of her father's homestead for the benefit of her mother during her life tenancy and paid the costs of it out of the assets of her father's trust.

In the first case that the Florida Supreme Court considered this issue when a homeowner has

19

conveyed a homestead to a trust and how ownership of it is to be transferred upon death, *Johns v. Bowden*, 68 Fla. 32, 66 So. 155 (2014), discussed extensively by Mr. Kelley at his lecture,  the court said:

> The conveyance alleged to have been made by Uriah Bowden to V. W. Shields as trustee carried if anything the bare legal title to the trustee, subject to the grantor's right during his lifetime to direct a conveyance of the title and the entire benificial interest to others at his pleasure, as well as subject to ultimate disposition as directed by the trust deed made to the trustee. The interest attempted to be conveyed was not a vested right in the property to any of the beneficiaries named in the trust deed, but a contingent interest subject to the right of the grantor to direct a conveyance of the entire property to others at any time during the grantor's life. In effect the entire beneficial interest and right in the specific property remained in the grantor and could not pass at all, without his consent, till after his death, thus making the trust deed not an absolute conveyance of a vested right *in presenti,* of the property alleged to be a homestead. [citations omitted]. Because of the retention of the entire beneficial estate in the grantor during his life, the instrument in practical effect, is in the nature of a testamentary disposition of property alleged to be a homestead, and a testamentary disposition of homestead property is forbidden by law when the testator leaves a wife or a child.  If the property was and continued to be in fact and in law a homestead, the alleged trust deed not being an absolute conveyance of any vested estate in the land to take effect during the grantor's life time, is apparently ineffectual for the purpose designed.

Thereafter, in a similar situation where a homeowner conveyed title to his homestead to a trust and thereafter title to himself as trustee via a quitclaim deed, the Fourth District Court of Appeal of the State of Florida said, relying on the reasoning of *Johns v. Bowden,* that "We believe the interpretation placed upon the 1885 Constitution of the *Johns* court applies with equal force today and operates to prevent the attempted devise by trust at issue here.  The homestead provisions of the 1968 [Florida] Constitution are not materially different from those of the 1885 Constitution." *In re Estate of Johnson,* 397 So.2d 970, 972-973 (Fla. 4th DCA 1981).

In *Engelke v. Estate of Engelke,* 921 So.2d 693 (Fla. 4th DCA 2006), the personal representative of the estate sought to compel the trustee to convey property from the trust to the estate to pay creditors.  The trustee objected on the grounds that he could not be ordered to pay

claims over and above the liquid assets of the trust because the residence at issue was a homestead property covered by the homestead protections of Article 10, § 4 of the Florida Constitution and could not be used to pay the debts of the estate. The Fourth District Court of Appeals agreed ruling that because the decedent retained control over the homestead during his lifetime and did not convey a vested property interest (one that was not revocable) to the trust that the decedent's homestead could be devised or alienated only in accordance with the Florida Constitution. The decedent's homestead interest was protected from creditors while he was alive and his heirs who inherited the property could claim the exemption for themselves under Article 10, § 4(b) of the Florida Constitution even though they had only a remainder interest in the property. As the Supreme Court of Florida stated in 1890:

> That property which creditors could not take from the head of the family when he was living they cannot take from his heirs after his death. This is what the constitution plainly said to anyone who might become a creditor....Whatever interest of the ancestor was in the land, it descends to and vests in the heir, whether it be a term of years, a fee simple, or other estate extending beyond the life of the ancestor.

*Miller v. Finnegan,* 7 So. 140, 142 (Fla. 1890). *Accord, Engelke v. Estate of Engelke,* 921 So.2d at 697. *See also, JBK Associates, Inc. v. Sill Bros. Inc.*, 191 So.3d 879 (Fla. 2016)(proceeds from sale of homestead interest held in investment account for reinvestment in a new homestead held exempt from creditors' claims). The court in *Engelke* said, "Because Paul retained a right of revocation [in the trust], he was free to revoke the trust at any point in time. Accordingly, he maintained an ownership interest in his residence, even though the trust held title to his property. We therefore conclude that Paul's interest in his residence as beneficiary of his own revocable trust would entitle him to Constitutional homestead protections." *Engelke v. Estate of Engelke,* 921 So.2d at 696. The *Engelke* court relied upon its own decision in *Hubert v. Hubert,* 622 So.2d 1049 (Fla.

4th DCA 1993) in which the court held that the decedent's homestead exemption inured to his sons who had a remainder interest where he devised a life estate (which could be reached by creditors). to a "good friend."

In *Aronson v. Aronson*, 81 So.3d 515 (Fla. 3d DCA 2012), the decedent owned a condominium and conveyed it to a revocable trust while he was married. He and his wife were residing in the condominium when he died and it was indisputably his homestead at that time. Because he was survived by a spouse, said the court, the condominium's disposition was not governed by the trust. Instead, it passed outside of probate at the moment of death to the widow for life and thereafter to his surviving sons *per stirpes*, pursuant to § 732.401(1), Florida Statutes. From the moment of death of the homestead owner, the trustees had no power over the homestead. Article 10, § 4( c) of the Florida Constitution provides that "the homestead shall not be subject to devise if the owner is survived by a spouse or a minor child." The Florida legislature has made clear that this provision of the Constitution is to be applied whether the property is held in a testamentary trust or there is a testamentary bequest. § 732.4015(2), Florida Statutes,[5] *Cutler v. Cutler,* 941 So.2d 341, 343 (Fla. 3d DCA 2008). § 732.401(1) provides:

Descent of homestead.—

_____

[5] 732.4015 Devise of homestead.—
(1) As provided by the Florida Constitution, the homestead shall not be subject to devise if the owner is survived by a spouse or a minor child or minor children, except that the homestead may be devised to the owner's spouse if there is no minor child or minor children.
(2) For the purposes of subsection (1), the term:
(a) "Owner" includes the grantor of a trust described in s. 733.707(3) that is evidenced by a written instrument which is in existence at the time of the grantor's death as if the interest held in trust was owned by the grantor.
(b) "Devise" includes a disposition by trust of that portion of the trust estate which, if titled in the name of the grantor of the trust, would be the grantor's homestead.

22

(1) If not devised as authorized by law and the constitution, the homestead shall descend in the same manner as other intestate property; but if the decedent is survived by a spouse and one or more descendants, the surviving spouse shall take a life estate in the homestead, with a vested remainder to the descendants in being at the time of the decedent's death per stirpes. Thus, said the court in *Aronson,* because the condominium was the decedent's homestead and he was survived by a spouse, the property was not subject to disposition through the trust. At the moment of the decedent's death, the property passed outside of probate to his wife for life and thereafter to his sons *per stirpes.* From that moment forward, the trustees had no power or authority with respect to the former marital home. *Aronson v. Aronson,* 81 So.3d at 519.

The state trial court, in discussing the J. Raymond Stuart homestead at 101 South Catalina Court noted that the successor trustee (who was not a lawyer) took the position that the home is a trust asset and that it was appraised at $550,000 on November 30, 2015. The state trial court also stated that Pamela Stuart "made no claim that the property was homestead at the time of his [Mr. Stuart's] death, but changed position after the litigation began. Order on Final Plan of Distribution at p. 20. This order appears at DE #24-1.

At this juncture, Plaintiff wishes the Court to understand that she was highly prejudiced by the fact that Catherine Ryan and Deborah Stuart's complaint in the state court case did not list Pamela Stuart's interest in her father's homestead property (or any property owned by Pamela Stuart) as special damages as required by Florida Rule of Civil Procedure 1.120(g). Because she had no notice that her one-third interest in her father's homestead was at risk, she had no reason to explain the basis for her view about whether her father's homestead was an asset of the trust other than that is what the law says. The trial court, however, noted her change in position "after this litigation

23

began" as it that were something nefarious.   It was not.   Plaintiff learned during a lecture given on

October 9, 2015 at a CLE course , "The Probate Team 2015" put on by the Florida Legal Education

Association ("FLEA") that the applicable Florida law treats a conveyance of a homestead to a trust

as ineffectual to pass title and treats the homestead property as one that passes by operation of law

upon death of the homestead's owner according to the intestacy statute outside of probate and

outside the trust pursuant to § 732.401(1), Florida Statutes.   Plaintiff has attached a copy of the

materials from the lecture by attorney Shane Kelley, Esq. on the topic of "Homesteads and Trusts"

containing Plaintiff's handwritten notes taken at the lecture which illustrate that proposition which,

at the time was news to Plaintiff as Exhibit 2.    Thereafter, having been educated about this issue,

Plaintiff took the position that her father's homestead was not a trust asset, was not subject to

probate, and  descended by operation of law to the three sisters, *per stirpes,* with a life estate to

Marion Stuart.   There was nothing nefarious about Plaintiff's change of position in this respect.

   The state trial court apparently thought that she changed her position as a matter of

convenience in the litigation.   In its ruling, the trial court said,  "Although her position [that her

interest in her father's homestead was not a trust asset and descended to her by operation of law

protected from creditors] is supported by the law, the constitutional exemption on homestead

property is not absolute." Order on Final Distribution at p. 21.   It then quoted *dicta* in *Partridge v.*

*Partridge,* 790 So.2d 1280, 1283 (Fla. 4th DCA 2001)  which said that an equitable lien can be

imposed against homestead property "where a plaintiff can establish fraud or "reprehensible

conduct" on the part of the beneficiary of the constitutional protection."  Notably the *Partridge* case

involved conduct by a former husband who was attempted to use the homestead exemption to escape

his child support obligations and did it in a way that the Florida Supreme Court later said, that his

contemptuous conduct using the homestead as a weapon against those persons sought to be protected by the homestead exemption statute was the functional equivalent of fraud and reprehensible conduct justifying foreclosure of the lien. *Partridge v. Partridge*, 912 So.2d 649, 650 (Fla. 2005).

The language quoted by the state trial court from the earlier *Partridge* case came from a 1987 First District Court of Appeals case that pre-dated the seminal case of *Palm Beach Savings & Loan Association, F.S.A. v. Fishbein,* 619 So.2d 267, 270 (Fla. 1993). *Fishbein* was cited in *Stuart v. Ryan*, 232 So.3d 418 (Fla. 4th DCA 2017) for the proposition that only the exemptions to homestead protection specifically stated in the Florida Constitution can be applied to justify an exemption from homestead protection. The *Fishbein* case also made clear that the litigant seeking to avoid the homestead protection afforded by the Florida Constitution must show that the opponent was unjustly enriched by some wrongful conduct involving the use of ill-gotten gains for the acquisition, maintenance or repair of the homestead property. In this case there was NO EVIDENCE showing that Plaintiff acquired her interest in her father's homestead by any wrongful conduct on her part. Most litigators would seek to prove such a proposition with expert testimony from a forensic accountant. Nothing of the sort was made available to the trial court. Rather, the evidence showed that Plaintiff acquired it the old-fashioned way – and the same way her sisters acquired their interests in it – their father died. § 732.401(1) provided the law governing the descent of this property after Mr. Stuart's death and Article X, § 4(b) provides for its protection when it descends from creditors.

Despite the applicable Florida law, the state trial court said, "In this case, Pamela Stuart seeks the protection of the homestead exemption against her sisters' claims arising from her 'reprehensible conduct' as trustee of their father's Trust as described above. . .Given the circumstances (the

excessive borrowing from J. Raymond Stuart's trust by Plaintiff), the court finds that it is entirely appropriate to impose an equitable lien against Pamela Stuart's interest in the 101 South Catalina Court homestead residence so that the her (sic) interest in the value of this property can be used to reduce the obligation she owes under the unsecured note." Order on Final Plan of Distribution at pp. 21-22. This ruling changed the clearly established Florida property law or the application of it. *In re Johnson,* 336 B.R. 468, 572 (Bankr. S.D. Fla. 2006)("It is now clearly established that the imposition of an equitable lien against homestead property is limited to those circumstances wherein the owner of the property has acquired proceeds by fraud or reprehensible conduct to either invest in, purchase, or improve the homestead.")(citing *Havoco of America, Ltd. v. Hill*, 790 So.2d 1018, 1028 (Fla. 2001)).

By terming Plaintiff's conduct "reprehensible," the trial court also violated the applicable law on what constitutes "reprehensible" conduct. Both the U.S. Supreme Court and the Florida Supreme Court have found that to establish "reprehensibility" (wrongful conduct sufficiently bad to support punitive damages), there must be both an element of physical as well as economic harm. *State Farm Mutual Auto Ins. Co. v. Campbell,* 538 U.S. 408, 419 (2003)(We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident);  *Schoeff v. R. J. Reynolds Tobacco Co.,* 232 So.3d 294, 306-307 (Fla. 2017)(The harm in this case was both physical and economic, done with reckless disregard for the health or safety of others, involved repeated actions, and was the result of intentional deceit).  Only

26

one Florida case has said that breach of fiduciary duty may constitute conduct supporting imposition of an equitable lien but that case did so based upon the use of proceeds of fraud to purchase the homestead at issue. *Hirchert Family Trust v. Hirchert*, 65 So.3d 548 (Fla. 5th DCA 2011).

The same analysis is applicable to Plaintiff's interest in her parents' personal property (furnishings, clothing, jewelry, and family recipes) which was never part of the subject matter of the state court case concerning the assets of the J. Raymond Stuart trust.   The personal property was never deeded to the J. Raymond Stuart trust which held only title to real estate in Garden City, New York that was sold in 2002, Mr. Stuart's homestead as discussed above, automobiles titled in the name of the trust, and assets in brokerage accounts at Smith Barney.  The personal property of Marion and J. Raymond Stuart was to be governed by their wills and handwritten instructions left by Marion Stuart.  The wills were included among the documents filed in the state court case and Mr. Stuart's will was filed and is a public record in the Circuit Court of Indian River County.[6] Plaintiff has attached as Exhibit 3 the wills of Marion and J. Raymond Stuart[7] as well as the deed conveying the assets of the brokerage account in January 1990 to the firm that was then called Shearson Lehman (Exhibit 4).  The 2012 appraisal of the personal property and Marion Stuart's handwritten notes indicating her wishes for distribution of her jewelry[8] and household items (to be

_____

[6] It was filed so that ownership of a Pontiac sedan garaged in Garden City, New York but registered and titled in Florida could be changed from J. Raymond Stuart, individually, to that of the trust so that the trustees could sell it.

[7] Mr. Stuart's will was filed in the records of the Circuit Court for Indian River County,

[8] Marion Stuart was fond of rings and several were held in a safe deposit box in Vero Beach.  Plaintiff gave the contents of the safe deposit box to the successor trustee for safekeeping and assumes that the successor trustee gave them to Catherine Ryan and Deborah Stuart, contrary to the wishes of Marion Stuart.

distributed evenly) are attached as Exhibit 5.

So, the state trial court in this case essentially changed Florida law and ordered that if a trustee borrows excessively from a family trust that any property interest that the trustee personally owns, no matter how acquired or whether or not it was acquired by means of ill-gotten gains, may be seized and converted to property of another for the purpose of paying down the debt even if it is against the demonstrable wishes of the decedent.  The court effectively changed the law so as to contravene Plaintiff's clearly established right to a homestead exemption for her one-third interest in her father's homestead and to Pamela Stuart's interest in one-third of her parents' personal property acquired by will.  This is the type of scenario contemplated in *Stop the Beach Renourishment v. Florida Department of Environmental Protection,* 560 U.S. 702, 733 (2010) as a judicial taking.  *See, Stuart v. Ryan,* 18-14244-Civ-Martinez/Maynard Order Denying Motion for Temporary Restraining Order (Middlebrooks, J.) at p. 2.

In Paragraph 9, the Magistrate finds that Plaintiff is not a "classic *pro se* plaintiff" whose pleadings are entitled to liberal construction because "she is an attorney with a wide breadth of professional experience" and remains "an officer of the court."  Plaintiff agrees with the Magistrate that the "recent suspensions of her law license" do not impair her respect for and desire for the benefit of the rule of law.  In essence, this entire case is founded upon a plea for the application of the rule of law grounded in the supremacy of authority of the United States Constitution over contrary pronouncements of, in this case, the state courts.

In Paragraph 10, the Magistrate asserted that Plaintiff became one of the trust's two trustees.

In fact, Pamela Stuart served as co-trustee[9] of the trust from its outset in 1990 and , upon the death of her father in January 1998, appointed her father's best friend, Lewis L. Smith, Jr. to serve as co-trustee.  The Magistrate also misunderstood what Plaintiff was asserting at page 6 of DE 46.  She did not as the Magistrate said, "deny having any experience whatsoever with probate law."  Rather, as she said in DE #46, prior to assuming active trustee duties with respect to her father's trust  on or about January 15, 1998, shortly before the death of the settlor, Plaintiff had never before administered an estate and, from time to time, sought the advice of outside counsel, Michael Stafford, Esq. as she carried out her responsibilities as administrator of her father's trust.  She particularly sought Mr. Stafford's advice in October 1998 (and for the first years of trust administration) when she was determining what compensation she was due to be paid as trustee under Florida law.  She joined the Executive Council of the Real Property, Probate and Trust Law Section ("RPPTL") of the Florida Bar in the fall of 1998, the same year her father died.  Membership on the Executive Council required the attendance at four day meetings six times annually that were held throughout the State of Florida.   Plaintiff appreciated the excellent legal education programs presented at RPPTL meetings, many of which assisted her in her service as trustee.[10]

In Paragraph 11, the Magistrate said that the trust required the service of an independent [non-family member] co-trustee.  Actually, the trust is somewhat ambiguous on that point.  A copy of the trust is attached as Exhibit 6 and appears many times among the records of the state courts that

---

[9] Her service from 1990 until her father's death was purely in name only as her father managed his own affairs up until a few days before his death on January 18, 1998.

[10] Indeed it is incredibly painful to Plaintiff that the many friends she had in the RPPTL section had to read about this case which was discussed at the annual update meeting and that her reputation has been ruined as a result of what the state court judges erroneously wrote about her.

considered this case.  **Article Twenty-First** of the trust provides for the Appointment of Successor Trustees, and Additional Trustees and Compensation of Trustees.  It reads as follows:

Vacancies in trusteeships shall be filled by such persons (including a corporate trustee) as the remaining trustees shall, by an instrument in writing, designate (and the remaining trustees shall determine the compensation to be paid to such person.

Normally, there shall be no more than two trustees in office at any one time. Notwithstanding the foregoing, as soon as the trustees have determined they will exercise their discretion under Article SECOND[11], but in any event, no later than the time when the trustees are holding the remaining principal and undistributed income under the provisions of Article FIFTH[12], at least one of the trustees then in office must be a person who is not eligible to receive any income or principal, either presently or in the future, (other than the compensation of a trustee) under the trust and whose spouse, issue, dependents and ancestors are not eligible to receive such benefits.  To the extent necessary to achieve the foregoing objective, but only to that extent, the remaining trustees shall, by an instrument in writing, designate a person (including a corporate trustee) to serve as an additional trustee.  A person is qualified to serve as an additional trustee if said person is not eligible to receive any benefits under the trust (other than the compensation of a trustee) and said person's spouse, issue, dependents, and ancestors are not eligible to receive such benefits.  A person who meets the qualifications of an additional trustee may be referred to herein as an independent

---

[11]  The discretion mentioned in Article Second was to be exercised when the settlor was deemed incapacitated.

[12]  Article FIFTH describes the actions to take place upon the death of the settlor if his spouse survived him.

trustee.  If a vacancy occurs and there are two remaining trustees in office, one of whom is an independent trustee, the vacancy shall not be filled.

**Article Thirty First** of the trust sets forth the authority of one trustee to act on behalf of the trust as follows:

> While the settlor is acting as a trustee, the settlor may act on behalf of the trust and issue instructions for the purchase, sale, transfer and/or delivery of securities or other assets to or from the trust account as if said instructions were issued by all of the trustees hereof and is authorized to execute any documents necessary and required to maintain any account on behalf of the trust.  In the event of the death or disability of the settlor, the other trustees may confer upon any other single trustee all of the aforementioned powers and authority.

Thus, according to Article Thirty First of the trust, a single trustee could be authorized to act on behalf of the trust at any time following the death of J. Raymond Stuart.  However, Article Twenty-First says that an independent trustee should be appointed after the death of the settlor.  The Florida Statutes provide in § 736.0704, that there is no requirement that a vacancy in a trustee position be filled.   In pertinent part, § 736.0704 reads as follows:

§736.0704 Vacancy in trusteeship; appointment of successor.—

> (2) If one or more cotrustees remain in office, a vacancy in a trusteeship need not be filled. A vacancy in a trusteeship must be filled if the trust has no remaining trustee. § 733.3101, Florida Statutes, provides that a personal representative who is unqualified has a duty to resign immediately.

In Paragraph 11, the Magistrate suggests that Plaintiff blamed the choice of Edward Ryan, who was her brother-in-law, as co-trustee on the advice of Michael Stafford.  This is not the case.

31

Plaintiff takes full responsibility for what turned out to be a very bad choice and merely noted that she consulted outside counsel at the time in order to make the decision with the benefit of his judgment and advice.  At the time, there was no discord in the family or any reason to think that bitter litigation would ensue.  So,  Mr. Stafford's comment that, despite the directive of the trust not to appoint family members as co-trustees that "no one will complain" seemed reasonable at the time. The Plaintiff at that time did not know anyone in Vero Beach who could be asked to serve as a co-trustee other than her parents' friends who were just as elderly as her parents.  She thought it would be helpful to have another trustee who was available to assist in Vero Beach.   The choice of Mr. Ryan seemed like a good idea at the time when her first choices were unavailable.

Several years later Plaintiff attended a continuing legal education lecture given by Jonathan Blattmachr, Esq., a nationally-known expert in trusts and estates who happens to be the son of friends of Plaintiff's parents who lived close by in Garden City, NY when plaintiff and her sisters were growing up.   Mr. Blattmachr, who attended the same high school as Plaintiff and whom she has known for many years, opined that the absolutely worst choice for a co-trustee of a family trust is another family member who is retired.   By then it was too late.  Plaintiff did consult Mr. Blattmachr from time to time during the course of trust administration but sadly failed to do so before she appointed Mr. Ryan.

The Magistrate commented on Plaintiff's withdrawals from the trust in Paragraph 11 as if to suggest that they were excessive or unauthorized.  They were not.  Not only the trust documents permitted withdrawals for trustee fees and expenses and attorneys' fees, but the Florida law provided authority for those withdrawals as well.

Procedural due process rights derive from a property interest in which the individual has a

legitimate claim. Once acquired, a property interest falls within the protections of procedural due process. A property interest may be created by statute, ordinance or contract, as well as policies and practices of an institution which support claims of entitlement. *Moser v. Barron Chase Securities, Inc.*, 783 So.2d 231, 236 (Fla.. 2001), citing *Metropolitan Dade County v. Sokolowski*, 439 So.2d 932, 934 (Fla. 3d DCA 1983).   The Florida Supreme Court has recognized that "[p]roperty rights are among the basic substantive rights expressly protected by the Florida Constitution." *Department of Law Enforce. v. Real Property*, 588 So.2d 957, 964 (Fla.1991), quoted in *Moser v. Barron Chase Securities, Inc.*, 783 So.2d 231, 236 n 5  (Fla.  2001).  The applicable Florida property law with respect to the determination of trustee and legal fees and expense reimbursements requires that an applicant be provided with due process standards necessary in safeguarding such a property right including  a "meaningful, full, and fair" hearing to the affected individual. *See Moser v. Barron Chase Securities, Inc.*, 783 So.2d 231, 236 (Fla.. 2001).  Plaintiff did not receive due process in this regard.   The state trial court relied upon the successor trustee who did not include any expense reimbursements or trustee fees in her accounting for the trust and decided in its Order on Final Distribution that it would not award Plaintiff any trustee fees, legal fees, or expense reimbursements for her sixteen years of service to the trust.  The expenses she was owed totaled $325,507.99 and a credit in that amount against the "loan" outstanding should have reduced that amount.

Plaintiff's withdrawals from the trust for fees and expenses in the years 1998 to early 2001 were done based upon the advice of Michael Stafford, Esq. and the accountant who assisted in the preparation of the estate tax returns for the trust, Greta Tosi-Miller, CPA.   Mr. Stafford provided advice in writing about how to apply the Florida law to arrive at appropriate fees initially in October 1998. A copy of his letter which is in the record of the state courts is attached as Exhibit 7.  A copy

33

of the letter Plaintiff sent to co-trustee Lewis L. Smith, Jr. at that time forwarding Mr. Stafford's

letter and discussing the advice to take fees is attached as Exhibit 8.

The initial valuation of the gross estate assets for the estate tax return filed in 1999 was

$2,766,033. The estate tax return, which was prepared by Mr. Stafford, in 1999 reflected a personal

representative's commission of $70,000 and attorneys' fees of $79,000. Both Mr. Stafford and

Plaintiff regarded those amounts as reasonable under the Florida statutory scheme. In this case,

Plaintiff served as personal representative, trustee, and lawyer for the trust. Copies of the pages of

the estate tax return reflecting those amounts is attached as Exhibit 9.

The Florida Statutes provide guidance for the allowance of fees and commissions to personal

representatives of estates and trustees. The applicable part of the Probate Code reads as follows:

733.617 Compensation of personal representative.—

(1) A personal representative shall be entitled to a commission payable from the estate assets without court order as compensation for ordinary services. The commission shall be based on the compensable value of the estate, which is the inventory value of the probate estate assets and the income earned by the estate during administration.
(2) A commission computed on the compensable value of the estate is presumed to be reasonable compensation for a personal representative in formal administration as follows:
(a) At the rate of 3 percent for the first $1 million.
(b) At the rate of 2.5 percent for all above $1 million and not exceeding $5 million.
(c) At the rate of 2 percent for all above $5 million and not exceeding $10 million.
(d) At the rate of 1.5 percent for all above $10 million.
(3) In addition to the previously described commission, a personal representative shall be allowed further compensation as is reasonable for any extraordinary services including, but not limited to:
(a) The sale of real or personal property.
(b) The conduct of litigation on behalf of or against the estate.
(c) Involvement in proceedings for the adjustment or payment of any taxes.
(d) The carrying on of the decedent's business.
(e) Dealing with protected homestead.
(f) Any other special services which may be necessary for the personal representative to perform.
(4) If the will provides that a personal representative's compensation shall be based upon

specific criteria, other than a general reference to commissions allowed by law or words of similar import, including, but not limited to, rates, amounts, commissions, or reference to the personal representative's regularly published schedule of fees in effect at the decedent's date of death, or words of similar import, then a personal representative shall be entitled to compensation in accordance with that provision. However, except for references in the will to the personal representative's regularly published schedule of fees in effect at the decedent's date of death, or words of similar import, if there is no written contract with the decedent regarding compensation, a personal representative may renounce the provisions contained in the will and be entitled to compensation under this section. A personal representative may also renounce the right to all or any part of the compensation.

(5) If the probate estate's compensable value is $100,000 or more, and there are two representatives, each personal representative is entitled to the full commission allowed to a sole personal representative. If there are more than two personal representatives and the probate estate's compensable value is $100,000 or more, the compensation to which two would be entitled must be apportioned among the personal representatives. The basis for apportionment shall be one full commission allowed to the personal representative who has possession of and primary responsibility for administration of the assets and one full commission among the remaining personal representatives according to the services rendered by each of them respectively. If the probate estate's compensable value is less than $100,000 and there is more than one personal representative, then one full commission must be apportioned among the personal representatives according to the services rendered by each of them respectively.

(6) If the personal representative is a member of The Florida Bar and has rendered legal services in connection with the administration of the estate, then in addition to a fee as personal representative, there also shall be allowed a fee for the legal services rendered.

The Florida Trust Code is not as specific with respect to compensation of the trustee.  It reads

as follows:

736.0708 Compensation of trustee.—

(1) If the terms of a trust do not specify the trustee's compensation, a trustee is entitled to compensation that is reasonable under the circumstances.

  (2) If the terms of a trust specify the trustee's compensation, the trustee is entitled to be compensated as specified, but the court may allow more or less compensation if:

      (a) The duties of the trustee are substantially different from those contemplated when the trust was created; or

      (b) The compensation specified by the terms of the trust would be unreasonably low or high.

(3) If the trustee has rendered other services in connection with the administration of the trust, the trustee shall also be allowed reasonable compensation for the other services rendered in addition to reasonable compensation as trustee.

35

As Plaintiff recalls, the advice she received was that trustee fees were usually somewhat less than the fees allowed for personal representatives because probate was not required for trusts. So, applying the scale of § 733.617 to the initial valuation of the trust assets, the presumptively reasonable fee for a PR would have been around $74, 150. In this case, Plaintiff spent around 190 hours on trust administration duties in both 1998 and 1999. In 1998 her hourly rate she charged clients for her law practice was $315. In 1999 it was $330. While those rates reflect the higher costs of what was then a mostly Washington DC - based law practice, the Court may calculate the opportunity cost of spending many days and months away from her clients and law practice in order to attend to trust administration. Her activities included research and work with the broker at Shearson Lehman to restructure the investment portfolio, handling the administrative duties following her father's death including planning the funeral, arranging for his cremation and burial, tending to her mother after the death, reviewing his files and notifying creditors and various governmental agencies of the death, selecting and appointing the successor co-trustee, assisting her mother with preparation of tax filings, marshaling the assets including life insurance policy payouts, assisting in the compilation of data and preparation of the estate tax return, arranging for the transfer of titles of vehicles, and taking care of deferred maintenance on one of her father's residences in Garden City, NY. In 1999, she had to undertake some extraordinary duties such as preparing a Baker Act proceeding for her mother who became psychotic during the Christmas holidays. In 1998, Plaintiff devoted 39 days to trust administration and made seven round trips between Washington DC and Vero Beach in order to carry out her duties as trustee. Plaintiff incurred $7,150.10 of trustee expenses in 1998. ( R. 2923)

In 1999, she spent 44 days in Vero Beach devoted to trust administration, incurred $7, 142.15

in trustee expenses she paid out of pocket ( R. 2937-38),  and made ten round trips between Washington DC and Vero Beach. During 1999, Pamela Stuart was diagnosed with and underwent treatment for invasive breast cancer on 63 days including two surgeries, six administrations of AC chemotherapy, six weeks of daily radiation, and one administration of taxol chemotherapy.  To say that her fulfillment of her duties as trustee was taxing under the circumstances while she was simultaneously trying to carry on her law practice (and her doctor advised her to avoid stress) is an understatement.  Her sisters provided no assistance during this period.  Indeed, her sister Catherine, a physician, never came to visit her while Plaintiff was undergoing treatment for breast cancer until after the treatment was completed.   In 2000, while her treatment for breast cancer continued, Plaintiff spent 51 days in Vero Beach on trust administration activities, incurred $5,748.34 in trustee expenses ( R. 2945) and made ten round trips between Vero Beach and Washington DC for that purpose.  In 2001, she spent 40 days in trust administration activities in Vero Beach and made eight round trips but incurred $ 9,304.92 in trustee expenses ( R. 2952 - 53).  For the Court's information, the travel time between Washington and Vero Beach is about 7.5 hours assuming no delays or glitches.

Plaintiff was acting not only as trustee for the trust but also was providing legal services to the trust.  The Florida law with respect to compensation of attorneys for a trust is as follows:

736.1007 Trustee's attorney fees.—

(1) If the trustee of a revocable trust retains an attorney to render legal services in connection with the initial administration of the trust, the attorney is entitled to reasonable compensation for those legal services, payable from the assets of the trust, subject to s. 736.0802(10), without court order. The trustee and the attorney may agree to compensation that is determined in a manner or amount other than the manner or amount provided in this section. The agreement is not binding on a person who bears the impact of the compensation unless that person is a party to or otherwise consents to be bound by the agreement. The agreement may provide that the trustee is not

37

individually liable for the attorney fees and costs.

(2) Unless otherwise agreed, compensation based on the value of the trust assets immediately following the settlor's death and the income earned by the trust during initial administration at the rate of 75 percent of the schedule provided in s. 733.6171(3)(a)-(h) is presumed to be reasonable total compensation for ordinary services of all attorneys employed generally to advise a trustee concerning the trustee's duties in initial trust administration.

(3) An attorney who is retained to render only limited and specifically defined legal services shall be compensated as provided in the retaining agreement. If the amount or method of determining compensation is not provided in the agreement, the attorney is entitled to a reasonable fee, taking into account the factors set forth in subsection (6).

(4) Ordinary services of the attorney in an initial trust administration include legal advice and representation concerning the trustee's duties relating to:

(a) Review of the trust instrument and each amendment for legal sufficiency and interpretation.

(b) Implementation of substitution of the successor trustee.

(c) Persons who must or should be served with required notices and the method and timing of such service.

(d) The obligation of a successor to require a former trustee to provide an accounting.

(e) The trustee's duty to protect, insure, and manage trust assets and the trustee's liability relating to these duties.

(f) The trustee's duty regarding investments imposed by the prudent investor rule.

(g) The trustee's obligation to inform and account to beneficiaries and the method of satisfaction of such obligations, the liability of the trust and trustee to the settlor's creditors, and the advisability or necessity for probate proceedings to bar creditors.

(h) Contributions due to the personal representative of the settlor's estate for payment of expenses of administration and obligations of the settlor's estate.

(i) Identifying tax returns required to be filed by the trustee, the trustee's liability for payment of taxes, and the due date of returns.

(j) Filing a nontaxable affidavit, if not filed by a personal representative.

(k) Order of payment of expenses of administration of the trust and order and priority of abatement of trust distributions.

(l) Distribution of income or principal to beneficiaries or funding of further trusts provided in the governing instrument.

(m) Preparation of any legal documents required to effect distribution.

(n) Fiduciary duties, avoidance of self-dealing, conflicts of interest, duty of impartiality, and obligations to beneficiaries.

(o) If there is a conflict of interest between a trustee who is a beneficiary and other beneficiaries of the trust, advice to the trustee on limitations of certain authority of the trustee regarding discretionary distributions or exercise of certain powers and alternatives for appointment of an independent trustee and appropriate procedures.

(p) Procedures for the trustee's discharge from liability for administration of the trust on termination or resignation.

(5) In addition to the attorney's fees for ordinary services, the attorney for the trustee shall be allowed further reasonable compensation for any extraordinary service. What constitutes an extraordinary service may vary depending on many factors, including the size of the trust. Extraordinary services may include, but are not limited to:

(a) Involvement in a trust contest, trust construction, a proceeding for determination of beneficiaries, a contested claim, elective share proceedings, apportionment of estate taxes, or other adversary proceedings or litigation by or against the trust.

(b) Representation of the trustee in an audit or any proceeding for adjustment, determination, or collection of any taxes.

(c) Tax advice on postmortem tax planning, including, but not limited to, disclaimer, renunciation of fiduciary commission, alternate valuation date, allocation of administrative expenses between tax returns, the QTIP or reverse QTIP election, allocation of GST exemption, qualification for Internal Revenue Code ss. 303 and 6166 privileges, deduction of last illness expenses, distribution planning, asset basis considerations, throwback rules, handling income or deductions in respect of a decedent, valuation discounts, special use and other valuation, handling employee benefit or retirement proceeds, prompt assessment request, or request for release from personal liability for payment of tax.

(d) Review of an estate tax return and preparation or review of other tax returns required to be filed by the trustee.

(e) Preparation of decedent's federal estate tax return. If this return is prepared by the attorney, a fee of one-half of 1 percent up to a value of $10 million and one-fourth of 1 percent on the value in excess of $10 million, of the gross estate as finally determined for federal estate tax purposes, is presumed to be reasonable compensation for the attorney for this service. These fees shall include services for routine audit of the return, not beyond the examining agent level, if required.

(f) Purchase, sale, lease, or encumbrance of real property by the trustee or involvement in zoning, land use, environmental, or other similar matters.

(g) Legal advice regarding carrying on of decedent's business or conducting other commercial activity by the trustee.

(h) Legal advice regarding claims for damage to the environment or related procedures.

(i) Legal advice regarding homestead status of trust real property or proceedings involving the status.

(j) Involvement in fiduciary, employee, or attorney compensation disputes.

(k) Considerations of special valuation of trust assets, including discounts for blockage, minority interests, lack of marketability, and environmental liability.

The most comprehensive Florida case that gives guidance on reasonable compensation for

a trustee is *West Coast Hospital Assoc. v. Florida National Bank*, 100 So.2d 807, 811 (Fla. 1958) where the court stated that the following factors determine a reasonable fee:

> The following factors may be influential in enabling the court to reach a conclusion as to the appropriate amount of pay which should be granted the trustee in a given case: The amount of capital and income received and disbursed by the trustee; the wages or salary customarily granted to agents or servants for performing like work in the community; the success or failure of the administration of the trustee; any unusual skill or experience which the trustee in question may have brought to his work; the fidelity or disloyalty displayed by the trustee; the amount of risk and responsibility assumed; the time consumed in carrying out the trust; the custom in the community as to allowances to trustees by settlors or courts and as to charges exacted by trust companies and banks; the character of the work done in the course of administration, whether routine or involving skill and judgment; any estimate which the trustee has given of the value of his own services; payments made by the cestuis to the trustee and intended to be applied toward his compensation.

In *Robert Rauschenberg Found. v. Grutman*, 198 So.3d 685 (Fla. 2d DCA 2016), the Second District Court of Appeals found that the appropriate method of determining a reasonable trustee's fee was to apply the *West Coast* factors rather than a lodestar formula.

Ms. Stuart performed substantial services for the Trust on many days other than those in which she was performing on site services. For example, in 1998, she performed Trust business on 151 days outside of those when she was in Vero Beach or Garden City. She also performed services for the Marion Stuart Revocable Trust and never took a fee from that trust.

Plaintiff took trustee fees of $30,000 in 1998, $75,000 in 1999, $60,000 in 2000, and $10,000 in 2001. She paid taxes on those fees. However, the state trial court found that the fees that Plaintiff paid herself upon the advice of counsel and an accountant were "loans" and included those amounts, as well as the expense reimbursements she was paid during those years, in the judgment amount the trial court awarded to Plaintiff's sisters. In fact, the state trial court awarded Plaintiff no fees at all for her sixteen years of service to the trust. The concept of a property right is the right

40

to earn money for the expenditure of one's time and talents.   For the fourteen years that Plaintiff served as trustee during the years of her life from age 48 to age 65 when she should have been at her peak earning years and saving money for retirement, she received nothing but a stained reputation, a ruined career and a future of poverty.   While there is some authority for withholding trustee fees for breaches of fiduciary responsibilities, there is no authority for withholding expense reimbursements.   Indeed, the applicable Florida law REQUIRES the trust to repay the trustee for reasonable expenses incurred in the course of serving as trustee with a lien against the trust to secure repayment.   The state trial court rewrote the Florida law in that regard as executed a judicial taking of Plaintiff's established property rights.   The established Florida law in the trust code with respect to repayment of expenses is:

§ 736.0709 Reimbursement of expenses.—

(1) A trustee is entitled to be reimbursed out of the trust property, with interest as appropriate, for reasonable expenses that were properly incurred in the administration of the trust.

(2) An advance by the trustee of money for the protection of the trust gives rise to a lien against trust property to secure reimbursement with reasonable interest.

Gina Rall, the successor trustee retained at the behest of counsel for Catherine Ryan and Deborah Stuart included in her accounting an amount of $10,251.08 to be credited to Cathy Ryan for expenses paid for the Vero Beach homestead and provided a list.   However, Ms. Rall refused to credit any of the expenses paid by Pamela Stuart while trustee despite the backup consisting of original receipts provided to counsel and electronic copies of those receipts provided to Ms. Rall. Ms. Rall was required to treat all beneficiary claims alike but she did not.

In addition, the state trial court failed to credit Plaintiff with corrections to Ms. Rall's

41

accounting for which Pamela Stuart provided evidence in the form of receipts.

In paragraphs 12 and 13, the Magistrate discusses the acquisition by Plaintiff of her Florida homestead. Attached are the documents that she submitted with her motion for relief from judgment that show that she acquired that residence entirely with her own funds initially and then refinanced it in 2006 in order to raise funds to pay legal fees for a limited liability company that was litigating against the seller who sold it a commercial townhouse in a fraudulent manner. That debt incurred by the Stuart Building LLC had to be repaid at closing of the sale of its only asset and was paid to Wilshire as shown in Exhibit 10. (R. 3031).

Plaintiff purchased the townhouse in January 2000 after her mother had been involuntarily hospitalized under the Baker Act when Plaintiff concluded that she would need to spend more time in Florida taking care of her mother and trust administration. She also considered the purchase to be for a permanent home for her. Because Plaintiff was busy with trust administration duties, taking care of her elderly mother, her clients and her own needs, she did not assiduously attend to preparing the filings necessary to establish officially her homestead claims in Florida. This has been a consistent failing of Plaintiff who always puts the needs of others before her own. She registered to vote in 2004 and served faithfully as a volunteer voter protection attorney. She abandoned her homestead exemption in D.C. She joined the John's Island Community Service League which raises money to support non-profit agencies in Indian River County that serve the needs of children and families. She served faithfully on the Executive Council of the Real Property, Probate and Trust Law Section of the Florida Bar for ten years. She established her own law office in Vero Beach in 2004 after it became apparent that prospective clients did not take her seriously unless she had a stand alone office. She had to abandon that office in 2017 after the Florida Supreme Court

42

suspended her law license in the state.  Plaintiff admits that she did not file for homestead status in the Circuit Court until 2014.   She also admits that she continued to travel back and forth to Washington DC for business reasons where she was well known in the legal community.  But she purchased her burial plot in the Indian River Shores Town Cemetery (which requires residence in the town in order to be buried there) and she joined the Community Church of Vero Beach where her father established the Missions program.  She finally officially became a member after she had attended that church regularly with her parents and since their deaths since 1987.

So, Plaintiff pleads guilty for being bad at paperwork but her heart and mind were in the right place and that was in Florida.  Indeed, she has not abandoned her plan to live primarily in Vero Beach and she has not sold her burial plot back to the Town of Indian River Shores.  She pleads guilty to being miserable in Washington DC in the current political climate and the current weather. On January 9, 2019, she suffered the indignity of having her application for assistance from the DC HomeSavers program denied (this is a program that offers assistance to elderly homeowners who have suffered a temporary hardship in order to allow them to stay in their homes).  Not only does Florida not want to claim her as the permanent resident she thought she was, but the D.C. Housing Finance Agency denied her application for assistance on the grounds that her primary residence is not in the District of Columbia.  *See* Exhibit 11, attached.  So, thanks to the Florida state courts that erroneously denied she was domiciled in Florida, she may be homeless.

Plaintiff did take loans from the trust beginning in 2001 to pay part of the carrying costs of the building owned by the Stuart Building, LLC.  The LLC was established in 2001 and purchased the building in July 2001.  The building was named for her father who served as head of the Steel Division of the War Production Board in Washington, DC during World War II).  Attached as

43

Exhibit 12  is a picture of J. Raymond Stuart (top row, left) attending the second annual banquet of the Steel Products Warehouse Association held in Pittsburgh, Pa. on December 1, 1944.   Exhibit 13 is  the stationery she used when she had her law office in the Stuart Building prior to the time she established her Vero Beach office.

Plaintiff not only had to borrow from the trust to pay the carrying costs of the building after she unexpectedly learned that she could not renovate the building because she lacked guaranteed rear access to a public street, she also had to liquidate her IRAs and pension accounts to do so.  When the J. Raymond Stuart Building was sold in December 2009, the LLC had to repay the debt to Plaintiff for the refinancing she had secured to raise funds to pay the lawyers for the LLC (and that included the $150,000 mortgage amount that had been a lien against her Florida home that was used for part of the down payment on the Stuart Building in 2001).  She did not repay her IRAs and pension accounts she liquidated (they collectively contained about $450,000 prior to this catastrophe) and used the remaining funds she had left from the payment for the building to repay a substantial portion of the loans she took from the trust, $705,000.   She did reimburse the trust with these amounts but put them in a new trust account at a different brokerage institution, Charles Schwab, because by that time Plaintiff and Edward Ryan were not in agreement about his continued service to the trust and he had refused to resign from the Smith Barney accounts as requested by Plaintiff and her mother when they "fired" him as trustee in July 2009.  Indeed, Marion Stuart was present and assisting in the establishment of the Charles Schwab accounts and opened up one for herself at the same time.  Exhibit 14 shows the account opening and the deposits at Charles Schwab.

In Paragraph 15, the Magistrate discusses the accounting obligation that Plaintiff was unable to accomplish after a few years.  From 1998 to 2002, Plaintiff had provided annual accountings

44

reviewed by Greta Tosi-Miller, CPA, to her mother as required by the terms of the trust. Beginning in 2003, the law that preceded the Florida trust code was changed so that an annual accounting had to be provided not only to the surviving spouse but also to all qualified beneficiaries which included those holding remainder interests such as Plaintiff's sisters. Plaintiff recalls discussing her problem with the accountant for the trust, Greta Tosi-Miller, but the discussion was mostly concerned with what to do about the annual tax returns that had theretofore been filed with the IRS. Ms. Tosi-Miller advised that because of the expenses of the trust annually for trustee fees (she assumed that they were being accrued and paid) and the payments to Marion Stuart of all of the income as required that no taxes would ever be owed because the trust was not ever going to make a profit. Plaintiff does not recall discussing the situation with her sisters but she did discuss it with Mr. Ryan who consistently failed to understand the accounting principles involved.

In deciding to forego annual accountings, Plaintiff had no intention to hide anything from her sisters or Mr. Ryan or her mother. Indeed, all of the income and expenses of the trust (except for the expenses she incurred personally as trustee) were itemized on the monthly statements prepared by Smith Barney (the successor in interest to Shearson Lehman) that had been going to Edward and Catherine Ryan since July 2000 and went to Deborah Stuart beginning in March 2007. Unfortunately, despite Plaintiff's request in a separate handwritten note to Charles Schwab's broker to arrange for statements for the new accounts to be sent to her sisters, it did not do so (it was not an accountant who made that mistake as the Magistrate reported at page 11).

In Paragraph 16, the Magistrate made the same mistake as the state trial court judge in stating that Plaintiff took out a reverse mortgage on her home on the same day that she sent her sisters a plan of trust administration. Instead, the Plan of Trust Administration was prepared in July 2012. A copy

45

of it is attached as Exhibit 15.

In 2013, when Plaintiff was having financial problems due to undergoing numerous surgeries from 2010 to 2014, she took out a reverse mortgage on her D.C. home. **One year after she authored the Plan of Trust Administration**, July 26, 2013, Pamela Stuart executed a Home Equity Conversion Deed of Trust (reverse mortgage) on her home located at 5115 Yuma Street NW, Washington, D.C., which secures to the Lender the repayment of the debt  evidenced by the Note, with interest at a rate subject to adjustment up to a maximum principal amount of $938,250.00.  The way this type of mortgage works, the homeowner does not make payments against the debt which accrues monthly and increases due to the interest applied based upon an adjustable interest rate. The actual amount of the mortgage lien as of July 31, 2013 when the mortgage was funded was $320,173.57 – not the amount that was stated by the Magistrate ($938,250) which the state trial court also used erroneously in his Order on Final Distribution.  That $938,250 amount is actually the capped amount that is the highest that the principal of the loan can go to over the lifetime of the loan as shown in Exhibit 16.    The current amount outstanding on the loan as of January 2019 is $543,909.12.  This mortgage was not taken out with the option to receive the full $938,250 as the trial judge erroneously assumed and prompted his comment that Plaintiff was trying to fully shield her DC residence from creditors.   Rather, this mortgage was taken out at a time when Plaintiff lacked the necessary funds to pay her real estate taxes in DC and was unable to secure a loan to pay them any other way.   This period of financial difficulty for Plaintiff followed the period during which Plaintiff spent nearly all of her time in 2011 and 2012 either in surgery or recovering from it and caring for trust administration requirements of her mother.  As a result, her ability to earn an income plummeted.  After the Stuart Building LLC sold the building in December 2009, Plaintiff

thought she would not have to borrow from the trust ever again. Instead, beginning in 2011she had to borrow again to assist in her support. Such loans were permitted by the trust in Articles 15 and 23 and Florida law, § 736.0816(19), Florida Statutes. Whenever Plaintiff borrowed from the trust against her right to an inheritance and her right to trustee fees and expense reimbursements, she was borrowing in the good faith belief that such borrowing was authorized by the trust and Florida law.

The closing instructions for the reverse mortgage dated July 26, 2013 included the payoff of the loan made by Eagle Bank in connection with the Stuart Building acquisition that was not paid off at closing in December 2009 and was retained to approximate the original mortgage that Plaintiff had on her Florida homestead prior to the 2006 refinancing. *See,* page 2 of Exhibit 16. In Plaintiff's mind the retention of the obligation to pay that loan meant that she was in the same financial position with respect to her debt for the Florida home purchase as she had been when she purchased the property originally. The Wells Fargo mortgage payoff was all that remained from the original mortgage that she took out in 1994 to acquire the DC residence. The Magistrate (and the state trial court) were incorrect in their statement that Plaintiff received $938,250 from the reverse mortgage (that is the amount that the documents indicate is the highest possible amount to which the mortgage outstanding might rise). Instead, the amount of the reverse mortgage loan at the time of closing was $320,173.57.

In Paragraph 17 of the Magistrate's report, she suggests that the complaint in the trust case sought repayment of "an alleged $3,407,783.90 in loans outstanding." That is erroneous. In fact the complaint did not allege any amount in any specificity that was outstanding. The amount cited by the Magistrate is the fantasy number crafted by the successor trustee and accepted by the state trial court as the amount of the outstanding loan owed by Plaintiff. The successor trustee got to that

number by failing to credit any of Plaintiff's claims for trustee expense reimbursements
($325,507.99), failing to credit Plaintiff's withdrawals during years 1998-2001 for trustee fees and
expense reimbursements ($181,899.99 through July 11, 2001, the date of purchase of the J. Raymond
Stuart Building by the Stuart Building, LLC), failing to correct erroneous charges contained in the
successor trustee's accounting for which corrective evidence (receipts, etc.) was provided
($308,289.18)[13].   In addition, the number was inflated by the state trial court's decision not to credit
Plaintiff with any trustee fees for 16 years of service and his decision to apply a 6% rate of interest
to the outstanding "loans" over the sixteen year period.   Also, the number was inflated by the fact
that one-third of the amount had to be credited to Pamela Stuart in any case.

Pamela Stuart believed that the loans she took were authorized by the trust document and by
Florida law.   The Florida Trust Code, § 736.0816(19)  permits the trustees to

> Make loans out of trust property, including, but not limited to, loans to a beneficiary on terms
> and conditions that are fair and reasonable under the circumstances, and the trustee has a lien
> on future distributions for repayment of those loans.

Pamela Stuart secured the loans against her right to receive an inheritance, her rights to trustee fees
and expense reimbursements.  She also provided a promissory note covering loans she took that was
retroactive to 2001 when she began taking withdrawals that were loans.  The state trial court did not
regard that note as adequate security but the New York Appellate Division that reviewed the case
found it to be adequate security.

The JRS Trust instrument provided the trustee(s) with broad powers to manage the trust

---

[13]  That number includes the $200,000 repayment in December 2009 that was directed to
Marion Stuart's account which had been depleted.   Had that not gone to Marion Stuart's
account, the trust would have had to pay it out in reimbursements to Marion Stuart for expenses
she incurred.

property for the benefit of the decedent, his spouse, and the three daughters and provided authority for Ms. Stuart as trustee, in addition to the authority provided by the Florida Trust Code, to make loans to herself as a beneficiary.

A.  Article SECOND provided that during the settler's lifetime, in the event of his incapacity, "**the other trustee shall, in their discretion, from time to time . . . apply all or any part of the net income and/or principal toward the support, care and maintenance of the settler, and the settler's spouse and the settler's issue in such amount or amounts and in such manner as they may determine . . . .** (taking into account the other means of the settler, the settler's spouse and the settler's issue).

B.  Article THIRD provided that in the event of an alteration, amendment or revocation of the Trust, the settler's will should be examined to determine what changes, if any, should be made in the settler's will in light of such alteration, amendment, or revocation.

In light of Article Third of the JRS Trust, Pamela B. Stuart, while acting as trustee, was justified in believing in good faith that the JRS Trust and the Last Will and Testament should be regarded as an integrated estate plan.

C.  Article ELEVENTH gave the trustees authorization to co-mingle the trust property of the separate trusts except for the marital deduction trust.

D.  Article FIFTEENTH provided that the trustees, subject to the directions to distribute income and principal in Article Seventh and the marital deduction trust in Article Fifth, were authorized in their **uncontrolled discretion** to use the income and principal of each separate trust and distributable share from time to time:

      1.  To purchase and to retain as investments any securities or other property, real

49

or personal, belonging to the estate of the settler or other trusts established by the settler.

2.     To make loans to the settler's executors or administrators on such terms as the trustees deem advisable.

E.     Article EIGHTEENTH provided that in extension and not in limitation of the powers given them by law (which the settler incorporated by reference) the trustees had the following powers **in each case to be exercised from time to time in the discretion of the trustees and without order or license of the court:**

1.     To retain indefinitely any investments and to invest and reinvest in stocks, shares *and obligations of corporations* . . . **without giving notice to any beneficiary**, or any other kind of personal or real property, **notwithstanding the fact that any or all of the investments made or retained are of a character or size which but for this express authority would not be considered proper for trustees.**

2.     To make loans with adequate interest and adequate security.

3.     To . . . make contracts concerning real or personal property **for such considerations and upon such terms as to credit or otherwise as the trustees may determine**, which leases and contacts may extend beyond the term of any trust . . . To execute . . . transfers, leases and other instruments of any kind.

4.     To . . . deposit cash in a checking or savings account in bank, in the name of the trustees or in the name of one of the trustees.

6.     **To improve or develop real estate . . . to partition and to join with co-owners and others in dealing with real estate in any way.**

50

9.      To pay as income . . . proceeds from the sale of real estate, although such real estate may have been wholly or partly unproductive; to charge to income or principal or to apportion between them . . . attorneys' fees, insurance premiums, repairs or improvements, taxes . . . depreciation charges and trustees' compensations; and generally to determine all questions as between income and principal and to credit or charge to income or principal or to apportion between them any receipt or gain and any charge, disbursement or loss as deemed advisable in the circumstances of each case as it arises, **notwithstanding any statute or rule for distinguishing income from principal or any determination of the courts.**

F.      Article TWENTIETH provided that no bond shall be required of any trustee.

G.      Article TWENTY-SECOND provided that "Anyone may rely upon any statement of fact certified by anyone who appears from the original document or a certified copy to be a trustee thereunder.

H.      Article TWENTY-THIRD provided that any liability that must be satisfied out of property held in the Trust may be obtained by borrowing, and pledging or mortgaging trust property to secure the sum borrowed, or by selling trust property, or both methods.

I.      Article TWENTY-FIFTH provided that except as otherwise provided, the trustees were to act by unanimous vote in order to act on any matter affecting the trust unless a vacancy in the office of trustee existed.

J.      Article TWENTY-SEVENTH provided that no one dealing with the trustees need inquire concerning the validity of anything they purport to do, or need see to the application of any money paid or any property transferred to or upon the order of the trustees.

K.    **Article TWENTY-EIGHTH provided that each trustee was to be responsible only for his, her, or its acts or omissions in bad faith.**

L.    Article TWENTY-NINTH gave power to a trustee to delegate all or any powers and discretion to a co-trustee by an instrument in writing for a period of one year or less and such delegation could be renewed.

M.    Article THIRTIETH authorized the trustee to establish and maintain a margin account.

N.    Article THIRTY-FIRST provided that after the death of the settler that **the other trustees were permitted to confer upon any other single trustee all of the powers and authority set forth in the trust**.

O.    Article THIRTY-SECOND provided that the Trust was to be a non-probate trust and shall not be subject to the jurisdiction of the probate court.

Accordingly, the state court should have found that the Trust instrument together with J. Raymond Stuart's Last Will and Testament and Fla. Stat. § 736.0816(19) provided Pamela B. Stuart as trustee and as executor with authority to borrow from the Trust and to make distributions to beneficiaries from time to time in advance of the distribution contemplated by Article SEVENTH of the Trust. The security provided for the loans was not only the promissory note entered into by Ms. Stuart and the JRS Trust which is part of the state court record but also Ms. Stuart's right to inherit one third of the trust assets remaining following administration and her entitlement to compensation by the JRS Trust as a trustee and as an attorney for the Trust.   The only aspect of the loans that was problematic was that they were applied, as Ms. Stuart described, following their deposit in her bank accounts, to pay the expenses of The Stuart Building, LLC which was a limited liability company in which she held an interest and some of her personal expenses.   The Florida Trust Code does

permit loans from trust assets for such purposes and the trust provided authority for investments in real estate of whatever kind.   Fla. Stat. § 736.0814(2)(a) gives discretion to the trustees to make loans to a trustee who is a beneficiary for that trustee's health, education, maintenance and support.

The failure to list Plaintiff's Florida homestead and her one-third interest in her father's homestead and her parents' personal property as special damages in violation of Florida Rule of Civil Procedure 1.120(g) made the subsequent order concerning those properties void for lack of subject matter jurisdiction under long-standing Florida property and procedure law.   The defense of lack of subject matter jurisdiction may be raised at any time – even after a trial on the merits has been concluded under applicable Florida law.   Fla. R. Civ. P. 1.140(h)(2).   *City of Miramar v. DCA Homes, Inc.,* 385 So.2d 152, 153 (Fla. 4th DCA 1980), citing *Bollinger v. Higgenbotham,* 70 So.2d 911 (Fla. 1954).   A failure of subject matter jurisdiction trumps res judicata and all other timeliness requirements said the Florida Supreme Court in the venerable case of *Lovett v. Lovett*, 112 So. 768, 776 (Fla. 1927) that is still good law.   Under *Lovett*, even when a court undoubtedly has subject matter jurisdiction and jurisdiction over the persons involved, it does not have "jurisdiction of the subject-matter and the parties" unless the pleadings have properly "invoked" the court's power.   A Florida state court may not enter an order outside of the scope of the pleadings.   *Garcia v. Stewart,* 906 So.2d 1117, 1122 (Fla. 4th DCA 2005); *Cortina v. Cortina*, 98 So. 2d 334, 337 (Fla. 1957); *Aldridge v. Peak Prop. & Cas. Ins. Corp.*, 873 So. 2d 499, 501 (Fla. 2d D.C.A. 2004); *Carroll & Assocs., P.A. v. Galindo*, 864 So. 2d 24, 28 (Fla. 3d D.C.A. 2003); *Instituto Patriotico Y Docente San Carlos v. Cuban Am. Nat'l Found.*, 667 So. 2d 490, 492 (Fla. 3d D.C.A. 1996).

In *Garcia v. Stewart,* 906 So.2d at 1122, the 4th DCA said:

In general, there are two aspects to a court's subject matter jurisdiction. The first

concept "concerns the power of the trial court to deal with the class of cases to which a particular case belongs." *Paulucci v. Gen. Dynamics Corp.*, 842 So.2d 797, 801 n. 3 (Fla.2003) (citation omitted). The second aspect requires that a court's jurisdiction be lawfully invoked by the filing of a proper pleading. *See Fla. Power & Light v. Canal Auth.*, 423 So.2d 421, 423 (Fla. 5th DCA 1982). As the supreme court has explained:

> [B]efore this potential jurisdiction of the subject-matter — this power to hear and determine — can be exercised, it must be lawfully invoked and called into action; the parties and the subject-matter of the particular case must be brought before the court in such a way that it acquires the jurisdiction and the power to act. There must be a right in dispute between two or more parties; a proceeding commenced under the proper rules of law; process must be served on the opposite party or parties in order that they may have an opportunity to be heard ... The jurisdiction and power of a court remain at rest until called into action by some suitor; it cannot by its own action institute a proceeding sua sponte. The action of a court must be called into exercise by pleading and process, prescribed or recognized by law, procured or obtained by some suitor by filing a declaration, complaint, petition, cross-bill, or in some form requesting the exercise of the power of the court. If a court should render a judgment in a case where it had jurisdiction of the parties, upon a matter entirely outside of the issues made, it would, of necessity, be arbitrary and unjust as being outside the jurisdiction of the subject-matter of the particular case, and such judgment would be void and would not withstand a collateral attack, for upon such matter a presumption would arise that the parties had had no opportunity to be heard.

*Lovett v. Lovett*, 93 Fla. 611, 112 So. 768, 775-76 (1927) (emphasis added); *see Lockwood v. Pierce*, 730 So.2d 1281, 1283 (Fla. 4th DCA 1999); *In re Estate of Hatcher*, 439 So.2d 977, 980 (Fla. 3d DCA 1983).

In theory the state trial court may have had subject matter jurisdiction over the properties because they were within the territorial jurisdiction of the court. However, the lawyers for Catherine Ryan and Deborah Stuart failed to file a pleading sufficient to invoke the jurisdiction of the court to adjudicate their rights to the special damages of defendant's homestead, the defendant's one-third interest in her father's homestead (which the state court ruled was not an asset belonging to the J. Raymond Stuart Trust although titled in the name of the trust), or defendant's one-third interest in

her parents' personal property which was never an asset of the J. Raymond Stuart trust.  *See,* Exhibit

3 (the wills);  Florida Rule of Civil Procedure 1.120(g). Indeed, the state court never accorded

Pamela Stuart a properly noticed hearing on her rights in those properties but rather based its October

21, 2016 ruling on matters discussed  in hearings held, as the state court acknowledged, to

determined the right to trustee fees and expense reimbursements or on matters outside the evidentiary

record in the case.  Since the state court lacked subject matter jurisdiction over those properties and

matters not raised as special damages, its October 21, 2016 order distributing them or ruling on them

was void *ab initio*.    However, as noted, neither the state trial court or the Fourth District Court of

Appeals followed the applicable law on that point.

       In this case, the complaint did not properly invoke the state court's power over

Pamela Stuart's domiciliary status, her right to vote, her homestead property or her interest achieved

by death in her father's homestead and her parents' personal property as they were not specifically

mentioned in plaintiffs' complaint. The requirement of subject matter jurisdiction is never waivable;

judgments rendered without subject matter jurisdiction are void *ab initio*, and may be successfully

attacked at any time pursuant to Rule 1.540 of the Florida Rules of Civil Procedure.   However,

Pamela Stuart presented these arguments to the state court in motions for relief from judgment and

to the Fourth District Court of Appeals in case no. 4D18-2388, but the trial court denied them and

the state Court of Appeals invoked a procedural device that is the state court equivalent of a cover-

up. It denied Plaintiff's appeal in a per curiam affirmance without opinion that is not appealable to

the Florida Supreme Court.  Plaintiff moved for rehearing en banc and for an opinion and that

motion was denied as well.

       <u>Paragraph 18</u> – no objection to the description of the order other than it was entered on March

4th, not March 14, 2014.

In Paragraph 19, the Magistrate notes the objection to the authority of a Florida state court over a property in Washington DC.   Florida adheres to the local action rule which dictates that when real property is in controversy, "jurisdictional authority exists over the property only in the circuit where the land is situated." *Ruth v. Dep't of Legal Affairs*, 684 So.2d 181, 185 (Fla.1996)(When the property that is the subject matter of the controversy is real and the parties are seeking to act directly on the property or the title thereto, jurisdictional authority exists over the property only in the circuit where the land is situated.)   Thus, an *in rem* suit, in which the real property is the primary dispute and the parties are seeking to act directly on the property or the title, may only be entertained in the circuit where the property is located. *Id.*   *Hammond v. Dsy Developers, LLC*, 951 So.2d 985 (Fla. 3d DCA 2007).

The successor trustee did not act with impartiality between all beneficiaries as required.   Plaintiff described previously that she credited Catherine Ryan with the expenses she claimed she paid to maintain my father's homestead but did not credit Pamela Stuart with any of the expenses she paid personally to perform her duties as trustee over sixteen years of service.   The state trial court accepted the successor trustee's testimony which was demonstrably false that for the years 1998 through 2001 that Pamela Stuart had taken loans from the trust when in fact she withdrew trustee fees and expense reimbursements upon the advice of outside counsel to the trust.   The successor trustee testified falsely that she drew the conclusion that all withdrawals were loans because no Form 1099's were filed for the payment of trustee fees when the IRS requires the filing of Form 1099's only for businesses, not for trusts. *See* www.irs.gov/pub/irs-pdf/i1099msc.pdf.   By

56

accepting the opinion of a witness not qualified as an expert[14] and accepted as such, the state trial

court failed to rely upon competent substantial evidence in violation of the settled law of Florida and

the $175,000 of trustee fees paid to Pamela Stuart during that period on which she paid taxes should

not have been added to the judgment amount credited to Catherine Ryan and Deborah Stuart. The

state trial court also failed to credit over $20,000 in expense reimbursements that were paid to

Pamela Stuart during that period. To do so amounted to a judicial taking.

The state court trial judge relied upon testimony of the successor trustee who was not

offered or accepted by the Court as an expert and who offered the accountings she did as a business

record of her firm rather than the accounting of the J. Raymond Stuart trusts, and who served as

successor trustee without treating the interests of defendant as beneficiary equally to those of

Catherine Ryan and Deborah Stuart, contrary to § 736.0803 (duty of impartiality). The successor

trustee did not even review the over 500 electronic transmissions of original receipts for Pamela

Stuart's trustee expenses that were provided in paper form to counsel for Dr. Ryan and Deborah

Stuart. As a result, the state court ordered that each and every reimbursement for trustee expenses

that was a lien against the trust and for which Pamela Stuart was entitled to be reimbursed under

settled Florida law, § 736.0709 Florida Statutes, not be credited against the loan made to Pamela

Stuart from the trust. Pamela Stuart provided to counsel for Ryan/Stuart and the successor trustee

just what the IRS requires for documenting expenses. *See* IRS Publication 463, section 5.

Summaries of the trust expenses (the original receipts were provided to Ryan/Stuart's counsel on

---

[14] It is interesting that counsel for Catherine Ryan and Deborah Stuart never offered the
successor trustee as an expert and introduced her accounting not as the accounting of the J.
Raymond Stuart trust or estate but rather as a business record of her professional firm which was
not a party or otherwise involved in the case.

January 22, 2016) were introduced in evidence pursuant to the Florida Evidence Code that permits

the introduction of summary exhibits, § 90.956 Florida Statutes, and showed a total of $325,507.99

( R. 2910-3027). These expenses were incurred and paid by Pamela Stuart over a period of 16 years

in the reasonable and settled expectation pursuant to Florida law that she would be reimbursed by

the Trust for expenses she incurred on its behalf. The Florida law not only entitles her to be

reimbursed with interest but also makes such a reimbursement a priority obligation of the Trust

ahead of paying distributions to beneficiaries and provides that the trustee has a lien against the trust

to secure reimbursement with reasonable interest. Fla. Stat. § 736.0709. By failing to credit

defendant with the costs of the reimbursable expenses of her administration of the trust as required

by settled Florida law, the state trial court executed an unconstitutional judicial taking. *See Stop the*

*Beach Renourishment v. Florida Department of Environmental Protection*, 560 U.S. 702, 713-715

(2010).

        In addition, the state trial court allowed the successor trustee to testify to her personal

opinions in violation of the settled evidentiary law of Florida which requires the court to accept the

opinions only of a witness who meets the requirements of an expert. § 90.702 Florida statutes.

*Houghton v. Bond,* 680 So.2d 514, 521 (Fla. 1st DCA 1996)(failure of expert to provide competent

substantial evidence). The successor trustee testified falsely that the court should impose a 6%

interest rate on Pamela Stuart's outstanding loans as she calculated them (an opinion not permitted

of non-expert witnesses) because, she said, Pamela Stuart was involved in the procurement of a 6%

mortgage on her sister Deborah's residence in the fall of 1997 when that mortgage was procured

solely by J. Raymond Stuart while he was alive. Pamela Stuart supplied the trial court with

documentation showing not only that her father was solely responsible for the mortgage but that the

interest rate provided in the mortgage documentation was never agreed to by the former trustee to be applied to loans from the trust. *See,* Exhibit 17. They were included among the records of the state court proceeding. Pamela Stuart had a contractual agreement with the trust with respect to an interest rate to be applied to her loans in a promissory note but the state trial court refused to apply it. Exhibit 18. Instead, the court accepted the personal opinion of the successor trustee that it was "fair" to impose a 6% interest rate on the loans Pamela Stuart took from the trust because, said the successor trustee, Pamela Stuart was responsible for procuring Deborah Stuart's 6% mortgage loan when in fact she was not. The 6% rate that the state trial court applied to the "loans" going back to 1998 was not only applied to withdrawals that Pamela Stuart had taken as trustee fees and expense reimbursements and paid taxes on that were now being reclassified as loans, the 6% rate was demonstrably grossly in excess of prevailing interest rates over the period of time since she began taking loans in 2001 and thus was a judicial taking in violation of settled Florida property law.

In Paragraphs 20, 21, and 22, the Magistrate discusses the events leading up to Judge Cox's January 3, 2016 order approving the accountings provided by the successor trustee and the bases for objections to it. Counsel for Ryan/Stuart failed to file the accounting for the years 1998 to 2014 prior to the hearing which was noticed for November 23, 2015 as a hearing on the plaintiffs' motion to approve accounting. The notice did not provide any indication that Pamela Stuart's real property, her right to an interest in her father's homestead or her parents' property was at issue or her right to unfettered use and benefit of her residences was at issue. The notice is attached as Exhibit 19. The hearing consisted of a 36 minute non-evidentiary hearing during which no witnesses or evidence was presented. There was merely argument of counsel. The judge admitted that she had not seen or read the accounting but ruled that she would approve it anyway. She made defamatory remarks about

Pamela Stuart's explanations for why she was not yet finished with accounting for sixteen years worth of trustee expenses and her request for trustee fees. The judge found Ms. Stuart's explanation that she had been taking care of a friend who was dying of cancer from June 2015 to January 2015 along with trying to keep up her law practice and finish the sixteen years' worth of accounting to be "preposterous" excuses for not finishing the accounting for trustee expenses and that she had the wrong priorities. The Court should note that the March 4, 2014 order by Judge Cox placed no time table on production of the accounting but it did prohibit Plaintiff from engaging in any discovery until a full accounting was completed and provided to the beneficiaries. Since Pamela Stuart opposed the accounting and filed a motion for reconsideration of the court's January 3, 2016 order approving the accounting that was denied on February 9, 2016, she did not get a chance to request discovery until after that. Her requests were denied and a motion to compel was denied by the court.

In any event, toward the close of the 36 minute hearing on November 23, 2015, the judge approved the accounting without reviewing it, against the earnest entreaties of Pamela Stuart that it was inaccurate, without holding an evidentiary hearing, and then issued her defamatory order which placed restrictions on the transfer of Pamela Stuart's properties in Florida and DC without benefit of any legal basis without waiting for the transcript of the hearing. Judge Cox's order of January 3, 2016 is attached as Exhibit 20 along with a transcript of the November 23, 2015 hearing that is part of the record of the state court proceeding. Judge Cox transmitted her January 3, 2016 order to the Florida Bar which then resurrected Edward Ryan's complaint submitted in 2014.[15]

The United States Constitution and the Bill of Rights rightly place considerable

---

[15] Plaintiff believes that what Judge Cox did was not only unconstitutional but was in violation of Canon 3 of the Florida Code of Judicial Conduct.

evidence on the property rights that the Founders viewed to be fundamental. James Madison, writing for the National Gazette on March 29, 1792 said:

> Government is instituted to protect property of every sort; as well that which lies in the various rights of individuals, as that which the term particularly expresses. This being the end of government, that alone is a just government, which impartially secures to every man, whatever is his own.

JAMES MADISON: WRITINGS, ed. Jack N. Rakove (New York: Library of America, 1999), 515-517. He went on to explain that our right to property is as untouchable as our freedom of speech, press, religion and conscience. In fact, he viewed the concept of property as fundamental, pertaining to much more than merely our material possessions. In the narrow sense, Madison said, "A man's land, or merchandize, or money is called his property." But in a wider sense, "A man has a property in his opinions and the free communication of them … in his religious beliefs … in the safety and liberty of his person … in the free use of his faculties and free choice of the objects on which to employ them." He then concluded: "[A]s a man is said to have a right to his property, he may be equally said to have a property in his rights."

The founders thought property rights were so important that they were included in the Second, Third (no quartering of soldiers in homes without consent of the owner), Fourth (The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated), Fifth (No person shall . . .be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation), Seventh (preserving right to jury trial for suits at common law with a value in controversy of at least $20), Eighth (no excessive bail or excessive fines), Ninth (unenumerated rights retained by the people), and Tenth (powers not delegated retained by the states or the people)

61

Amendments ratified in 1791.  The amendments were written by James Madison and influenced by

Virginia Declaration of Rights, written by George Mason, the Magna Carta, the English Petition of

Right, the English Bill of Rights, and the Massachusetts Body of Liberties.  After the Civil War, the

Fourteenth Amendment was added to the Constitution which specified that, "No State shall make

or enforce any law which shall abridge the privileges or immunities of citizens of the United States;

nor shall any State deprive any person of life, liberty, or property, without due process of law; nor

deny to any person within its jurisdiction the equal protection of the laws."

Even Florida law requires due process in the form of a hearing before restrictions may be

imposed upon property rights.   The Fifth Amendment prohibits the government from depriving a

person of life, liberty, or property without due process of law.    In order to ascertain whether

governmental action affecting a person violates this prohibition, two inquiries are made: first, a life,

liberty, or property interest within the meaning of the clause must be identified; and, second, the

degree of process due to the person before he can be deprived of that interest must be ascertained.

*Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), *SOUTH FLA.*

*GROWERS ASS'N v. US DEPT. OF AGR.*, 554 F. Supp. 633, 636-637 (S.D. Fla. 1982)(Failure to

provide adequate protection when property is placed in jeopardy by governmental action can amount

to an unconstitutional "taking" of property by destroying it or by exposing it to the risk of

destruction. [citations omitted]. It is this threatening of the Plaintiffs' property right by the

governmental action that entitles Plaintiffs to due process.)

For more than a century the central meaning of procedural due process has been clear:

"Parties whose rights are to be affected are entitled to be heard, and in order that they may enjoy that

right, they must first be notified." *Baldwin v. Hale*, 1 Wall. 223, 68 U.S. 233, 17 L.Ed. 531 (1863),

*Fuentes v. Shevin*, 407 U.S. 67, 80, 92 S.Ct. 1983 1994, 32 L.Ed.2d 556 (1972);  *Ray Lein Const., Inc. v. Wainwright*, 346 So.2d 1029 (Fla. 1977).   It is equally fundamental that the right to notice and an opportunity to be heard "must be granted at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187 1191, 14 L.Ed.2d 62 (1965)The United States Supreme Court has consistently held that a person is entitled to some sort of procedural protection before being deprived of a property interest. *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).  The constitutional right to be heard is a basic aspect of the duty of government to follow a fair process of decisionmaking when it acts to deprive a person of his possessions. The purpose of this requirement is not only to ensure abstract fair play to the individual. Its purpose, more particularly, is to protect his use and possession of property from arbitrary encroachment. . . .For when a person has an opportunity to speak up in his own defense, and when the government must listen to what he has to say, substantively unfair and simply mistaken deprivations of property interests can be prevented.   It has long been recognized that "fairness can rarely be obtained by secret, one-sided determination of facts decisive rights.... And no better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it." *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 170-172, 71 S.Ct. 624, 647-49, 95 L.Ed. 817 ... (Frankfurter, J., concurring). If the right to notice and a hearing is to serve its full purpose, then, it is clear that it must be granted at a time when the deprivation can still be prevented. *Fuentes v. Shevin*, 407 U.S. at 80-81, 92 S.Ct. at 1994-95.

Not only was there no notice in the complaint or in the notice of hearing for November 23, 2015 that Pamela Stuart's property rights were at risk, but she was never given a hearing on this issue throughout the state court litigation.  Counsel for the Ryan/Stuart litigants made the bold assertion

at the November 23, 2015 hearing that Pamela Stuart's Florida residence should be deeded to the trust without any legal or evidentiary basis whatsoever.  In fact, the funds to acquire it came from Pamela Stuart initially and then, after it was mortgaged to raise funds for the LLC that owned a commercial townhouse in Washington that needed funds to pay attorneys litigating on its behalf, when the building was sold the LLC repaid that debt which retired the refinanced mortgage entirely. At best counsel for Ryan/Stuart represented that the funds to pay off the refinanced mortgage came from "money that she was going to repay her loans with." (Transcript, R. 3936).  In fact those funds belonged to the LLC which had to retire its debts before going out of business.  No proof was ever offered or expert testimony showing that funds from the trust were used to acquire, improve or repair that residence at any time in the state court proceeding.  Yet, the subsequent trial judge, who refused to revisit the accounting's accuracy, ruled it was "appropriate" in the judge's opinion that it be distributed to Pamela Stuart's sisters.  This was hardly due process.   That judge held two evidentiary hearings in response to Judge Cox's January 3, 2016 order which required a hearing within 45 days to address Pamela Stuart's claims for reimbursement of expenses and trustee fees.  Notice was given of these hearings by the judge and they are attached as Exhibit 21.  Nowhere in the notices are mentioned Pamela Stuart's Florida residence or her property rights in her father's homestead that she inherited by operation of law mentioned or her rights to a share of her parents' personal property that she acquired by will.  The notices also fail to mention that Pamela Stuart's domicile, her right to homestead protection of her permanent residence in Florida or her right to vote will be adjudicated.

The constitutional right to be heard is a basic aspect of the duty of government to follow a fair process of decision making when it acts to deprive a person of his possessions. The purpose of this requirement is not only to ensure abstract fair play to the individual. Its purpose, more

particularly, is to protect his use and possession of property from arbitrary encroachment. SOUTH FLA. GROWERS ASS'N v. US DEPT. OF AGR., 554 F. Supp. 633 (S.D. Fla., 1982). The Fuentes Court stated unequivocally that an opportunity for a hearing is required prior to the taking of Any property right. *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), cited in *Phillips v. Guin & Hunt, Inc.*, 344 So.2d 568 (Fla. 1977). The *Fuentes* Court, in denouncing replevin statutes from Florida and Pennsylvania, announced the broad rule that, except in extraordinary situations, a defendant must have notice and opportunity for a hearing before he may be deprived of **any significant property interest**. *Fuentes* allowed postponement of the required notice and hearing only under these conditions: (1) the deprivation must be directly necessary to secure an important governmental or general public interest; (2) prompt action must be imperative; (3) the state must strictly control its exercise of legitimate force. The Court noted that such circumstances were highly unusual. *Fuentes, supra*, at 90, 92 S.Ct. 1983.

In Paragraph 23, the Magistrate noted that Judge Kanarek took over the case from Judge Cox and denied Pamela Stuart's motion to determine homestead status of her father's homestead on February 9, 2016. She filed the motion after learning that Florida law provided that homestead property held in a trust is not subject to probate or disposition by the trustee but passes by operation of law at the death of the homeowner to the surviving heirs with a life estate in the surviving spouse. § 732.401(1), Florida Statutes. Despite being apprised of the Florida law, the judge ruled that title to the property was in the trust and the trust was not a party to the action so the motion was denied. Plaintiff Pamela Stuart subsequently filed a motion for leave to file a third party complaint against the trust as the judge had suggested and Edward Ryan, former co-trustee. The judge denied that motion after a brief hearing on March 3, 2016 without explanation. Plaintiff also had filed a motion

65

to dismiss the complaint for failing to join Edward Ryan as a necessary party. That was denied on March 9, 2016 without explanation. She also filed a motion to compel discovery through a de bene esse deposition of the opposing parties. That was denied on March 3, 2016. In fact, Pamela Stuart received no discovery in the case whatsoever because Judge Cox's March 4, 2014 order prohibited further discovery after ordering Pamela Stuart to produce all trust records to counsel for Ryan/Stuart. On April 12, 2016, Pamela Stuart moved to quiet title to her father's homestead and for partition and to name the trust in a third party complaint. The trial court denied that motion without explanation on June 7, 2016. In its Order on Final Distribution, the judge conceded that Pamela Stuart's position that her father's homestead at 101 South Catalina Court was not an asset of the trust but had descended by operation of law to the three sisters, *per stirpes,* at the moment of J. Raymond Stuart's death on January 18, 1998 (a time well before any conduct complained of in the case) and that the homestead property was protected against forced sale or transfer even in the hands of the heirs, but nevertheless the trial court said, "Given these circumstances (that Pamela Stuart was seeking homestead protection for her interest in her father's homestead and there was a large outstanding loan which was not offset by trustee expense reimbursements or trustee fees), the court finds that it is entirely appropriate to impose an equitable lien against Pamela Stuart's interest in the 101 South Catalina Court homestead residence so that the her (sic) interest in the value of this property can be used to reduce the obligation she owes under the unsecured note." Order on Final Plan of Distribution at 21-22.

By so ruling, the state court effectively changed Florida law which requires an evidentiary basis showing some wrongdoing associated with the acquisition of the property interest to be made subject to an equitable lien. In so doing, the judge contravened Plaintiff's clearly established right

66

to a homestead exemption for her one-third interest in her father's homestead that was not acquired with any wrongdoing on her part. The trial court also ruled that "The Successor Trustee shall divide the personal [property] only among the plaintiffs Catherine S. Ryan and Deborah A. Stuart, given that the defendant has already received almost the entire Trust corpus. . ." (Order at p.26). This is the type of scenario contemplated in *Stop the Beach Renourishment v. Florida Department of Environmental Protection,* 560 U.S. 702, 733 (2010) as a judicial taking. *See, Stuart v. Ryan,* 18-14244-Civ-Martinez/Maynard Order Denying Motion for Temporary Restraining Order (Middlebrooks, J.) at p. 2.

In Paragraphs 24 and 25, the Magistrate recounts that Judge Kanarek issued the ruling after holding a hearing. In fact two hearings were held that were supposed to be directed at Pamela Stuart's request for credits against her outstanding loans for trust expense reimbursements and trustee fees. The judge recounted his view of the history of the case which in many respects was inaccurate.

In all probability, the judge's view of Pamela Stuart, a former federal prosecutor who had been appointed by then Chief Judge Thomas Hogan of the US District Court for the District of Columbia to that court's Grievance Committee, was shaped by Judge Cox's order, following a 36 minute non-evidentiary hearing during which she took no testimony and received no evidence. Judge Cox's opinion said, "The Defendant's credibility is questionable at best" and accused Pamela Stuart of engaging in delaying tactics rather than trying diligently to assemble and account with the original documentation – receipts covering 16 years of work – for the trustee expenses. Judge Cox further went on to accuse Pamela Stuart of providing "preposterous excuses" and engaging in "deceitful conduct." Judge Cox's actions, after a thirty six minute non-evidentiary hearing, called

into question her compliance with Canon 3 of the Florida Supreme Court's Code of Judicial Conduct

which requires, in pertinent part:

> (4) A judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity, and shall require similar conduct of lawyers, and of staff, court officials, and others subject to the judge's direction and control.
> (5) A judge shall perform judicial duties without bias or prejudice. A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice . . . .

Judge Kanarek took over the case from Judge Cox and acted as if he had taken Judge Cox's

personal opinion of Pamela Stuart, whom she did not know, to be the gospel truth.  Judge Kanarek,

in over two years of presiding over two cases involving Pamela Stuart, never issued a written ruling

in her favor.

Thus, Judge Kanarek's view of the history of the case in his Order on Final Plan of

Distribution, was that Pamela Stuart executed a diabolical scheme which she must have crafted with

malice to steal funds from the trust that was to benefit her elderly mother and, after her mother's

death, her sisters and herself.  This was complete nonsense but it obviously infected every aspect of

Judge Kanarek's handling of the case.   Pamela Stuart's character had been regarded highly in her

career as an Assistant United States Attorney and practitioner.  She had been appointed by then Chief

Judge Thomas Hogan to the Grievance Committee of the US District Court for the District of

Columbia.[16]   Instead of accepting Pamela Stuart's explanation for why she appointed her brother

in law as co-trustee when her parents' friends declined the appointment due to age and other

commitments, Judge Kanarek viewed it as nefarious – setting the stage for "further abuses of her

---

[16] Since the Magistrate mentioned the New York court's view of Pamela Stuart's career, the curriculum vitae that Pamela Stuart submitted to the New York court is attached as Ex. ___ to illustrate that she was not generally known as engaging in devious or unprofessional conduct.

authority as trustee." The appointment of Mr. Ryan as co-trustee occurred over a year before Pamela

Stuart formed a limited liability company that purchased a commercial townhouse for a law office

that, because the seller lied to her, could not get the necessary permits to be renovated and rented out.

It was that set of circumstances that set the stage for Pamela Stuart's decision to take loans against

her inheritance, her right to trustee reimbursements and trustee fees which she discussed with her

family and reviewed the trust documents and Florida law to make sure such loans were permitted.

Judge Kanarek also found erroneously (based upon the erroneous testimony of the non-

impartial successor trustee) that Pamela Stuart began taking loans in April 1998, when she wrote a

check to reimburse herself for such trustee expenses as obtaining proper photographs for her father's

obituary and travel to and from Vero Beach to work on tax returns for the trust and her mother. He,

along with the successor trustee, viewed every withdrawal shown transparently on the Smith Barney

monthly statements as paid to Pamela Stuart as a loan whether or not the funds withdrawn were

utilized for trust purposes.

Judge Kanarek viewed the promissory note which Pamela Stuart prepared to cover the period

from 2001 through the end of trust administration to be ineffectual. Since the outset of her

withdrawals for purposes of paying the carrying costs of the commercial townhouses, Pamela Stuart

intended to repay the loans and the promissory note memorialized that intention.   A New York

Court described it as "A promissory note prepared by the respondent properly secured repayment of

the loans." *In the Matter of Pamela Bruce Stuart,* 152 A.D.3d 68 (New York, 2d Appellate Division,

2017). A copy of the promissory note is attached as Exhibit 18.   It was prepared in 2009 when the

strife with Edward Ryan reached its nadir and after Ms. Stuart reviewed a Florida court's opinion

that counseled preparation of promissory notes in family trust situations like that.  Pamela Stuart

would repay what she owes but for the fact that her career and thus her source of income has been destroyed by the suspension of her law licenses. In order to save her sole remaining residence in DC, she has been forced to request government assistance which so far has been denied.

The Magistrate's summary of Judge Kanarek's view of the facts of the case needs clarification. Pamela Stuart appointed Edward Ryan as co-trustee in 2000 and he and Catherine Ryan began receiving monthly trust brokerage account statements in July 2000. Each and every withdrawal made by Pamela Stuart was detailed on those brokerage statements which Mr. Ryan did not begin to complain about until after he retired. Mr. Ryan did not take an active role in managing the trust assets and never lifted a finger to assist Marion Stuart in managing her household or the nursing operation that supported her very existence beginning in 2006. Contrary to the Magistrate's suggestion, Pamela Stuart maintained original receipts for each and every trustee and trust expenditure that she made over the sixteen years she served as trustee and many of them were made utilizing her personal credit cards. So the task of compiling these expenses into summary form was a formidable one that took the better part of two years of her "free" time after resigning as trustee in March 2014. Pamela Stuart had compiled the expenses in the first several years of her trusteeship and provided annual accountings under the supervision of Greta Tosi-Miller, CPA (now retired) and provided them to her mother as required by the trust and filed tax returns from 1998 to 2001 with the IRS. Contrary to the Magistrate's conclusion, Pamela Stuart did declare her trustee fees in her personal tax return preparation from 1998 onward and provided the backup to Ms. Tosi-Miller, but the trustee fees were not accounted for separately on the returns filed but were included in her overall income tabulation. The successor trustee found that she did not do this but claimed it was because Pamela Stuart did not file Form 1099's for those fees. A Form 1099 is required for businesses, not

trusts, by the IRS.

Beginning in 2002, however, Pamela Stuart was engaged in a non-stop effort to convince the surrounding neighbors of the commercial townhouse to grant her rear access over what they regarded as a private alley so that she could obtain renovation permits from the DC Government. That effort which blossomed into litigation against the seller of the townhouse in 2004 (it continued until 2014) and a declaratory judgment action against the surrounding neighbors in 2007, was time-consuming and costly (this is what required Pamela Stuart to refinance her Florida residence in 2006 to pay the lawyers for the LLC that owned the building so that they would take the case to trial). She just could not complete all of her trust responsibilities and care for her mother and her clients at the same time. So, she prioritized her mother, her clients, and the ongoing litigation and rationalized that the trust accountings could be done at a later time. BIG MISTAKE.

The Magistrate's summary concluded that the judge found no evidence that the Plaintiff ever repaid the trust for any of her loans. That is an erroneous conclusion. Pamela Stuart repaid $11,000 on October 11, 2005, an amount that was not credited by the successor trustee because it was paid to the trust via a Smith Barney local office in Bethesda, Maryland to the credit shelter trust account and was not otherwise identified as a payment from Pamela Stuart. Notably, this repayment occurred within a week of a portfolio review with the brokers attended by Catherine and Edward Ryan by telephone.

Pamela Stuart also repaid the trust after the Stuart Building LLC sold its asset on December 9, 2009. The LLC paid $200,000 to Marion Stuart at closing via wire transfer. Marion Stuart's trust had been depleted in mid-2009 and the J. Raymond Stuart trust was obligated to pay 100% of her maintenance and support at that juncture. So, the $200,000 payment in effect was a repayment of

the trust.  Later that year, Pamela Stuart repaid $505,000 to trust accounts established at Charles

Schwab Co. in the name of the trust.  Copies of the documents establishing those accounts in April

2010 are attached in Exhibit 14 .  Deposits of $505,000 were made.  *See,* Exhibit 14.  She did not

put the money in the Smith Barney trust accounts because Edward Ryan had refused to resign from

those accounts when he was terminated as trustee and he had blocked requested transfers to Mrs.

Stuart. Pamela Stuart sought to appoint a new co-trustee, Lynn Larkin, a Vero Beach lawyer who was

a former CIA agent.  Mr. Ryan's defamatory remarks about Pamela Stuart in emails discouraged her

from serving and so Pamela Stuart, relying upon Article 31st of the trust, soldiered on without trying

to appoint a new co-trustee thereafter.  Mr. Ryan continued his obstructive behavior including after

Marion Stuart passed away.  By that time Smith Barney required authorization from both Mr. Ryan

and Pamela Stuart for any withdrawals.  Mr. Ryan blocked payments from Smith Barney that Pamela

Stuart requested for funeral expenses.

The Magistrate correctly mentioned that as of the time of her mother's death that Pamela

Stuart's hourly rate as an attorney for her DC area based clients was $675.  That was a rate that was

reasonable and justified by the charges of attorneys in that area with which Ms. Stuart compared

herself and was validated by a consultant, Jonathan Groner, Esq., who investigated that issue for her.

A copy of his opinion (without attachments) is attached as Exhibit 22.

The Magistrate commented that Judge Kanarek found that Pamela Stuart shielded her money

in judgment-proof assets: Her John's Island Drive property over which she claims homestead

protection and the reverse mortgage on her 5115 Yuma Street property in Washington D.C.  While

the Magistrate correctly summarized Judge Kanarek's view, his conclusion as to Pamela Stuart's

actions was erroneous.  The facts are that Pamela Stuart purchased her Florida home in January

2000, while Lewis L. Smith, Jr. was still co-trustee of the trust, after her mother had been hospitalized under the Baker Act at the Center for Behavioral Health in Vero Beach and Ms. Stuart concluded that she needed to spend more time taking care of her mother's situation in Vero Beach. It was a permanent residence, however, and met the qualifications under the Florida Constitution, Article X, § 4 for a homestead property.  By September 2004, Pamela Stuart had concluded that she was legally qualified to vote in Florida and the Supervisor of Elections agreed and registered her. From that point on, her Florida residence was her homestead in fact if not in name.  Over the years she gave up her homestead tax exemption on her DC residence and claimed a homestead tax exemption in Florida for which she was deemed qualified.  ( R. 3046).  She filed a Declaration of Domicile, Exhibit 23 ( R. 2869-70).  She filed a Notice of Homestead.  Exhibit 24 ( R. 3181 - 3183). Thus, the Florida residence was qualified for the homestead exemption of Article 10, § 4 of the Florida Constitution and none of the exceptions listed in the Florida Constitution applied, but Judge Kanarek, in an effort to avoid the consequences of the Florida Constitution, without benefit of notice or hearing, ruled incorrectly that Pamela Stuart was not domiciled in Florida.  This ruling established a new legal standard for domicile found nowhere in the Florida statutes or Constitution – that a long-time resident who showed no evidence of abandonment of her permanent residence could not be domiciled in Florida because she had a federally guaranteed reverse mortgage on an unrelated property outside of Florida.

The reverse mortgage on Plaintiff's DC home, contrary to Judge Kanarek's belief, was not shielded from creditors by the reverse mortgage.  The reverse mortgage amount would take priority in any collection action but it was not the figure of $938,250 that Judge Kanarek thought it was. However, District of Columbia law, which Pamela Stuart had no role in creating, does provide

homestead protection from creditors just as Florida's Constitution does but it is far more expansive because it is afforded to residents who are domiciled elsewhere but who earn the majority of their livelihood in DC (such as members of Congress). § 15-501(a)(14) D.C. Code exempts from claims of creditors "the debtor's aggregate interest in real property used as the residence of the debtor" and applies to a residence of the debtor, even if domiciled elsewhere.  As the statute says, it applies to the residence of a debtor "householder residing in the District of Columbia, or of a person who earns the major portion of his livelihood in the District of Columbia, being the head of a family or householder, regardless of his place of residence" and makes it "free and exempt from distraint, attachment, levy, or seizure and sale on execution or decree of any court in the District of Columbia."  So, Pamela Stuart, by virtue of earning the majority of her livelihood in Washington, D.C., would have had creditor protection of her D.C. residence despite being domiciled in Florida. However, that was never a motivation for anything that she did with respect to her Florida and DC residences.

Judge Kanarek did  regard Plaintiff's Declaration of Domicile to be an attempt to circumvent the order of Judge Cox dated January 3, 2016 placing restraints on Plaintiff's ownership rights to her Florida and DC residences for which Judge Cox had no legal or evidentiary basis.  Plaintiff regarded her Declaration of Domicile to be merely a statement of what the factual circumstances of her status had been since 2004 – well before Judge Cox took it upon herself to interfere with Plaintiff's property right in contravention of the 4th and 5th Amendments to the US Constitution.

In Paragraph 26, the Magistrate is correct that Judge Kanarek decided not to apply credits requested by Plaintiff to the outstanding loan amounts that the successor trustee had identified (erroneously).   As noted above, Judge Kanarek refused to credit any trustee expenses incurred by

74

Plaintiff over sixteen years of service despite the requirements of § 736.0709, Florida Statutes, that made credits for those expenses mandatory with interest. Judge Kanarek's ruling in this respect was not only legally erroneous but contrary to public policy. Would any family member reading of Plaintiff's experience before the Florida courts take on a role as an unpaid trustee for sixteen years with the prospect that all expenses of travel, housing, meals and maintenance of the trust property paid in the expectation of reimbursement would be denied? It also was erroneous when the Judge claimed that Pamela Stuart had not supplied substantiation for the expenses she incurred. Pursuant to Judge Cox's order, Ms. Stuart sent ALL of the original receipts in a large box (about three feet by two feet) to counsel for Ryan/Stuart that was delivered by the deadline set by Judge Cox of January 22, 2016. She delivered electronic copies of all of those receipts to the successor trustee who refused to look at them claiming it was a waste of her time. Pamela Stuart introduced summaries of the receipts in evidence as permitted by § 90.956 of the Florida Evidence Code. ( R. 2909 - 3027),

Judge Kanarek's ruling denying fee compensation has some basis in Florida case law but, like the case law that applies to equitable liens against homesteads, there must be some showing of wrongdoing or breaches of trust associated with the fees earned. As noted above, for the first years of trust administration, Pamela Stuart was paid trustee fees upon advice of counsel and the accountant. Those fees and reimbursements were properly earned but not credited by Judge Kanarek. After Plaintiff started taking loans in 2001 against her inheritance, her right to trustee fees and expense reimbursements, she failed to formally credit herself with fee payments and characterized the withdrawals as loans. That was a huge error but consistent with her thought at the time that the situation would sort itself out after she arranged for the LLC to sell its building and

could reimburse the trust for anything above what she was due to be paid.

Plaintiff notes in this context that the LLC did not net $1.95 million from the sale of the

building as Judge Kanarek thought (Order on Final Distribution at p. 14). Instead the net proceeds

after payment of the debts of the LLC and the payment to Marion Stuart was more like $ 985, 137.06

as shown on the settlement statement for that sale.   ( R. 3031).

To award her zero fees, Judge Kanarek had to ignore the meticulous time sheets prepared by

Plaintiff showing her work on trust administration ( R. 3056-3177).  Her work consumed thousands

of hours and weeks and months of her time which interfered with her ability to earn income in other

pursuits.  Yet Plaintiff readily acknowledged, she failed to file required accountings (relying on her

sisters' access to brokerage documents and her frequent communications with them as shown in R.

3056-3177 to establish that they were well-informed of the status of the trust and its administration).

Her thoughts in that regard were not unreasonable.  A district court found in *Figel v. Wells Fargo*

*Bank, N.A.,* no. 10-cv-60737 COHN/SELZER (S.D.Fl. Mar. 9, 2011) (Exhibit 24) where the trustee

had filed no accountings for years that claimants' access to brokerage statements showing trust assets

and withdrawals barred their claims. Plaintiff also readily acknowledged her borrowing from the

trust which she reasonably believed was authorized by the trust and by Florida law as discussed

previously. Yet, Judge Kanarek thought her abuses of the trust were "multiple and flagrant" and was

able to rely on a decision of the Second District Court of Appeals of Florida, *Ortmann v. Bell*, 100

So.3d 38 (Fla. 2d DCA 2012) citing a 1961 opinion of that court that has never been cited by the

Fourth District Court of Appeals which has jurisdiction over Indian River County.  So, it is fair to

say that Judge Kanarek's opinion that Plaintiff should be denied all fees for her sixteen years of

service as a trustee had a bare modicum of legal support but was something akin to an abuse of

discretion.  His claim that Plaintiff did not submit competent substantial evidence supporting her

claim for reimbursement of expenses mandated by law was plainly in error.

In Paragraph 28, the Magistrate turned to Judge Kanarek's rejection of the applicable Florida

law concerning the descent of homestead titled in a trust pursuant to § 732.401(1), Florida Statutes,

and his decision that it was "appropriate" to award Plaintiff's interest in her father's homestead to

her sisters.  Plaintiff has discussed previously how US Supreme Court and Florida Supreme Court

precedent did not support Judge Kanarek's finding that Plaintiff's conduct met the standard

announced by those courts for "reprehensibility."

The Magistrate noted that Judge Kanarek found "clearly and unequivocally" that Plaintiff's

home was and remains in Washington, D.C.  To do so, the judge had to ignore all of the evidence

that the Florida Statutes regards as indicative of homestead status: § 196,015, Florida Statutes,

196.015 Permanent residency; factual determination by property appraiser.—

Intention to establish a permanent residence in this state is a factual determination to be

made, in the first instance, by the property appraiser. Although any one factor is not conclusive of

the establishment or nonestablishment of permanent residence, the following are relevant factors that

may be considered by the property appraiser in making his or her determination as to the intent of

a person claiming a homestead exemption to establish a permanent residence in this state:

(1) A formal declaration of domicile by the applicant recorded in the public records of the

county in which the exemption is being sought.

(2) Evidence of the location where the applicant's dependent children are registered for

school.

(3) The place of employment of the applicant.

(4) The previous permanent residency by the applicant in a state other than Florida or in another country and the date non-Florida residency was terminated.

(5) Proof of voter registration in this state with the voter information card address of the applicant, or other official correspondence from the supervisor of elections providing proof of voter registration, matching the address of the physical location where the exemption is being sought.

(6) A valid Florida driver license issued under s. 322.18 or a valid Florida identification card issued under s. 322.051 and evidence of relinquishment of driver licenses from any other states.

(7) Issuance of a Florida license tag on any motor vehicle owned by the applicant.

(8) The address as listed on federal income tax returns filed by the applicant.

(9) The location where the applicant's bank statements and checking accounts are registered.

(10) Proof of payment for utilities at the property for which permanent residency is being claimed.

As the time of the hearings in the case in Indian River County, Pamela Stuart had owned her personal residence in Florida since January 2000 and had resided there (along with periodic residence in her home in DC) since that time and had indicated no intention of abandoning her homestead.   She was single with no children.   She testified she had been a member of the Florida Bar since 1994, had served on the Executive Council of the Florida Bar's Real Property, Probate and Trust Law Section since 1998 and had a law office in Vero Beach which she had maintained since 2006.   She also had an office in DC and was "of counsel" to a small law firm in New York City. She indicated that she did not intend to terminate her residency in DC but to continue going back and forth as her business and personal needs dictated indefinitely.   She had a homestead tax exemption in Florida but not in D.C.   She had been registered to vote in Indian River County since September

78

2004 and had volunteered as a voter protection attorney in Indian River County for each federal election cycle since then.   She had a Florida driver's license and her car was titled in Florida.   She testified that she had used her DC address on tax returns in the past.   She has not done so in many years.   She testified that she maintained bank accounts at Northern Trust in Vero Beach and at Eagle Bank of Maryland.   She had paid utilities to the City of Vero Beach utilities since January 2000.

Pamela Stuart had taken the steps prescribed in the Florida Statutes for manifesting domicile in Florida.   Judge Kanarek discounted her Declaration of Domicile because at the time she filed it she used a DC license for identification.   She still uses that DC license for identification sometimes but it is not currently in force and was not at the time of the hearing.   As noted previously, Plaintiff filed her Declaration of Domicile to confirm facts already in existence, not to violate an order of the court (which was unsupported by any legal basis) that she not transfer her ownership rights to her home in Florida for the pendency of the proceeding.   The Florida law with respect to how one manifests Florida domicile clearly anticipates that some Floridians domiciled in Florida have another residence elsewhere:

222.17 Manifesting and evidencing domicile in Florida.—

(1) Any person who shall have established a domicile in this state may manifest and evidence the same by filing in the office of the clerk of the circuit court for the county in which the said person shall reside, a sworn statement showing that he or she resides in and maintains a place of abode in that county which he or she recognizes and intends to maintain as his or her permanent home.

(2) Any person who shall have established a domicile in the State of Florida, but who shall maintain another place or places of abode in some other state or states, may manifest and evidence his or her domicile in this state by filing in the office of the clerk of the circuit court for the county in which

he or she resides, a sworn statement that his or her place of abode in Florida constitutes his or her predominant and principal home, and that he or she intends to continue it permanently as such. (3) Such sworn statement shall contain, in addition to the foregoing, a declaration that the person making the same is, at the time of making such statement, a bona fide resident of the state, and shall set forth therein his or her place of residence within the state, the city, county and state wherein he or she formerly resided, and the place or places, if any, where he or she maintains another or other place or places of abode.

The concept of domicile in Florida centers on the mental status of the resident. Does he or she intend to make Florida a permanent residence? A durational residency requirement for domicile is unconstitutional under both Florida precedents and US Supreme Court precedents. *Ostendorf v. Turner,* 426 So.2d 539 (Fla. 1982), *citing Sparkman v. State ex rel. Scott,* 58 So.2d 431 (Fla. 1952); *L'Engle v. Forbes*, 81 So.2d 214, 215-16 (Fla. 1955)(continuous residency not required for permanent residency). *Dunn v. Blumstein,* 405 U.S. 330 (1972). In an unintentional way of demonstrating intent to remain in Florida, on September 4, 2007 Plaintiff purchased a burial plot next to the final resting place of her father in the Town of Indian River Shores Cemetery. Exhibi9t 25( R. 3036). The rules of the town permit only residents of the town to be buried there. Judge Kanarek noted that Plaintiff had admitted calendars that he thought showed her periods of residency in Florida since 1998. They did not. They were introduced to illustrate the days she spent in Florida working on trust administration matters for purposes of demonstrating her entitlement to trustee fees (the topic that was supposed to be the issue at the hearings). ( R. 2891 - 2907).

Judge Kanarek found that Plaintiff's DC residence was her "principal" place of residence. In part, he relied upon evidence found nowhere in the trial record but which the Judge must have

researched himself on the internet for which place Plaintiff used as her official bar address for the five jurisdictions where she was admitted to the bar.  On page 23 of his Order on Final Plan of Distribution, he noted that Plaintiff listed her DC address with the Florida Bar.  Because this was never an issue in the case and had not been raised in the complaint or at any point in any hearing, Plaintiff did not have the opportunity to advise the judge that she used her DC address because she believed that members of the Florida Bar who were admitted from out of state could not use a Florida address until they had completed the Basic Skills requirement of the MCLE rules of the Florida Bar.  Subsequent to the hearings in this case, Plaintiff found out that she was in error in that belief.  She then changed her official Florida Bar address to Vero Beach but had to give that up when her home was seized by the court.

Judge Kanarek also noted that Plaintiff had entered into a reverse mortgage on her DC residence in July 2013.  Because of the federal guarantees for a Home Equity Conversion Mortgage, the regulations implementing the National Housing Act require that a homeowner entering into such a mortgage occupy it as a "principle residence" meaning that the homeowner occupies it generally at least 183 days annually. [17]   As the Florida statute on declaration of domicile notes, it is perfectly acceptable to be domiciled in Florida and have a residence in another place.   Plaintiff followed the example of her parents in this regard.  But Judge Kanarek said otherwise.

A most troubling aspect of this part of the case is that Judge Kanarek not only went outside the record for "evidence" to support his view that Plaintiff was not domiciled in Florida, he actually invented evidence.  The Judge said at page 25 of his Order on Final Distribution, "Although she says

---

[17]  This requirement, set forth in 24 C.F.R. Section 206.3, is intended to make this type of mortgage (which is limited to homeowners age 62 or older) unavailable to investors.

that she intended to make this her home the evidence shows clearly and unequivocally that her home was and remains in Washington, D.C."  Plaintiff NEVER SAID during the entirety of the case that she intended to make Florida her home in the future.  Rather, she asserted many times under oath that she considered Florida her permanent residence.   Under Florida law, a Notice of Homestead (Exhibit 24)  is supposed to be a notice to potential creditors that a particular residence is a permanent homestead and exempt from creditors' levies.  She filed the Notice of Homestead with the Circuit Court and also in the case files so Judge Kanarek knew about it when he ruled otherwise. (R 3181 - 3183)

The applicable Florida law, § 222.01, Florida Statutes, reads as follows:

222.01 Designation of homestead by owner before levy.—

(1) Whenever any natural person residing in this state desires to avail himself or herself of the benefit of the provisions of the constitution and laws exempting property as a homestead from forced sale under any process of law, he or she may make a statement, in writing, containing a description of the real property, mobile home, or modular home claimed to be exempt and declaring that the real property, mobile home, or modular home is the homestead of the party in whose behalf such claim is being made. Such statement shall be signed by the person making it and shall be recorded in the circuit court.

So, Pamela Stuart, who had never been advised in the complaint or any notice of hearing that her domiciliary status, her right to vote, her ownership of her permanent residence in Florida, or her right to a one-third share of her father's homestead and her parents' personal property, had those rights taken from her in violation of established US and Florida law in violation of the Fourth and Fifth Amendments to the US Constitution and the applicable Florida law set forth above.  The

82

Florida Division of Elections in its guidelines for voting in Florida defines legal residence as follows:

> Legal residence-Permanent. Legal residency is not defined in law. However, over the years, the courts and the Florida Department of State/Division of Elections' have construed legal residency to be where a person mentally intends to make his or her permanent residence.1 Evidence of such intent can come from items or activities such as obtaining a Florida driver's license2, paying tax receipts, paying bills for residency (light, water, garbage service) and receiving mail at address, claiming the property as homestead,3 declaring the county as domicile, and doing other activities indicative or normally associated with home life. Therefore, legal residence is a convergence of intent and fact. Once residency is established for voting purposes, it is presumptively valid or current until evidence shows otherwise. See Op. Atty Gen. Fla. 055-216 (August 26, 1955). A business address is not typically a satisfactory legal residential address but if the person resides there despite the zoning ordinance, the address could become the person's legal residential address.4

Plaintiff did everything that her parents had done before her to establish Florida residency and domicile. She became active in civil life in Florida, made friends, and joined her church in Vero Beach. She served clients in legal matters there. All that has been taken away from her by a state court that did not grant her the due process of law to which she was entitled. Because it was manifestly in contravention of the applicable Florida property law, this amounted to an unconstitutional judicial taking in violation of the 5th Amendment. *Stop the Beach Renourishment v. Florida Department of Environmental Protection,* 560 U.S. 702 (2010).

Paragraph 29: Plaintiff has explained previously that her interest in her father's homestead was acquired innocently in that she inherited it by descent and operation of law when he died on January 18, 1998. As such her homestead interest in that property was not legally supposed to be subject to an equitable lien because she had never been unjustly enriched by her ownership of that property interest. *See Palm Beach Savings & Loan Assn., F.S.A. v. Fishbein,* 619 So. 2d 267, 270-71 (Fla. 1993). Plaintiff notes that she refused to execute a quitclaim deed to her interest in her father's residence. In violation of Florida law which gives a trustee no authority over such a

homestead, the successor trustee executed a "trustee's deed" and gave the property to Catherine Ryan and Deborah Stuart.  The deed noted that no title search had been undertaken to do that.   The successor trustee filed a "certificate of trust" which implied, contrary to applicable Florida law, that she had authority to transfer title to the residence to Catherine Ryan and Deborah Stuart.  These items are attached as Exhibit 26.  On January 20, 2018, Deborah Stuart executed a quitclaim deed of her interest in J. Raymond Stuart's homestead to Catherine Ryan.  Catherine Ryan and her husband, Edward Ryan, have occupied that residence annually from about November to April ever since Marion Stuart passed away in 2012.

In Paragraph 30, the Magistrate recounts Plaintiff's efforts to stay enforcement of the liens while the matter was on appeal.  She was unable to post a bond.

In Paragraph 31, the Magistrate accurately recounts Plaintiff's Notice of appeal.

In Paragraph 32, the Magistrate describes her view of the federal lawsuit now before this Court.    In fact, this lawsuit is founded upon a complaint under 42 U.S.C. § 1983 and the Declaratory Judgment Act, 28 U.S.C. § 2201, to declare Plaintiff's rights to her properties and civil rights as summarized above in light of the seizure of those properties in violation of the Takings Clause of the Fifth Amendment to the Constitution.    It is somewhat analogous to a habeas corpus case under  in a non-criminal context.

The writ of habeas corpus is one of what are called the "extraordinary", "common law", or "prerogative writs", which were historically issued by the English courts in the name of the monarch to control inferior courts and public authorities within the kingdom. The most common of the other such prerogative writs are *quo warranto, prohibito, mandamus, procedendo, and certiorari.* They are available to a federal court under the All Writs Act, 28 U.S.C. § 1651.  Under the All Writs Act,

this court may issue "all writs necessary or appropriate in aid of [its] jurisdiction[s] and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). *Ohio A. Philip Randolph Institution v. Larose*, No. 18-4258, (6th Cir. January 18, 2019). Importantly, as the Supreme Court has held, "[t]he power conferred by the All Writs Act extends, under appropriate circumstances, to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice...and encompasses even those who have not taken any affirmative action to hinder justice." United States v. New York Tel. Co., 434 U.S. 159, 174,  98 S. Ct. 364, 372 (1977). (holding district court had authority to order a company to provide technical assistance). The due process for such petitions is not simply civil or criminal, because they incorporate the presumption of non-authority. The official who is the respondent must prove his authority to do or not do something. Failing this, the court must decide for the petitioner, who may be any person, not just an interested party.

Upon reflection, Plaintiff submits that this Court  may be the only place that Plaintiff can get a fair hearing and that she is entitled to the exercise of jurisdiction of this Court to provide it under the Supremacy Clause of the US Constitution.  Article VI, Paragraph 2 of the U.S. Constitution is commonly referred to as the Supremacy Clause.  It establishes that the federal constitution, and federal law generally, take precedence over state laws, and even state constitutions.  It prohibits states from interfering with the federal government's exercise of its constitutional powers, and from assuming any functions that are exclusively entrusted to the federal government. The so-called State Judges clause of the Supremacy Clause provides that, "This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state

shall be bound thereby, anything in the Constitution or laws of any State to the contrary

notwithstanding."   That suggests that state courts are bound and required not to engage in

unconstitutional takings or seizures of private property in violation of the 4th and 5th Amendments

to the Constitution and that this Court has the power to review and state Plaintiff's rights with

respect to state court actions that violate the US Constitution.  The centrality of the concept of

private property rights to the Founders is expressed in the Supremacy Clause which, in section 3 of

Article VI, assured creditors that their rights would be respected under the new Constitution just as

they had under the Articles of Confederation.

Ordinarily, the federal courts will defer to state courts' interpretation of property rights

which historically has been the province of state law.  However, the supremacy of the U.S.

Constitution permits such review in the rare case when state courts simply depart from well-

established principles as to be without substantial basis. *Broad River  Power Co v. State of South

Carolina Daniel*, 281 U.S. 537, 543, 50 S.Ct. 401, 74 L.Ed. 1023 (1930).  In this case, the actions

of the state courts present that extremely rare instance when state actions "so departs from

established principles as to be without substantial basis, or presents any ground for the protection,

under the Constitution, of rights or immunities which the state court has found to be nonexistent."

*Id.*    The Court in *Stop the Beach Renourishment v. Florida Department of Environmental

Protection,* 560 U.S. 702, 725 (2010) noted that " To ensure that there is no "evasion" of our

authority to review federal questions, we insist that the nonfederal ground of decision have "fair

support." *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 130 S. Ct. 2592, 177 L.

Ed. 2d 184, 560 U.S. 702 (2010).  The Court went on to say, "If a judicial decision, as opposed to

an act of the executive or the legislature, eliminates an established property right, the judgment could

be set aside as a deprivation of property without due process of law. The Due Process Clause, in both its substantive and procedural aspects, is a central limitation upon the exercise of judicial power. And this Court has long recognized that property regulations can be invalidated under the Due Process Clause." 560 U.S. at 735.

The Court in *Stop the Beach* postulated how such a case might arise in exactly the context presented here: "the party may file a separate lawsuit—Case B—arguing that a taking occurred in light of the change in property law made by Case A. After all, until the state court in Case A changes the law, the party will not know if his or her property rights will have been eliminated. So res judicata probably would not bar the party from litigating the takings issue in Case B." *Id.,* 560 U.S. at 740. Here Plaintiff is asserting that there was no "fair and substantial basis" for the rulings of Judge Kanarek and later the Fourth District Court of Appeals which relied erroneously on Judge Kanarek's findings. *See Broad River Power Co v. State of South Carolina Daniel*, 281 U.S. at 540.

The Supremacy Clause suggests that the usual deference accorded to state court decisions under the *Rooker-Feldman* doctrine would not be appropriate where a challenge such as this one was brought alleging that there was no "fair and substantial basis" for the state courts' rulings under established state law and that the taking of Plaintiff's property without subject matter jurisdiction constitutes egregiously wrong governmental action that is unconstitutional

The Fifth Amendment's mandate that private property shall not be taken for public use without just compensation applies to the states and their political subdivisions through the Fourteenth Amendment. *See Chicago, Burlington & Quincy R.R. Co. v. Chicago,* 166 U.S. 226, 239, 17 S.Ct. 581, 41 L.Ed. 979 (1897). This protection is not restricted to physical invasions, occupations, or removals of property; in some cases, overly assiduous government regulation can

create an unconstitutional taking. A taking of private property by a governmental authority from one private party to give it to another private party may be an unconstitutional taking. *Kelo v. City of New London,* 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005).[18]   Whether a particular restriction implicates the Takings Clause is context-sensitive and hinges on the specific circumstances. *See Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *United States v. Central Eureka Mining Co.*, 357 U.S. 155, 168, 78 S.Ct. 1097, 2 L.Ed.2d 1228 (1958). In mounting such inquiries, courts must weigh especially the character of the government action, its economic impact on the plaintiff, and the degree to which it interferes with the plaintiff's reasonable, investment-backed expectations. *Houlton Citizens' Coalition v. Town of Houlton*, 175 F.3d 178, 190 (1st Cir. 1999).

In Paragraph 33, the Magistrate recounts the history of the professional license suspensions suffered by Plaintiff as a result of the complaint filed with the Florida Bar by Edward Ryan. Plaintiff disputes footnote 5 wherein the Magistrate notes that Defendants added that Plaintiff pleaded guilty to charges that as trustee she engaged in a pattern of misconduct in violation of the Rules regulating the Florida Bar.  Plaintiff most certainly did NOT plead guilty to such a thing. Rather, at the insistence of Bar Counsel, she agreed (mistakenly) to the inclusion of a sentence that read as follows: "Honorable Judge Paul B. Kanarek both found that respondent breached her fiduciary duties by failing to provide the required annual accountings and loaning herself substantial monies from the trust and denied respondent's request for payment of trustee fees and repayment of trust expenses advanced by respondent."   Plaintiff entered into a "conditional

---

[18]   Plaintiff notes that the Florida legislature reacted to the *Kelo* decision by passing a statute, 73.014, Florida Statutes, that prohibits the exercise of eminent domain in circumstances like those presented in the *Kelo* case.

guilty plea for a consent judgment." She did not plead guilty to engaging in a pattern of misconduct in violation of the Rules Regulating the Florida Bar. Rather, she agreed that she failed to complete certain duties associated with trust administration because she was overwhelmed with other duties and engaged in borrowing from her father's trust that was permitted by the terms of the trust and Florida law that was deemed excessive. It is important that the Court understand that Plaintiff did not have any malicious intent in doing what she did and reasonably but erroneously believed that what she did was permissible under the circumstances.

*In Paragraph 34*, the Magistrate questions why the Plaintiff did not account for her "reverse mortgage income." The reason is that there was no reverse mortgage income. The Magistrate was under the same erroneous impression as Judge Kanarek that Plaintiff received a large sum of money when she entered into a reverse mortgage. That was not the case. The circumstance that prompted her to do that was her inability to pay real estate taxes that were due to be paid on her residence in Washington. At the time of the closing on the reverse mortgage, Plaintiff received approximately $100,000 in cash that had to be applied to past due real property taxes in Florida, past due annual dues and assessments for the residential community where she lived in Florida, and various fees of doctors (she underwent foot and spine surgery in the fall of 2013) and expenses associated with those surgical procedures.

In Paragraph 35, the Magistrate discusses the Fourth District Court of Appeals' opinion. The Magistrate seems to have misunderstood the appellate court's decision which got both the facts and the law wrong. The Appellate court was correct in deciding that equitable liens could not be applied to homestead property for any reasons not part of the named exceptions in Article 10, § 4 of the Florida Constitution. It then said that Plaintiff did not qualify for homestead protection on her

89

father's homestead because she could not have more than one homestead.  This decision was clearly erroneous as the Florida statutes and Constitution recognize that a person may have only one personal homestead but that an interest in a parent's homestead may be acquired by inheritance or descent and be protected from forced sale to creditors.  *See,* Article X, § 4(a) and (b), Florida Constitution, and § 732.401(1), Florida Statutes, which reads as follows:

732.401 Descent of homestead.—

(1) If not devised as authorized by law and the constitution, the homestead shall descend in the same manner as other intestate property; but if the decedent is survived by a spouse and one or more descendants, the surviving spouse shall take a life estate in the homestead, with a vested remainder to the descendants in being at the time of the decedent's death per stirpes.

The appellate court said Plaintiff did not qualify for homestead protection because she was not a permanent resident of Florida and referred to the part of Judge Kanarek's order where he invented a statement by Plaintiff that appears nowhere in the record on appeal because she never said it and also made the same mistake as Judge Kanarek in saying that Plaintiff testified she spent an average of 59 days in the state annually which was not true either.  The appellate court said, " While she testified that she "intended" to make her permanent residence in Florida at some point in the future, she also testified that she spent an average of only fifty-nine days in the state each year from 1998 through 2013." *Stuart v. Ryan*, 232 So.3d 418 (Fla. 4th DCA 2017). The appellate court found that Plaintiff, who had a personally purchased resident in the state for nearly 18 years prior to the appellate decision and showed no evidence of abandoning it, was not a permanent resident of Florida entitled to the homestead exemption.  The appellate court noted the reverse mortgage on Plaintiff's out of state residence and thus appeared to announce a new rule of law that to be a permanent

resident of Florida one must not have a reverse mortgage on an entirely unrelated property in another state.  The appellate court also ignored applicable US Supreme Court and Florida Supreme Court precedent that made it  unconstitutional under the equal protection clause for a durational residency requirement to be imposed for purposes of determining domicile or residency for voting purposes. *Dunn v. Blumstein,* 405 U.S. 330 (1972)( one-year residency requirement for voting unconstitutional as violative of the equal protection clause of the fourteenth amendment of the United States Constitution because it was not necessary to further a compelling state interest.), *Ostendorf v. Turner,* 426 So.2d 539 (Fla. 1982)(" With regard to the constitutionality of homestead residency requirements, this Court, in *Sparkman v. State*, 58 So.2d 431 (Fla.1952), struck down a one-year durational residency requirement.""The reason for the equal protection clause was to assure that there would be no second class citizens.).  *See also, Florida State Board of Dentistry v. Mick*, 361 So.2d 414 (Fla.1978) (Florida could not apply a "continuous residency" and domicile requirement for a license to practice dentistry in the state).   In light of the plainly flawed ruling, Plaintiff was astonished when the Florida Supreme Court denied certiorari.  Indeed, it looked to her like a coverup.

In Paragraphs 36 through 39, the Magistrate describes the initiation and conduct of the lien foreclosure case in brief.  However, it was still ongoing at the time that the instant federal action was filed except for the fact that Catherine Ryan and Deborah Stuart were named as cross-plaintiffs by the Tennis Townhouses Condominium Association, Inc. in its complaint.   Plaintiff notes that she has a perfect right to assert the *ultra vires* action by the Tennis Townhouses as a defense to the case under the applicable Florida law which regards Declarations of Condominium and by-laws of the association as covenants running with the land so that Plaintiff, as a unit owner, had a right to insist

on fulfillment of the conditions precedent to a collection lawsuit. In the absence of authority of the plaintiff in that case to bring the claim, the circuit court lacked subject matter jurisdiction over it. The case was ongoing in that the court had ordered the sale of Plaintiff's homestead residence which was scheduled for June 27, 2018. The Final Judgment of Foreclosure was entered on May 24, 2018 after Pamela Stuart was not made a party to the case until April 27, 2018 and was denied the opportunity to present any evidence at the "hearing" held on the motions for summary judgment filed by the Condo Association and the cross-plaintiffs. Plaintiff subsequently filed objections to the sale and her objections were summarily rejected. She filed notices of appeal from the Final Judgment of Foreclosure and the order confirming the sale and that appeal is pending before the Fourth District Court of Appeals. The Magistrate was in error when she indicated that Judge Kanarek deemed the HOA's cure of the defect to be sufficient. Rather Judge Kanarek refused to hold a hearing as required on Plaintiff's motion to strike an affidavit by the President of the homeowner's association that stated falsely that the defective failure of the Board of Directors to affirmatively approve the lawsuit and make a finding that it was in the best interests of the association to file it had been cured. To this day the Tennis Townhouses Board of Directors has not made the required finding and its minutes do not reflect that it ever voted to approve the collection action. The Judge also summarily denied Plaintiff's motions for sanctions against the attorney for the Tennis Townhouses who appears to have suborned perjury in that respect and obstructed justice by instructing the agents of the Tennis Townhouses not to provide Plaintiff with affidavits she requested concerning the compliance with the requirement of Board of Directors approval.

In paragraph 40, the Magistrate describes in brief the federal constitutional claims raised in this lawsuit and that the judicial takings claim was included in a petition for certiorari to the US

Supreme Court in the Trust case.  That petition due to the Supreme Court's rule of procedure had

to be filed by July 9, 2018, just after the high court retired for its summer recess.  The petition was

denied on the first Monday in October when the Court resumed its work.  Thus, Plaintiff suspects

that her case did not get much scrutiny or consideration beyond that of one of the pool law clerks.

It was one of hundreds of denials of cert petitions listed on about sixty pages of the Court's docket

entries for that day.   As Herman Schwartz, a professor of law at American University who is a

seasoned observer of the high court, remarked recently,[19] the Supreme Court has consistently reduced

the number of cases it actually considers in a term to about 75.  Thus, the idea that the US Supreme

Court is the ultimate source of appellate review and correction for Constitutional violations tolerated

at the state court level is wholly illusory.

In Paragraph 41, the Magistrate recounts the consideration of Plaintiff's motion for a

temporary restraining order that was courteously and expeditiously decided the day it was filed

because the sale of Plaintiff's home was scheduled for the following day.   Plaintiff disagreed with

the conclusion of the opinion that the Florida circuit court did not change the law in a way that

contravened Plaintiff's clearly established right to a homestead exemption.  Because of the inability

to present argument on this point, Plaintiff was unable to advise Judge Middlebrooks that the circuit

court invented evidence in the case with which to conclude erroneously that Plaintiff was not

domiciled in Florida and established a new rule of law contrary to the established Florida precedent

that a durational residency requirement exists for domicile.

As the Eleventh Circuit said in *Cotton v. Jackson,* 216 F.3d 1328 (11th Cir. 2000), "It is the

---

[19]  Herman Schwartz, remarks to Legal Affairs Group, The Cosmos Club, Washington,
D.C., December 19, 2018.

state's failure to provide adequate procedures to remedy the otherwise procedurally flawed deprivation of a protected interest that gives rise to a federal procedural due process claim." In this case Plaintiff had an interest in her own personal residence protected by Florida statutes and the Florida Constitution as described above that was taken from her. Plaintiff can demonstrate and has demonstrated that the state trial court exercised jurisdiction over her properties that were never named in her sisters' complaint at all, let alone identified as special damages as required by Florida Rule of Civil Procedure 1.120(g), that the state trial court placed restrictions on her ownership and use of her property interests without a legal basis for such restrictions, and that ultimately the court imposed equitable liens on properties without any evidence that Plaintiff's interest in them was acquired wrongfully or that she was unjustly enriched other than that she borrowed excessively from her father's trust. There was no expert testimony tracing any of her borrowed funds to those properties. Her acquisition of her own permanent residence in Florida and the ones she inherited by operation of law and by her parents' wills were wholly unrelated to any claim in the complaint. She demonstrated by the opinions of the trial judge and the Fourth District Court of Appeals that those due process violations were not remedied and the Florida Supreme Court declined to exercise jurisdiction to correct those defective decisions. So, Plaintiff made the required showing that the state court system, including the opportunity to appeal, was ineffective as to the Trust case.

In that connection, Plaintiff adds that she filed a motion for relief from judgment on June 9, 2018 in the Trust case highlighting the court's lack of subject matter jurisdiction and asserting that the judgment was consequently void. The trial court denied the motion as untimely even though Florida Rule of Civil Procedure 1.540(b)(4) says that a void judgment may be challenged at any time. The Court of Appeals affirmed in a per curiam decision without opinion in case no. 4D18-2388. Plaintiff filed a motion for rehearing en banc and for an opinion which was denied. Plaintiff is now

beyond astonished at the inadequacy of the Florida state courts for remedies to procedural and Constitutional deprivations she has suffered.

In Paragraphs 42 and 43, 45 and 46, the Magistrate reports that Plaintiff's sisters were the highest bidders at the foreclosure sale of her home on June 27, 2018. That was because the trial court awarded them a bid credit which scared off other bidders. A local appraiser, Peter Armfield, appraised the value of Plaintiff's home at $560,000 but the sisters were awarded a bid credit of over $ 2 million. They ended up paying $71,100 for the home which was less than one-third of the $225,000 that Plaintiff paid for it when she bought it in January 2000. Plaintiff challenged the sale as irregular and the sale price as shockingly inadequate but Judge Kanarek denied her motion. The clerk issued a certificate of title to Catherine Ryan and Deborah Stuart and Plaintiff was forced to evacuate her home on July 23, 2018. She donated the contents of the home to the Johns Island Community Service League to support its program which assists families and children in Indian River County. Plaintiff had served on the Service League's philanthropy committee in the past. While she had made arrangements to sell some of the furnishings through a consignment shop should she be forced to move, she could not arrange for transportation of the items in the time frame presented by the circumstances.

While the Magistrate notes that at the time the sisters had taken no steps to collect their judgment, they then proceeded to move for a deficiency judgment which was granted. They have now filed a foreign judgment action in DC Superior Court in which they seek to collect that judgment. Apparently they were aware from Plaintiff's prior reports that her residence in DC is subject to foreclosure by the reverse mortgage company and they hope to collect whatever is left so that Plaintiff will be left homeless. As noted above, District of Columbia law protects Plaintiff's

equity interest in her DC residence even if she is not domiciled there.

In Paragraph 44, the Magistrate recounts Plaintiff's unsuccessful attempt to obtain US Supreme Court review of the Trust case.

In Paragraph 47, the Magistrate accurately recites Plaintiff's claims with respect to property rights. She did not mention the Plaintiff's claim for loss of domicile, loss of her right to vote, and impairment of her right to travel (move from state to state) as a privilege and immunity guaranteed by the 14th Amendment. *See Shapiro v. Thompson,* 394 US 618 (1969).   In addition, if Plaintiff is permitted to amend her complaint to assert claims under the All Writs Act and the 4th Amendment for seizure of her property interests in an unreasonable and legally unfounded manner, those claims would also be before the Court.   Count III, based upon diversity of citizenship between Plaintiff (who is now a resident of DC), Catherine Ryan (a resident of New Jersey) and Deborah Stuart (who is a resident of Washington State) asserts under the Declaratory Judgment Act a claim to quiet title to Plaintiff's father's homestead that was fraudulently deeded by a "trustee's deed" to Plaintiff's sisters when the trustee lacked legal authority to act with respect to that property under the applicable Florida precedents recounted above.

In Paragraph 48, the Magistrate recounts the issues raised in Count I of the federal complaint. The sum total of the claims is that there was no adequate remedy in the state courts and Plaintiff was denied due process of law by courts that fabricated evidence and mixed up the facts of the case. Plaintiff notes, as an aside, that she has practiced law in five different jurisdictions for over 45 years and has never seen anything like this judicial conduct.  For that reason, she asserts that a departure from the usual *Rooker-Feldman* deference and preclusion avoidance is warranted as more fully set forth below.

In Paragraph 49, the Magistrate accurately recounts Plaintiff's claims as she describes them.

In Paragraph 50, the Magistrate erred in saying " . . ., but she contends that no evidence supports the state court's imposition of those equitable liens against her."  In truth and in fact, the claim is that there was no evidence in the state court proceeding that tied Plaintiff's alleged misconduct (failure to file accountings and excessive borrowing from the trust) to Plaintiff's acquisition of her permanent residence in Florida (acquired with Plaintiff's personal funds in 2000, mortgaged to support the purchase of the Stuart Building LLC's sole property asset in 2001, refinanced by Plaintiff to raise funds for legal fees for the LLC in 2006, and repaid by the LLC in 2009 when it paid off the refinancing as required when its asset was sold).  With respect to Plaintiff's interest in her father's homestead and her parents' personal property, she acquired her interest in her father's homestead by operation of law in 1998 when her father died – not through any misconduct on her part.  The same was true with respect to Plaintiff's interest in her parents' personal property that was governed by her parents' wills and was never part of the trust.  Plaintiff acquired her interest in her parents' furnishings and her mother's jewelry and recipes wholly apart from any misconduct on her part alleged in the complaint.  Despite the state trial court's lack of subject matter jurisdiction over these properties, it imposed equitable liens wholly unsupported by applicable Florida property law and engineered their transfer to Plaintiff's sisters in an unconstitutional manner.  In addition, the state trial court, in finding that Plaintiff engaged in "reprehensible conduct" so as to theoretically support an equitable lien, made the finding that was not in conformity with the applicable US Supreme Court precedent in *State Farm Mutual Auto Insurance Association v. Campbell,* 538 U.S. 408, 419 (2003) and Florida Supreme Court precedent in *Schoeff v. R. J. Reynolds Tobacco Co.,* 232 So.3d 294, 306-307 (Fla. 2017).  It is not clear that Florida law would support a finding that a breach

of trust could be "reprehensible" conduct sufficient to allow an equitable lien to be placed against a homestead property.  In any event, the Florida law is clear that only the exceptions to homestead protection against forced sale listed in the Florida Constitution may be applied and that courts are required to apply the protection against forced sale liberally to protect the home of the homestead owner.  That was not honored in this case.

In Paragraph 51, the Magistrate accurately summarizes Plaintiff's complaints without the legal analysis provided earlier.

In Paragraph 52, the Magistrate summarizes her view of Count II of Plaintiff's complaint.

In Paragraph 53, the Magistrate provides her analysis of Count III which Plaintiff disagrees with.  Count III is based upon diversity and attacks the erroneous transfer of title to Plaintiff's father's homestead and her parents' personal property, neither of which was properly within the subject matter of the complaint in the trust case because neither one of them were assets of her father's trust.   It does not provide the means for redress of the complaints in Counts I and II but stands on its own.   Plaintiff seeks a declaration of her one-third ownership of those properties and then an order for their sale and distribution of the proceeds of sale accordingly.

## DISCUSSION

In Paragraph 54, the Magistrate provides a brief introduction to her conclusion that the case merits dismissal based upon several doctrines that ordinarily would favor dismissal under these circumstances.

In Paragraph 55, the Magistrate cites the doctrines of abstention and preclusion because of the fact that the state court litigation purported to decide legal rights and obligations. With respect to abstention, the Supreme Court of the U.S. has said that abstention from the exercise of federal

jurisdiction is the exception, not the rule. "The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest." *Colorado River Water Conservation District v. United States, Akin v. United States*, 424 U.S. 800, 813, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), quoting *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188-189, 79 S.Ct. 1060 1063, 3 L.Ed.2d 1163, 1166 (1959). The Court's decisions have confined the application of the abstention doctrine to three general categories of cases: (1) cases presenting a federal constitutional issue which might be mooted or presented in a different posture by a state court determination of pertinent state law. *Colorado River,* 424 U.S. at 814. This category clearly does not fit the instant case before this Court because the Trust case has no further proceedings before it in which a Constitutional issue might be determined based upon a state court determination. (2) Abstention is also appropriate where there have been presented difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar. *Colorado River Water Conservation District v. United States Akin v. United States*, 424 U.S. at 814. This category does not fit the instant case either because there are no public policy problems of substantial public import at issue other than the state court having ignored the constraints on its subject matter jurisdiction, manufactured evidence, and ignored applicable Supreme Court precedents from both the Supreme Court of the U.S. and the Supreme Court of Florida. Because the state court actions were so bizarre, there can (hopefully) be no worry that action by this court would disrupt a state effort to establish

a coherent state policy with respect to a matter of substantial public concern,  (3) Abstention is appropriate where, absent bad faith, harassment, or a patently invalid state statute, federal jurisdiction has been invoked for the purpose of restraining state criminal proceedings. *Colorado River Water Conservation District v. United States Akin v. United States*, 424 U.S. at 816. This third category does not apply to this case because it is not concerned with a state criminal proceeding. The Court in Colorado River observed that the lower federal courts are creatures of Congress, which may limit their jurisdiction as it sees fit. *See* U.S. Const. art. III, § 1. Once Congress has granted jurisdiction, however, federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them." *Colorado River,* 424 U,S, at 817, quoted in *Sierra v. City of Hallandale Beach,* No. 18-10740 (11th Cir. September 27, 2018).  So, this case does not meet the exceedingly rate criteria for application of the abstention doctrine.,

The preclusion doctrine encompasses principles are embodied in the related "preclusion" doctrines of res judicata and collateral estoppel, which the courts have developed in order to conserve judicial resources, relieve parties of the cost and vexation of multiple lawsuits, avoid inconsistent judgments and prevent forum shopping.  Under the judicially-developed doctrine of collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision is conclusive in a subsequent suit based on a different cause of action involving a party to the prior litigation. *United States v. Mendoza,* 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984). Plaintiff agrees with the concept of preclusion in those cases where the parties in the previous litigation have had a full and fair opportunity to litigate the issues.  As the Supreme Court said in *U.S. v. Mendoza*, "i]n such cases, no significant harm flows from enforcing a rule that affords a litigant only one full and fair opportunity to litigate an issue, and [that] there is no sound reason for

burdening the courts with repetitive litigation." *Id.,* 464 U.S. at 159.

The instant case before this Court does not present the situation where there was a full and fair opportunity to litigate the issues. Because the properties that were ultimately taken from Plaintiff (as the late Justice Arthur Goldberg would say, "we wuz robbed") were taken when the trial court had not acquired jurisdiction over those properties by a properly pleaded complaint or evidence supporting their removal from Plaintiff due to some misconduct associated with the properties, the preclusion based upon collateral estoppel or *res judicata* does not apply. Plaintiff did not have the opportunity to forum shop because she expected that she would get a full and fair hearing before the state courts. As she got deeper into the litigation it became apparent that there was a decision made early on in the case by the first judge to decide a motion that Plaintiff was a bad, deceitful, conniving person who schemed to wrest her parents' wealth from her sisters and the second judge just followed that lead. It ignored the fact that the J. Raymond Stuart trust did not own Plaintiff's personal residence or have anything to do with it. The court ignored the applicable law that J. Raymond Stuart's homestead may have been titled in the name of his trust but that after his death the trust no longer owned it and the trustee lacked authority to deed it to Plaintiff's sisters. Plaintiff never got the Constitutionally required notice and opportunity to be heard with respect to these property interests and was prejudiced by the lack of competent substantial evidence that was used by Judge Kanarek as a foundation for his rulings. The doctrine of laches was not applied. *See Corya v. Sanders,* 155 So.3d 1259 (Fla. 4th DCA 2015). This was no full and fair litigation as required by the collateral estoppel and *res judicata* doctrines of preclusion. In this case, the state court proceedings and procedural guarantees were fundamentally inadequate to vindicate Plaintiff's rights. *See Alvarez v. Florida Attorney General,* 679 F.3d 1257 (11th Cir. 2012).

In Paragraphs 56 and 57, the Magistrate raises the *Rooker-Feldman* doctrine as yet another reason this Court should abstain from giving Plaintiff the full and fair hearing to which her invocation of her Constitutional rights entitle her. The *Rooker-Feldman* doctrine derives from *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923), and *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). The doctrine is a jurisdictional rule that precludes the lower federal courts from reviewing state court judgments. *Nicholson v. Shafe,* 558 F.3d 1266, 1270 (11th Cir.2009). Federal district courts lack jurisdiction to adjudicate the validity of a state court order. *Thurman v. Judicial Corr. Servs., Inc.* No. 17-14450,(11th Cir. January 10, 2019). This is because "[28 U.S.C.] § 1257, as long interpreted, vests authority to review a state court judgment solely in th[e Supreme] Court." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 292, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005). The federal district courts, meanwhile, have been given original, not appellate, jurisdiction. *See, e.g.,* 28 U.S.C. §§ 1331, 1332.

The Supreme Court recently has cautioned that "[t]he *Rooker- Feldman* doctrine ... is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Id.* at 284, 125 S.Ct. 1517;*see also Lance v. Dennis,* 546 U.S. 459, 464, 126 S.Ct. 1198, 163 L.Ed.2d 1059 (2006) (per curiam) (noting the "narrowness" of the *Rooker- Feldman* rule). The Eleventh Circuit has since explained that the *Rooker- Feldman* doctrine operates as a bar to federal court jurisdiction where the issue before the federal court was "inextricably intertwined" with the state court judgment so that (1) the success of the federal claim would "effectively nullify" the state court judgment, or that (2) the federal claim would succeed "only to the extent that the state court wrongly decided the issues." *Casale v. Tillman,* 558 F.3d 1258, 1260

(11th Cir.2009) (per curiam).

   The instant case does not neatly fit within the confines of the very narrow *Rooker-Feldman* doctrine. As the Supreme Court said in *Dist. Attorney's Office for the Third Judicial Dist. v. Osborne*, 557 U.S. 52, 77,129 S Ct 2308, 174 L.Ed.2d 38 (2009)(hereinafter "*Osborne*"), "No State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const., Amdt. 14, § 1; accord Amdt. 5. This Clause imposes procedural limitations on a State's power to take away protected entitlements.   In such cases, it may be fairly inquired whether claim within the framework of the State's procedures for providing due process and obtaining relief "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental," or "transgresses any recognized principle of fundamental fairness in operation." *Id.,* 557 at 69.   In *Osborne*, the Court said that federal courts may upset post-conviction relief procedures provided by a state if they are "fundamentally inadequate to vindicate the substantive rights involved." Unlike the unlucky Mr. Osborne who was denied access to the newly improved version of DNA testing in part because he had never tried to access it through the available Alaska state procedures, Plaintiff in this case doggedly pursued what she hoped was an adequate state remedy for her situation but the state appellate courts shut her out, effectively, by not faithfully reviewing and applying  the actual evidence in the case and by ignoring or failing to apply state statutes and case precedents.  Unlike in Mr. Osborne's case, Plaintiff can show that she tried the state courts, found them facially and factually inadequate to supply her with the due process to which she was entitled and can show that it was arbitrarily denied. *See, Osborne,* 557 U.S. at 72.

   In Paragraph 57, the Magistrate said the doctrine applies when (1) the federal plaintiff was a party to the state court case, (2) the state court made am adverse ruling that was a final and

conclusive judgment on the merits; (3) the federal court plaintiff had a reasonable opportunity to raise her federal claim in the state court proceeding; and (4) the state court actually did adjudicate the federal claim in its adverse ruling or the federal claim was inextricably intertwined with the state court's judgment.  "A federal claim is inextricably intertwined with a state court judgment if the federal claim succeeds only to the extent that the state court wrongly decided the issues before it." *Parker v. Potter,* 368 Fed,Appx. 945 (11th Cir. 2000), citing *Siegel v. LePore,* 234 F.3d 1163, 1172 (11th Cir. 2000).  A claim is "inextricably intertwined" if it would "effectively nullify" the state court judgment or if it "succeeds only to the extent that the state court wrongly decided the issues." *Casale v. Tillman*, 558 F.3d 1258, 1260 (11th Cir. 2009) (per curiam), cited in  *Echeverry v. Wells Fargo Bank, N.A.* (S.D. Fla., 2017), 558 F.3d at 1260 (quoting Goodman ex rel. Goodman v. Sipos, 259 F.3d 1327, 1332 (11th Cir. 2001)),

The *Rooker-Feldman* doctrine is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.  *Exxon Mobil Corp. v. Saudi Basic Industries Corp*., 544 U.S. 280, 284 (2005). *Rooker-Feldman* does not otherwise override or supplant preclusion doctrine or augment the circumscribed doctrines that allow federal courts to stay or dismiss proceedings in deference to state-court actions  *Id.*  In the instant case, the application of this procedural bar is at best unclear because, as a practical matter, the state court cases that Plaintiff criticizes had not concluded at the time that Plaintiff filed her federal case.  What the Magistrate calls the "Trust Case" discussed in Count I of the federal complaint was not concluded at the time that the federal complaint was filed (June 26, 2018) because a petition for a writ of certiorari was filed with the

Supreme Court of the United States on July 9, 2018 after the Florida Supreme Court declined to accept jurisdiction on April 9, 2018 and a motion for relief from judgment filed June 9, 2018 on the grounds of lack of subject matter jurisdiction was pending before the state trial court.

The US Supreme Court subsequently included Plaintiff's petition among the thousands of cases for which certiorari was denied on October 1, 2018. Much like her compatriots on the "cert denied" list, Plaintiff assumes that her claims did not resonate with the newly-minted Supreme Court clerk who reviewed them and recommended that "cert" be denied. These days, only about 75 cases annually win the lottery of US Supreme Court review.[20] A state court case is not "final" until the Supreme Court issues its decision.

Similarly, what the Magistrate calls the "Lien Foreclosure case" in Count II of the federal complaint had not concluded at the time of filing of the federal complaint. While the Final Judgment of Foreclosure was entered on May 24, 2018, it was challenged thereafter and is on appeal at this time. In fact, simultaneously with the filing of her federal complaint, Plaintiff filed a motion for a temporary restraining order with this court in an effort to halt the foreclosure sale scheduled for the following day. That foreclosure sale went forward utilizing an irregular procedure (a bid credit about four times the value of the property being sold) and was challenged. Those issues are also on appeal to the Fourth District Court of Appeals at this time in cases 4D18-1904 and 4D18-2500 which have been combined. So, as of the time of the filing of the federal complaint, Plaintiff's case did not fit the profile for application of the *Rooker-Feldman* doctrine because her state court cases had not been finally adjudicated.

---

[20] Plaintiff seems to be having similar luck entering the daily lottery to win $10 tickets to see the Broadway show "Hamilton," but the consequences are not as severe.

Count III, a claim based upon diversity jurisdiction, arises because the Florida courts that awarded ownership of Plaintiff's interest in her father's homestead and in her parents' personal property lacked subject matter jurisdiction over these properties that were never mentioned in the state court complaint in the Trust case and the transfer of ownership by the trust's successor trustee was made without legal authority.   The Fourth District Court of Appeals refused to disturb this illegal state of affairs by issuing a per curiam affirmance of the trial court's denial of Plaintiff's motion for relief from judgment on the grounds that it was void with respect to the properties not named in the state court complaint under Florida Rule of Civil Procedure 1.540(b)(4). As this Court well knows, the lack of subject matter jurisdiction is an issue that may be raised at any time – even following judgment.  Indeed, many of the events challenged in Count II of the federal complaint occurred after the filing of the federal case and, if this Court grants leave to amend the complaint, new facts will be added showing continuing absence of a "full and fair litigation" that is a required predicate for a dismissal under *Rooker-Feldman. See, U.S. v. Mendoza,* 464 U.S. at 159, citing *Standefer v. United States*, 447 U.S. 10, 24, 100 S.Ct. 1999 2008, 64 L.Ed.2d 689 (1980).

Another bar to the application of the *Rooker-Feldman* doctrine is that Plaintiff really had no opportunity to raise and fully and fairly litigate her federal claims of a judicial taking in violation of the 5th Amendment Takings Clause or the unlawful and unreasonable seizure of her properties under the Fourth Amendment which bars unreasonable searches and seizures of property by the government (The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated,). Plaintiff could not fully and fairly assert such claims until the state courts had ruled on her claims and done so in a manner that patently ignored well-established and applicable Florida statutes and case precedents such as on how to

determine domicile, permanent residency, homestead protection from forced sale, and subject matter jurisdiction based upon filing of a complaint providing notice of properties to properly invoke the court's subject matter jurisdiction.  Thus, the federal case, filed after Plaintiff received the gut-punch of the Florida Supreme Court's denial of jurisdiction in the "Trust Case" truly raises new and independent claims for federal relief that were not available to Plaintiff in the state courts because the "Judicial taking" and seizures had not taken place.    So, unlike the question posed by the Magistrate in paragraph 57 of her report at p. 36, the federal claims that Plaintiff asserts are not re-framed versions of claims or defenses that Plaintiff could or did raise during the course of the two state lawsuits.  Consistent with the directions of the Supreme Court in *Exxon Mobil*, 554 US 280, the Eleventh Circuit now applies *Rooker – Feldman* to bar only those claims asserted by parties who have lost in state court and then ask the district court, ultimately, to review and reject a state court's judgments.  In *Nicholson* v. *Shafe*, the Eleventh Circuit noted that state court proceedings end for *Rooker–Feldman* purposes in three scenarios: "(1) when the highest state court in which review is available has affirmed the judgment below and nothing is left to be resolved, (2) if the state action has reached a point where neither party seeks further action, and (3) if the state court proceedings have finally resolved all the federal questions in the litigation, but state law or purely factual questions (whether great or small) remain to be litigated." *Nicholson v. Shafe* , 558 F.3d 1266, 1275 (11th Cir. 2009).  In *Target Media Partners v. Specialty Mktg. Corp.*, 881 F.3d 1279 (11th Cir.  2018), a case cited by the Magistrate in her report at p. 36, the Eleventh Circuit refused to apply the *Rooker-Feldman* doctrine to bar the litigation of a defamation claim when the events at issue occurred after the state court judgment in light of the fact that the state court had not (and could not have) adjudicated whether the alleged defamatory marketing letter was libelous.  The Eleventh Circuit said in that case, "Because there was no reasonable opportunity to raise the instant

claim in Alabama's state courts, and because the claim was not 'inextricably intertwined' with the judgment rendered in Alabama court, Rooker – Feldman cannot bar this suit." *Target Media Partners v. Specialty Mktg. Corp.*, 881 F.3d 1279, 1289 (11th Cir. 2018). Here, the state court proceedings were ongoing when the federal case was filed. There was a motion for relief from judgment pending before the court in the Trust case and the sale of Plaintiff's homestead was imminent and subject to later challenges and an ongoing appeal in the Lien foreclosure case.

While the Magistrate is correct that to determine the validity of the judicial taking or seizure claims this Court would have to review and consider the state court rulings and the evidence and law applicable to them, that is different from this Court being asked to reverse the state court judgments which plainly is beyond the scope of this Court's jurisdiction. 28 U.S.C. § 1257(a). Rather, Plaintiff is asking this federal court, bearing in mind the Supremacy clause, to evaluate federal claims arising from state court actions and make a determination that ultimately would be reviewable (and perhaps meet the mysterious criteria of the Supreme Court) in the US Supreme Court. Contrary to the Magistrate's assertion at p. 37 of her report that "Plaintiff does not argue that the state courts acted in the absence of a governing legal standard." Rather, Plaintiff asserts that the state courts failed to give her the opportunity of the full and fair litigation required by *US v. Mendoza*, failed to accord her the due process of law that the US and Florida Constitutions require, and failed to faithfully apply the well-established Florida property and procedural law so that the seizure of property (Plaintiff's home and her rights to her father's homestead and personal effects) was unconstitutional under rights guaranteed to her by the US Constitution. This is most certainly not an attempt to "delay justice" as defendants assert in DE 50, but rather an honest attempt to figure out what is the remedy for the unconstitutional cause of action posited by the Court in *Stop the Beach*

*Renourishment v. Florida Department of Environmental Protection,* 560 U.S. 702.  As Martin Luther

King, Jr. famously said, on March 21, 1965, in connection with the March from Selma to the state

capitol,  "no lie can live forever," and "the arc of the moral universe is long, but it bends toward

justice."  As the Supreme Court recently observed in *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015),

"Under the Due Process Clause of the Fourteenth Amendment, no State shall 'deprive any person

of life, liberty, or property, without due process of law.'   The fundamental liberties protected by this

Clause include most of the rights enumerated in the Bill of Rights." [citations omitted].  The Court

went on to say:

> The identification and protection of fundamental rights is an enduring part of the judicial duty to interpret the Constitution. That responsibility, however, "has not been reduced to any formula." *Poe v. Ullman*, 367 U.S. 497, 542, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting). Rather, it requires courts to exercise reasoned judgment in identifying interests of the person so fundamental that the State must accord them its respect. See ibid. That process is guided by many of the same considerations relevant to analysis of other constitutional provisions that set forth broad principles rather than specific requirements. History and tradition guide and discipline this inquiry but do not set its outer boundaries. See *Lawrence v. Texas,* 539 U.S. 558, 575.. That method respects our history and learns from it without allowing the past alone to rule the present.  The nature of injustice is that we may not always see it in our own times.

Obergefell v. Hodges, 135 S. Ct. 2584, 2598 (2015).  The Florida Supreme Court has said that the

right to devise property is a fundamental right protected by the Florida Constitution and its history.

Property rights are protected by article I, section 2 of the Florida Constitution as "Basic rights":

SECTION 2. Basic rights.--All natural persons are equal before the law and have inalienable

rights, among which are the right to enjoy and defend life and liberty, to pursue happiness, to be

rewarded for industry, and to acquire, possess and protect property; except that the ownership,

inheritance, disposition and possession of real property by aliens ineligible for citizenship may be

regulated or prohibited by law. No person shall be deprived of any right because of race, religion or physical handicap. *Shriners Hospitals for Crippled Children v. Zrillic*, 563 So.2d 64, 66-67 (Fla. 1990). While the Eleventh Circuit has said that property rights that are not created by the [US] Constitution are not fundamental rights, it did so as dicta in a case that has not been cited by any other court. *Foley v. Orange Cnty*. No. 14-10936 (11th Cir. 2016). In an earlier case, the Eleventh Circuit noted that a claim of executive deprivation of state-created property rights does not enjoy the protection of substantive due process analysis. *DeKalb Stone, Inc. v. County of DeKalb, Ga.*, 106 F.3d 956, 959-960 (11th Cir., 1997). Presumably the Circuit Court might feel the same way about a state court judicial deprivation of property rights.

The Supreme Court has long recognized physical takings and regulatory takings. A plurality in *Stop the Beach Renourishment* and the Magistrate in her report and recommendation have recognized the federal claim of a judicial taking. But property rights have always been fundamental to the concepts of liberty and personal freedom to make use of one's talents and efforts. In 1918, Justice Brandeis observed that, "[a]n essential element of individual property is the legal right to exclude others from enjoying it." *International News Service v. Associated Press,* 248 U.S. 215, 250, 39 S.Ct. 68, 63 L.Ed. 211 (1918)(Brandeis, J, dissenting). The Supreme Court adopted that view in *Nolan v. California Coastal Commission*, 483 U.S. 825, 832, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987). Thus, when the state courts ordered Plaintiff permanently out of her personal homestead and ordered the transfer of her rights acquired by law or devise to her parents' property, they took Plaintiff's property to which she had a fundamental right. The Eleventh Circuit, in a recent case, essentially agreed with the Supreme Court's view of an encroachment upon the right to exclude others as being a taking. *Chmielewski v. City of St. Pete Beach*, 890 F.3d 942, 949 (11th Cir., 2018)

.        Plaintiff submits that the facts of this case fit squarely within the applicable Takings

jurisprudence of the Eleventh Circuit and the US Supreme Court (not to mention the Florida

Constitution) so that this Court, under the Supremacy clause, may not defer to the actions of state

courts under the doctrines of preclusion, abstention, and *Rooker-Feldman* and leave Plaintiff without

a remedy. This Court has the power to review the state court actions and declare federal rights

without technically reversing the state courts and may declare that the State of Florida owes Plaintiff

just compensation. Such a declaration may well form the basis for a further motion to the state

courts under Rule 1.540(b)(4) of the Florida Rules of Civil Procedure to have the offending

judgments declared void. This Court may order a writ of prohibition or other appropriate writ under

the All Writs Act prohibiting enforcement of the offending state court actions. Since this Court has

the power to remedy violations of the US Constitution, it has the " unflagging obligation, to hear the

case the parties presented " rather than apply the narrow doctrines of abstention, preclusion and

*Rooker-Feldman* that for the reasons discussed above do not apply to this rare case of state court

abuse of due process, equal protection, and private property rights. *See Target Media Partners v.

Specialty Mktg. Corp.*, 881 F.3d 1279 (11th Cir. 2018).

    In Paragraphs 59 and 60, the Magistrate opines that Plaintiff's judicial takings theory is "for

all practical purposes" an appeal of the rulings she criticizes and re-frames her argument that the

Florida courts were wrong in certain findings. While Plaintiff's claims invite this Court to assess

the actions of the state courts, the assessment is not in the form of an appeal of all the issues before

the state courts but rather the federal issue of whether the actions of the state court amounted to a

taking or unreasonable seizure of Plaintiff's property and her rights to be compensated for sixteen

years of her personal and professional time as trustee and reimbursed for hundreds of thousands of

dollars of trustee expenses she incurred as is mandatory under Florida law. Plaintiff concedes that this Court has no appellate jurisdiction over the Florida state court judgments (the power to reverse the actions of the state courts). Rather, the power granted by the US Constitution and Congressional enactments is to decide the federal questions presented and to declare rights of citizens from different states that meet the requirements of diversity jurisdiction. This Court should not and cannot shrink from that responsibility under the guise of being nice to or deferring to the state courts merely because there is a duty of comity.

In Paragraph 61, the Magistrate makes the argument that since *Stop the Beach* had been decided prior to the initiation of any of these cases that Plaintiff could have raised the argument about a judicial taking in the state courts. Plaintiff disagrees because there was no judicial taking as the Supreme Court plurality described it until the state court had eliminated Plaintiff's rights to her property in violation of established Florida property law – an event that did not occur until the Florida Supreme Court and the US Supreme Court denied certiorari. To decide otherwise would be to put on Plaintiff the burden of objecting at a Supreme Court level to the various ill-advised encroachments upon her property rights imposed by orders of the trial court without a legal basis such as ordering her not to transfer her properties during the pendency of the litigation (Plaintiff had no intention of abandoning her property rights and so was lulled into not objecting at the time).

In Paragraph 62, the Magistrate makes the statement that in her view the state court litigation ended prior to the filing of the federal case. Plaintiff disagrees for the reasons stated before – the Trust case was still ongoing as a motion for relief from judgment had been filed and a Supreme Court certiorari petition was filed after the complaint in this case was filed. The Lien Foreclosure case was still ongoing because of the activities surrounding the foreclosure sale and that case is still

pending.  The declaratory judgment/quiet title claim in Count III stands on its own because of the lack of authority of the successor trustee to transfer title to the property under applicable Florida law which leaves Plaintiff still in possession to a one-third interest in her father's homestead and her parents' property devised by will.

In Paragraph 63, the Magistrate suggests that if all else fails in her analysis, that this Court should apply the doctrine stemming from *Younger v. Harris,* 401 US 37 (1971)(Only if the defendant will face irreparable harm should a federal court intervene in proceedings that are already underway in state court.)   Plaintiff respectfully disagrees with the Magistrate and asserts that what the state courts did and this Court has the power to remedy caused her irreparable harm.  If anything, the harm has become more irreparable with time as the D.C. Government has recently declared her DC residence not to be her principal residence and eligible for assistance under its programs.  Plaintiff can think of no more irreparable harm in a property sense other than to be rendered homeless by actions of a court.

In Paragraph 64, the Magistrate argues for application of the *Colorado River* doctrine which Plaintiff discussed and refuted previously as not applicable because while the case was litigated at length in the state courts, Plaintiff did not get an opportunity for a "full and fair litigation" that would support the deference of this Court to the state court proceedings.  One can hardly argue that it is a waste of federal judicial resources to remedy an unconstitutional taking and seizure of one's own home (and property devised by parents ) such that "judicial economy" should be invoked.

In Paragraph 65, the Magistrate discusses preclusion principles that Plaintiff has discussed above.  She notes that counsel for defendants Ryan/Stuart repeatedly makes the argument that Plaintiff is a vexatious litigant who is utilizing her rights and skills as a litigator to pepper them with

113

lawsuits. Plaintiff reminds counsel and the Court that it was THEY who started this unholy mess and did so in a manner that should invite a malpractice claim against their former lawyer who filed the complaint without naming properties and Plaintiff's domicile and right to vote and right to move from one jurisdiction to another as special damages.

In Paragraph 66, the Magistrate raises the issue of *res judicata* which Plaintiff has discussed previously. It does not apply because in this case the claims and some of the parties are different and, in any event, the state court judgments were not rendered on the merits due to the lack of subject matter jurisdiction and the failure to afford due process and rule in accordance with the established Florida law and precedents. They were still pending at the time that this federal complaint was filed. *See* Nicholson v. Shafe, 558 F.3d 1266, 1268 (11th Cir.2009), cited in *Lozman v. City of Riviera Beach*, 713 F.3d 1066 (11th Cir. 2013). Ironically, the Supreme Court of the United States was much more solicitous of Mr. Lozman's rights to his floating home in *Lozman v. City of Riviera Beach,* 568 U.S. 115 (2013). Plaintiff is relieved that Mr. Lozman finally got his day in court and retained his homestead. Plaintiff agrees that policy argues in favor of preclusion if, as was NOT the case here, a litigant has a full and fair hearing that amounts to Constitutionally sufficient due process in the other courts. A desire to lighten the court's caseload is not a basis for depriving a litigant of their right to a remedy for unconstitutional seizures of their property.

In Paragraph 67, the Magistrate finds that the "essential connection test" has been met with respect to Plaintiff's claims under the Fifth Amendment, the Equal Protection Clause and the right to travel claims she made in the federal litigation. The Eleventh Circuit in *Lozman v. City of Riviera Beach,* described the essentially connected test as follows: Florida's transaction test states that res judicata will apply to those causes of action that were actually litigated, as well as "every other

114

matter which the parties might have litigated ... within the issues as framed by the pleadings or as incident to or essentially connected with the subject matter of the first litigation." *Zikofsky v. Mktg. 10, Inc.*, 904 So.2d 520, 523 (Fla.Dist.Ct.App.2005) (citation, quotation, and brackets deleted). Despite the broad "every other matter" language, the transaction test is "narrow" and extends to "essentially connected claims that a defendant in a former action failed to raise as a defense." *Id., Lozman v. City of Riviera Beach*, 713 F.3d 1066, 1078 (11th Cir. 2013).   The subject matter of the federal case squarely arises out of the claims asserted against Plaintiff in the state court case, and significantly for this purpose, on claims that counsel for Ryan/Stuart omitted from the complaint in the Trust case.  Despite the omission, Ryan/Stuart were awarded equitable liens against Plaintiff's innocently acquired property interests against established Florida property and procedural law.  So, the essentially connected test fails in this instance to overcome Plaintiff's rights under the federal Constitution to a remedy for the unconstitutional taking and seizure of her property and civil rights interests in her domicile, her right to vote and her right to travel.

In Paragraph 68, the Magistrate concedes that the true bad actors identified in the federal complaint but not named due to personal judicial immunity are the state court judges who ran roughshod over Plaintiff's procedural and Constitutional rights.  The Magistrate concedes that "To that extent, the plaintiff's "judicial takings" cause of action may fall outside the scope of claim preclusion.

In Paragraph 69, the Magistrate asserts that issue preclusion or collateral estoppel would work to preclude Plaintiff's claims.  That is not the case because, as the record discussed above amply demonstrates, she did not have a full and fair opportunity to litigate the issues in the prior proceeding.

115

In Paragraph 70, the Magistrate asserts a variation on the theme raised in Paragraph 69.  In the discussion previously, Plaintiff discussed that the mismanagement of the trust for which she readily accepts responsibility, the failure to provide the annual trust accountings required by law after 2003 (but *See, Fidel v. Wells Fargo Bank, N.A.* holding that beneficiary claims were precluded when the beneficiaries had access to periodic brokerage statements showing the status of the trust at issue) and the excessive borrowing were not shown by the evidence in the case to have resulted in or affected Plaintiff's property rights that she seeks to vindicate here.  Those property rights include but are not limited to the acquisition of her permanent homestead in Florida (by purchase and refinance) and her acquisition of an interest in her father's homestead (pursuant to §732.401(1) at the time of his death in January 1998) and her parents' personal property (which was never deeded to the J. Raymond Stuart trust and was devised pursuant to her parents' wills which were not before the state court).  The Ryan/Stuart defendants who were plaintiffs in the state court action put on no evidence or expert testimony tying Pamela Stuart's borrowing from her father's trust to the acquisition of those property rights.

In Paragraph 71, the Magistrate, perhaps anticipating the Plaintiff's argument under the Supremacy Clause, asserts that this court should not sit as a super appellate court.  Plaintiff is not asking this Court to do so and concedes that a federal court lacks the power to outright void a state court judgment.  It may exercise its jurisdiction, however, to develop the facts and the law so that it could exercise its authority to craft a remedy under the All Writs Act or the Constitutional provisions at issue or, as a last resort, after this case has moved from this court to the Supreme Court of the United States, the high court could choose to exercise its jurisdiction under 28 U.S.C. § 1257 and declare the state court judgments reversed.

116

Plaintiff has made no judgments about why she received such bad treatment in the state courts. She has practiced in five different jurisdictions and has observed that the state trial courts in Florida are elected, have no law clerks, and rely upon counsel for the kinds of preparation that law clerks provide in other jurisdictions where she has practiced. There are about the same number of lawyers in the Florida Bar as in the District of Columbia bar but the Florida state courts support five intermediate appellate courts in order, in theory, to reverse mistakes made by the trial courts and the access to the Florida Supreme Court is limited by its certiorari jurisdiction. In the District of Columbia which has about 65 state court judges, there is only one District of Columbia Court of appeals which has jurisdiction over all judgments of the Superior Court of the District of Columbia as a matter of right. In Maryland and Virginia, there is one intermediate court of appeals and access to the Court of Appeals of Maryland and the Supreme Court of Virginia is discretionary with those states' highest courts. Frankly, the quality of justice appears to be superior where there is a judicial nominations commission and, in the case of the DC courts, presidential-level appointments. But these are mere musings of an experienced litigator who casts no aspersions on the motives of the state court judges she faced in this case although she believes their bias was transparent. Lawyers as litigants do not get a favorable reception in any court.

In Paragraph 72, the Magistrate muses that the state court's familiarity with state law over property disputes argues for abstention. Ordinarily that might make sense, but not in this case where Plaintiff failed to receive a full and fair hearing, was subject to deprivation of her property that was not legitimately before the state courts, and where she did not receive corrective justice when these mistakes were raised.

In Paragraph 73, the Magistrate suggests that Plaintiff should have shown concern for the

117

rights of the other litigants.  This is not the case.  Plaintiff wishes that her sisters had agreed to mediation of their claims as her counsel at the time suggested in the fall of 2013.  All of this could have been discussed civilly and worked out in Plaintiff's opinion without the catastrophic damage to her property rights and reputation.  Plaintiff is concerned that the State of Florida had no idea that it had rogue judges on the loose that were raising the risk of claims like the ones she is presenting.  Perhaps as a result of this case some fodder may be generated for meetings of the judges in various circuit courts and Courts of Appeal.   Plaintiff used to socialize with some terrific judges who attended the meetings of the Real Property, Probate and Trust Law Section of the Florida Bar and misses their friendship (she never appeared before them) and thinks that some educational materials could be produced with this case as a basis.  This opinion does not take away from the obligation of the State of Florida to compensate Plaintiff for the taking of her property in violation of the US Constitution without compensation.

In Paragraph 74, the Magistrate asserts the Plaintiff is seeking the relief of nullification.  As a former prosecutor, Plaintiff hated when defense counsel made effective arguments calling for jury nullification.  She recalls the defense put on in a burglary case – a picture of the large, mansion-type property that was burgled.  This is not that type of case.  *See, Sanders v. State*, 946 So. 2d 953, 958 (Fla. 2006) (recognizing that a jury pardon is "essentially 'a not guilty verdict rendered contrary to the law and evidence' and is an aberration.").  Plaintiff is not seeking a judgment contrary to applicable law but rather a remedy in conformance with the rights to which she is legally entitled.  This is not a nullification argument.

In Paragraph 75, the Magistrate transitions into considering whether Plaintiff's complaint states a claim for relief that is actionable.

In Paragraph 76, the Magistrate formulates a judicial takings claim to the effect that it occurs when a court fails to vindicate an established property right recognized by the applicable law in the jurisdiction and seizes the property for transfer to another party or the public without just compensation. Plaintiff disagrees that her attempt to plead such a cause of action fails, but if so, seeks leave to amend her complaint in order to cure any perceived deficiencies.

In Paragraph 77, the Magistrate correctly points out that the federal cause of action defined in *Stop the Beach* was recognized by a plurality of the Court. However, the concurring opinions provide alternative grounds for the claim (Justice Kennedy and Sotomayor endorsed a due process basis for the claim; Justice Breyer thought the question should best be left for a case that actually had a taking unlike the factual scenario presented in *Stop the Beach* in which the Court decided there was no such taking by the State of Florida). The property rights taken from Plaintiff were transferred for public use in the same way that the property owner's home in *Kelo v. City of New London* was transferred to another private party (a developer) for the purpose of upgrading the property in the area through redevelopment. Plaintiff admits that her excessive borrowing from the trust was a proper subject of court action and redress but she did not get due process in the state cases and her sisters failed to provide proof that the funds that she allegedly excessively borrowers were used to acquire her own homestead or her interests in her parents' property. In fact, in the motion for relief from judgment in the Trust case, Plaintiff provided part of the proof that she would have put on had the properties been listed as special damages. Plaintiff thought that she was defending a case in which she had to defend her rights to trustee fees and expense reimbursements and she put on evidence related to those issues. At the second hearing, all of a sudden, over her objection, she was questioned about the reverse mortgage on her DC home, an unrelated property, that had nothing to

119

do with the issues stated in her sisters' complaint (removal of trustee, accounting, conversion, injunctive relief).  While she may have had a debt to her sisters, the applicable Florida law requires some showing that unjust enrichment infected her acquisition, maintenance or improvement of those properties.  It is absurd to think that property rights she got by descent which are fundamental should be forfeited just because she owes a debt that had nothing to do with how she acquired those rights.  *See, Palm Beach Savings & Loan Assn, F.S.A. v. Fishbein.*   Plaintiff's conduct was transparent in that every withdrawal she made from the trust appeared on the monthly brokerage statements.  Prior case law in this court says that the Ryan/Stuart sisters' knowledge and access to the brokerage statements should bar their claims entirely.  *Fidel v. Wells Fargo Bank, N.A.,* (S.D.Fl.  March 9, 2011).  There was no fraudulent or egregious conduct proven in the case.  There is no question that the amount that was borrowed was excessive and Plaintiff expected to resolve the matter in the absence of litigation but was not afforded that opportunity.  The state court finding that her management of the trust was "reprehensible" offended applicable US Supreme Court and Florida Supreme Court precedents for the type of harm (physical as well as economic) that is required for a finding of reprehensibility.[21]

In Paragraph 79, the Magistrate suggests that the Plaintiff failed to meet Justice Kennedy's suggested cause of action requirement by failing to claim she was afforded she was provided "constitutionally-inadequate process."  To the contrary, from the moment that Judge Cox placed restrictions on her property rights after a 36-minute non-evidentiary hearing that was supposed to be devoted to an accounting of the trust property that was not filed and the judge had not read, to the

---

[21]  Plaintiff notes parenthetically that in the internet age, these remarks by a judge can fatally damage a person's reputation in a most egregious and unfair way.

failure of Judge Kanarek to hold a hearing on her rights to her domicile, her right to vote, her right to travel, her right to homestead protection for her home and her rights to a share by descent or devise of her parents' property, the failure to afford Plaintiff any discovery in that proceeding against her sisters and their witnesses, and the lack of competent substantial evidence for denying her credits for trustee fees and trustee expense reimbursements required by §735.0709, not to mention the foreclosure action proceeding to judgment on an *ultra vires* claim against which Plaintiff was precluded from providing evidence and getting discovery, Plaintiff most certainly is asserting that the state courts afforded deficient due process. Plaintiff hopes that the Magistrate will reconsider her opinion that Plaintiff did not assert she was denied due process in a manner that would support her claim under 42 U.S.C. § 1983 and the 4th and 5th Amendments.

In Paragraph 80, the Magistrate cites an unpublished opinion that Plaintiff was unable to locate on Fastcase or in the CM/ECF system for the proposition that the State of Florida cannot be held liable for the actions of its agents, the state judges, under 42 U.S.C. § 1983. The State of Florida has waived its immunity from certain torts under the Florida Torts Act, § 768.28. Florida Statutes, but asserts its immunity from suit under the Eleventh Amendment. Plaintiff notes that sadly she has been found not to be a citizen of Florida (against her will) and that her current DC residence might change the Eleventh Amendment immunity enjoyed by the State. However, Plaintiff suggests that this issue should be addressed in further proceedings as the Magistrate notes that the State's immunity claim does not square with the Supreme Court's pronouncements in *Stop the Beach*.

In Paragraph 82, the Magistrate asserts and Plaintiff agrees that Jeffrey Smith, clerk of the court is entitled to be dismissed as he carried out a ministerial responsibility for which he lacked the ability to prevent the harm done to Plaintiff.

In Paragraph 83, the Magistrate posits that the court is without authority to provide injunctive relief. Plaintiff disagrees as the Court could issue an injunction to prevent the exercise of property rights with respect to Plaintiff's homestead, her father's homestead and her parents' personal property by the Ryan/Stuart defendants. Plaintiff's homestead, she believes, is vacant and to date has not been sold which she believes is the ultimate intention of the Ryan/Stuart defendants who have been unjustly enriched by their possession of it. The Magistrate is in error that Plaintiff lacks standing to seek the relief with respect to her parents' properties sought in Count III. Because the applicable Florida law is that the successor trustee had no power to transfer title to those properties as demonstrated above, the one-third interest in those properties still resides with Plaintiff despite the erroneous rulings of the state courts. To the extent there is any disagreement on that point, Plaintiff's wrongful dispossession of those rights should provide standing to litigate her rightful claims to those properties. Ryan and Deborah Stuart valued a one-half interest in the father's homestead at $275,000 as of January 2018, so there is a valid claim to be made under the diversity statute, 28 U.S.C. § 1332.

Finally, the Magistrate asserts that any dismissal of this action should be with prejudice. Plaintiff opposes that suggestion and notes that "[D]ismissals for lack of jurisdiction should be without prejudice because the court, having determined that it lacks jurisdiction over the action, is incapable of reaching a disposition on the merits of the underlying claims." *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1218 (10th Cir.2006) (citing *Frederiksen v. City of Lockport*, 384 F.3d 437, 438 (7th Cir.2004) ("A suit dismissed for lack of jurisdiction cannot also be dismissed `with prejudice'; that's a disposition on the merits, which only a court with jurisdiction may render.")

## VERIFICATION

Plaintiff represents that under penalties of perjury pursuant to 28 USC § 1746 that the factual statements made above are true and correct to the best of her knowledge and belief.

## CONCLUSION

Wherefore, for the foregoing reasons, Plaintiff asks that the various motions to dismiss filed against Plaintiff be denied and the Magistrate's Report and Recommendations be accorded the *de novo* review by the Court as is required and a decision issued in accordance with Plaintiff's objections and comments.  Plaintiff appreciates the scholarly efforts devoted to this case which were plainly apparent in the Magistrate's report and recommendations and the disagreements and objections voiced were offered strictly on the merits.  In addition, Plaintiff asks leave to amend her complaint to add the claims under the Fourth Amendment she discussed as well as a prayer for relief under the All Writs Act in addition to the injunctive powers of this Court.

Dated January 23, 2019                          Respectfully submitted,


Plaintiff *pro se*
P.M.B. #8202
6001 Highway A1A
Indian River Shores, FL 32963-1014
(202) 999-2374 (cell)
(202) 244-0723 (landline)
pamstuart@aol.com
Alternate: 5115 Yuma St., NW
                    Washington, DC 20016

123

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have sent the original of the foregoing Plaintiff Pamela Stuart's

Rule 72 Objections to the Report and Recommendations of Magistrate Judge Maynard to the Clerk

of the Court for filing via overnight Federal Express delivery with fees prepaid and that I am serving

a copy on counsel via first class mail with postage prepaid at their addresses provided of record this

23rd day of January, 2019.


PAMELA B. STUART

copies to:

Jason L. Odom, Esq.
Gould, Cooksey Fennell, PA
979 Beachland Blvd.
Vero Beach, FL 32963
jodom@gouldcooksey.com

Counsel for Defendant Jeffrey R. Smith, Clerk of the Circuit Court for Indian River County, Florida

Sean A. Mickley, Esq.
Kirwin Norris
15 W. Church Street, Suite 301
Orlando, FL 32801
sam@kirwinnorris.com

Counsel for defendant, The Tennis Townhouses Condominium Association, Inc.

C. Douglas Vitunac, Esq.
Collins, Brown, Barkett, Garavaglia and Lawn, Chrtd.
756 Beachland Blvd.
Vero Beach, FL 32963
dvitunacpleadings@verolaw.com

Counsel for Defendants Catherine Ryan and Deborah Stuart

Maria Guitian Barker, Esq.
Assistant Attorney General
State of Florida
110 S.E. 6th Street, 10th Floor
Ft. Lauderdale, FL 33301
maria.guitianbarker@MyFloridalegal.com

Counsel for the State of Florida