UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

FORT PIERCE DIVISION

| | | |
|---|---|---|
| PAMELA B. STUART | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  18-14244- CIV- |
| | ) | MARTINEZ/MAYNARD |
| | ) | |
| CATHERINE S. RYAN, | ) | |
| | ) | |
| DEBORAH A. STUART, | ) | |
| | ) | |
| TENNIS TOWNHOUSES CONDOMINIUM | ) | |
| ASSOCIATION, INC., | ) | |
| | ) | |
| JEFFREY R. SMITH, | ) | |
| | ) | |
| STATE OF FLORIDA, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**EXHIBITS TO
PLAINTIFF PAMELA STUART'S RULE 72 OBJECTIONS TO THE
REPORT AND RECOMMENDATIONS OF MAGISTRATE JUDGE MAYNARD**



Prepared by and return to:

William E. Corley, III
CADWALADER, WICKERSHAM & TAFT
440 Royal Palm Way
Palm Beach, Florida 33480

RECORD VERIFIED
JEFFREY K. BARTON
CLERK CIRCUIT COURT
INDIAN RIVER CO., FLA

DOCUMENTARY STAMPS $. *60*
JEFFREY K. BARTON, CLERK
INDIAN RIVER COUNTY

_____THIS SPACE FOR RECORDER'S USE_____

## WARRANTY DEED

THIS WARRANTY DEED made and executed this *12th* day of January, 1992 by J. Raymond Stuart and Marion C. Stuart, his wife, grantors, whose address is 101 South Catalina Court, Vero Beach, Florida 32963, to J. Raymond Stuart, grantee, whose address is 101 South Catalina Court, Vero Beach, Florida 32963.

### W I T N E S S E T H

That the grantors, for and in consideration of the sum of $10.00 and other valuable consideration, receipt whereof is hereby acknowledged, by these presents do grant, bargain, sell, alien, remise, release, convey and confirm unto the grantee, all that certain land situate in Indian River County, Florida, described as follows:

Lot 30, SEAFOREST COURT, according to the plat thereof recorded in Plat Book 11, Page 97, public records of Indian River County, Florida.

TOGETHER with all and singular the tenements, hereditaments, and appurtenances belonging to or in any way appertaining to that real property.

TO HAVE AND TO HOLD, the same in fee simple forever.

AND the grantors hereby covenant with grantee that they are lawfully seized of said land in fee simple; that they have good right and lawful authority to sell and convey said land; that they hereby fully warrant the title to said land and will defend the same against the lawful claims of all persons whomsoever; and that said land is free of all encumbrances, except for easements, liens and restrictions of record, which are not reimposed by reference thereto; and real estate taxes for 1992 and subsequent years.

IN WITNESS WHEREOF, We have hereunto set our hands and
seals this _12th_ day of January, 1992.

Signed, sealed and delivered
in the presence of us:

LEWIS L. SMITH, JR.
**Witness**

J. Raymond Stuart
J. Raymond Stuart

WILLIAM E. CORLEY III
**Witness**

LEWIS L. SMITH, JR.
**Witness**

Marion C. Stuart

WILLIAM E. CORLEY III
**Witness**


STATE OF FLORIDA         )
                         ) SS:
COUNTY OF INDIAN RIVER   )

    I HEREBY CERTIFY that on this day, before me, an
officer duly authorized to take acknowledgments, personally
appeared J. Raymond Stuart and Marion C. Stuart, his wife, well
known to me to be the persons described as grantors in the
foregoing deed, and that they acknowledged executing the same in
the presence of two subscribing witnesses freely and voluntarily
for the purpose therein expressed.

    WITNESS my hand and official seal on this _12th_ day of
January, 1992.

WILLIAM E. CORLEY III
Notary Public
State of Florida

My Commission expires:



WILLIAM E. CORLEY, III
MY COMMISSION EXPIRES
March 5, 1993
BONDED THRU NOTARY PUBLIC UNDERWRITERS

OR 0920 PG 2515

wecre2:75:1-10-92                    -2-

RECORD VERIFIED
JEFFREY K. BARTON
CLERK CIRCUIT COURT
INDIAN RIVER CO . FLA

Prepared by and return to:

William E. Corley, III
CADWALADER, WICKERSHAM & TAFT
440 Royal Palm Way
Palm Beach, Florida  33480

DOCUMENTARY STAMPS $ .60
JEFFREY K. BARTON, CLERK
INDIAN RIVER COUNTY

_____THIS SPACE FOR RECORDER'S USE_____

## WARRANTY DEED

**THIS WARRANTY DEED** made and executed this *12th* day of
January, 1992 by J. Raymond Stuart, grantor, whose address is 101
South Catalina Court, Vero Beach, Florida 32963, to J. Raymond
Stuart and Pamela B. Stuart, as Trustees of The J. Raymond Stuart
Revocable Trust dated January 2, 1990, grantees, whose address is
101 South Catalina Court, Vero Beach, Florida 32963, with full
power and authority pursuant to Section 689.071, Florida Statutes
(1989) to protect, conserve and to sell, to lease, to encumber
and otherwise to manage and dispose of the real property
described in this deed.

### W I T N E S S E T H

That the grantor, for and in consideration of the sum
of $10.00 and other valuable consideration, receipt whereof is
hereby acknowledged, by these presents does grant, bargain, sell,
alien, remise, release, convey and confirm unto the grantees, all
that certain land situate in Indian River County, Florida,
described as follows:

Lot 30, SEAFOREST COURT, according to the
plat thereof recorded in Plat Book 11, Page
97, public records of Indian River County,
Florida.

**TOGETHER** with all and singular the tenements,
hereditaments, and appurtenances belonging to or in any way
appertaining to that real property.

**TO HAVE AND TO HOLD**, the same in fee simple forever.

**AND** the grantor hereby covenants with grantees that he
is lawfully seized of said land in fee simple; that he has good
right and lawful authority to sell and convey said land; that he
hereby fully warrants the title to said land and will defend the

OR 0920 PG 2516

same against the lawful claims of all persons whomsoever; and that said land is free of all encumbrances, except for easements, liens and restrictions of record, which are not reimposed by reference thereto; and real estate taxes for 1992 and subsequent years.

GRANTOR HEREBY CONFERS on grantees full power and authority to deal with and in the real property described in this deed, or any part of that real property, to wit: the power and authority to protect, conserve and to sell, to lease, to encumber and otherwise to manage and dispose of the real property described in this deed.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 12th day of January, 1992.

Signed, sealed and delivered
in the presence of us:

LEWIS L. SMITH, SR.
Witness

J. Raymond Stuart

WILLIAM E. CORLEY III
Witness

STATE OF FLORIDA          )
                          )ss:
COUNTY OF INDIAN RIVER    )

I HEREBY CERTIFY that on this day, before me, an officer duly authorized to take acknowledgments, personally appeared J. Raymond Stuart, well known to me to be the person described as grantor in the foregoing deed, and that he acknowledged executing the same in the presence of two subscribing witnesses freely and voluntarily for the purpose therein expressed.

WITNESS my hand and official seal on this 12th day of January, 1992.

WILLIAM E. CORLEY III
Notary Public
State of Florida

My Commission expires:



WILLIAM E. CORLEY, III
MY COMMISSION EXPIRES
March 5, 1993
BONDED THRU NOTARY PUBLIC UNDERWRITERS

wecre2:76:1-10-92          -2-

OR0920PG2517



# The Probate Team 2015

## PRESENTED BY



**SPEAKERS**

**Kimberly Bald, W. Fletcher Belcher, Sarah Butters, Sandra Diamond
Guy Emerich, Steven Hearn, Roger Isphording, George Karibjanian
Rohan Kelley, Shane Kelley, Theodore Kypreos, Laird Lile
Barry Spivey, Michael Stafford, and J. Michael Swaine**

David C. Brennan & Wm. Fletcher Belcher, Program Co-Chairs

**Friday & Saturday  October 9 & 10, 2015**
Caribe Royale All-Suite Hotel and Convention Center
Orlando, Florida

# **TABLE OF CONTENTS**

**Probate Power Hour – New Statutes, Cases, Rules** . . . . . . . . . . . . . . . . . . . . **A**
Steven Hearn, *Tampa*

**Elective Share – A Fresh Look** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **B**
Laird Lile, *Naples*

**Estate and Trust Causes of Action – A Primer** . . . . . . . . . . . . . . . . . . . . . . **C**
Kimberly Bald, *Bradenton*

**Homesteads and Trusts** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **D**
Shane Kelley, *Ft. Lauderdale*

**Probate – 50 Exciting Ways to Mess It Up!** . . . . . . . . . . . . . . . . . . . . . . . . **E**
Sarah Butters, *Tallahassee*

**Real Property/Probate Potpourri – Leases, Eviction, Mortgages, etc.** . . . . . . . . **F**
J. Michael Swaine, *Sebring*

**Probating Non-Residents and Snowbirds** . . . . . . . . . . . . . . . . . . . . . . . . . . **G**
Michael Stafford, *New York*

**Representing the Marginally Competent Client** . . . . . . . . . . . . . . . . . . . . . . .**H**
Rohan Kelley, *Ft. Lauderdale*

**Same Sex Marriage – Planning and Probate Implications** . . . . . . . . . . . . . . . .**I**
George Karibjanian, *Boca Raton*

**Expert Witnesses in Probate and Trust Litigation** . . . . . . . . . . . . . . . . . . . . .**J**
Theodore Kypreos, *West Palm Beach*

**Senior Partners Forum** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**K**
W. Fletcher Belcher, Moderator, *St. Petersburg*
Sandra Diamond, *Seminole*
Roger Isphording, *Venice*
Rohan Kelley, *Ft. Lauderdale*
Barry Spivey, *Sarasota*

**Attorneys/PRs/Beneficiaries – The Ethical Interface** . . . . . . . . . . . . . . . . . . .**L**
Guy Emerich, *Punto Gorda*

## HOMESTEADS AND TRUSTS

**Shane Kelley, Esq.**
**The Kelley Law Firm, PL**
**3365 Galt Ocean Drive**
**Fort Lauderdale, FL 33308**
**www.estatelaw.com**

I. <u>INTRODUCTION</u>

- In many cases, one of the most valuable assets that our clients own is their residence. But despite being one of the most valuable assets in our clients' portfolios, a residence is often the most difficult asset to address when creating an estate plan or administering a trust or estate. This is a result of the homestead provisions contained in Article X, Section 4 of the Florida Constitution. While the homestead provisions provide some incredible benefits for the citizens of Florida, they also contain restrictions on devise and descent of homestead property that may frustrate the client's intent in that regard and often lead to litigation if the homestead property is not properly addressed in our clients' estate planning documents.

- If a client is contemplating marriage and has children from a prior marriage or the client (whether contemplating marriage or already married) has a fixed intention to devise his or her homestead property to someone other than their spouse and/or descendants, you need to be aware of the provisions of both F.S. 732.4017 (inter vivos transfer of homestead property) and F.S. 732.702 (waiver of spousal rights).

- This outline will examine some of the ways that our clients can utilize inter vivos trusts in order to avoid the homestead devise restrictions as well as some of the recent cases involving trusts and waivers of homestead. One of the most difficult issues that the courts have addressed in the past couple of years is exactly what constitutes a waiver of homestead rights, especially when the homestead property passes from both spouses into a trust created by one of those spouses. During the last several years, multiple District Courts of Appeal have addressed this issue with varying results.

- But first, let's start with the basics.

II. <u>GENERAL HOMESTEAD OVERVIEW - CONSTITUTION AND STATUTES</u>

- Florida's first Constitution was adopted in 1868 and contained homestead provisions. The relevant provisions, which have been revised over the years, are now found in Article X, §4 of the Florida Constitution. Those provisions have three basic components in Florida:

  1. Exemption from forced sale.
  2. Inurement of the exemption upon death of owner.
  3. Restrictions on devise of homestead.

- While different concepts, they serve the same purpose of protecting the family home. See *McKean v. Warburton*, 919 So.2d 341 (Fla. 2005), which provides,

> The public policy furthered by a homestead exemption is to 'promote the stability and welfare of the state by securing to the householder a home, so that the homeowner and his or her heirs may live beyond the reach of the financial misfortune and the demands of creditors who have given credit under such law.'

- The general framework regarding the three concepts described above is found in Article X, §4 of the Florida Constitution and over the years those basic concepts have been somewhat developed through legislation contained in Chapter 732 and Chapter 733 of the Florida Statutes.

- While the Constitution and the Florida Statutes provide a general framework for homestead issues, there are many issues that are left unresolved and the courts have had to fill in the gaps.

a.   ARTICLE X, §4 OF THE FLORIDA CONSTITUTION:

SECTION 4. Homestead; exemptions.

(a) There shall be exempt from forced sale under process of any court, and no judgment, decree or execution shall be a lien thereon, except for the payment of taxes and assessments thereon, obligations contracted for the purchase, improvement or repair thereof, or obligations contracted for house, field or other labor performed on the realty, the following property owned by a natural person:

(1) a homestead, if located outside a municipality, to the extent of one hundred sixty acres of contiguous land and improvements thereon, which shall not be reduced without the owner's consent by reason of subsequent inclusion in a municipality; or if located within a municipality, to the extent of one-half acre of contiguous land, upon which the exemption shall be limited to the residence of the owner or the owner's family;

(b)  These  exemptions  shall  inure  to  the  surviving spouse  or  heirs  of  the  owner.

(c)   The  homestead  shall  not  be  subject  to  devise  if the  owner  is  survived  by  spouse  or  minor  child, except  the  homestead  may  be  devised  to  the  owner's spouse  if  there  be  no  minor  child.  The  owner  of homestead  real  estate,  joined  by  the  spouse  if married,  may  alienate  the  homestead  by  mortgage, sale  or  gift  and,  if  married,  may  by  deed  transfer the  title  to  an  estate  by  the  entirety  with  the spouse.  If  the  owner  or  spouse  is  incompetent,  the method  of  alienation  or  encumbrance  shall  be  as provided  by  law.

*(handwritten marginalia: can devise it to use for property for business out (eg I rent out) (eg I dock))*

- Article X, §4(a) allows an exemption from forced sale for a real property homestead owned by a natural person. Subsection 4(b) provides that the exemption shall inure to the decedent's heirs and Subsection (c) imposes restrictions on the devise of that property.

b.   <u>F.S. § 732.401. DESCENT OF HOMESTEAD</u>

(1)  If  not  devised  as  authorized  by  law  and  the Constitution,  the  homestead  shall  descend  in  the  same manner  as  other  intestate  property;  but  if  the decedent  is  survived  by  a  spouse  and  one  or  more descendants,  the  surviving  spouse  shall  take  a  life estate  in  the  homestead,  with  a  vested  remainder  to the  descendants  in  being  at  the  time  of  the  decedent's death  per  stirpes.

*(handwritten marginalia: Snider Clause)*

(2)  In  lieu  of  a  life  estate  under  subsection  (1), the  surviving  spouse  may  elect  to  take  an  undivided one-half  interest  in  the  homestead  as  a  tenant  in common,  with  the  remaining  undivided  one-half  interest vesting  in  the  decedent's  descendants  in  being  at  the time  of  the  decedent's  death,  per  stirpes.

c.  ·  <u>F.S. 732.4015. DEVISE OF HOMESTEAD</u>

(1) As  provided  by  the  Florida  Constitution,  the homestead  shall  not  be  subject  to  devise  if  the  owner is  survived  by  a  spouse  or  a  minor  child  or  minor children,  except  that  the  homestead  may  be  devised  to the  owner's  spouse  if  there  is  no  minor  child  or  minor children.

*(handwritten marginalia: 732, 4017 inter vivos trust 732.)*

(2) For the purposes of subsection (1), the term:

    (a) "Owner" includes the grantor of a trust described in s. 733.707(3) that is evidenced by a written instrument which is in existence at the time of the grantor's death as if the interest held in trust was owned by the grantor.

    (b) "Devise" includes a disposition by trust of that portion of the trust estate which, if titled in the name of the grantor of the trust, would be the grantor's homestead.

## III.   ALIENATION OF HOMESTEAD THROUGH IRREVOCABLE TRUSTS

- While Article X, Section 4 of the Florida Constitution imposes devise restrictions on homestead property, there is no restriction on the lifetime alienation of homestead property. But it is imperative that if the owner is married at the time of the transfer, the spouse must consent to that transfer. See Article X, §4(c) of the Florida Constitution that provides in pertinent part, "The owner of homestead real estate, joined by the spouse if married, may alienate the homestead . . ."

- In 2010, the Florida Legislature passed F.S. 732.4017 that provides statutory guidelines for accomplishing lifetime transfers of homestead property, either outright or to a continuing trust. If you follow the guidelines of the statute, it creates a "safe harbor" for the transferor that will ensure that the chosen structure will not be treated as an "improper devise" of the homestead property upon his or her death.

- While the statute was effective as of October 1, 2010, the appellate courts in Florida did not address this statute until almost five years later in *Stone v. Stone*, 157 so.3d 295 (Fla. 4th DCA 2015). This is the only case to analyze the statute to date. The *Stone* case will be discussed in more detail below.

- The statute provides guidance to the estate planning practitioner on how to effectively avoid the devise restrictions on homestead property through the use of an inter vivos conveyance while still retaining certain rights in the owner. The conveyance can be outright (such as a deed of a remainder interest to a named individual), or it can be in trust for the benefit of one or more beneficiaries.

- The statute was not intended to create new law on the alienation of homestead property, but rather was intended to outline what rights a person may validly retain in the homestead property while still allowing the transfer to the trust treated as an "alienation" of the property for purposes of the homestead devise restrictions found in Article X, §4(c)

of the Florida Constitution.  See F.S. 732.4017(4) which provides, "It is the intent of the Legislature that this section clarify existing law."

a.  BACKGROUND – PRIOR CASE LAW

- The drafters of the statute were aware of the early attempts by homeowners to avoid the devise restrictions through the use of trusts in which the grantor retained too many rights and the courts found that there was no effective alienation of the property during lifetime. Accordingly, the trust instruments were deemed to be ineffective attempts to devise the homestead property upon death in derogation of the devise restrictions found in Article X, §4(c) of the Florida Constitution:

- Johns v. Bowden, 66 So. 2d 155 (Fla. 19414).

  ▪ In *Johns* an un-remarried widower executed a deed of trust conveying his homestead to a third party trustee.  Under the trust deed, the grantor reserved the right to occupy and use the property and receive and use all rents and profits from the property for his life.  The trust deed also provided the grantor with the power to direct the trustee to convey title to the property to any person named by the grantor (including himself).

  ▪ If the grantor failed to exercise this power, the trust deed provided that the trustee would hold the property for the use and benefit of one of the grantor's children and ultimately to be distributed to one of the grantor's grandchildren upon the child's death.

  ▪ The trust deed was challenged by one of the grantor's heirs and the Supreme Court of Florida invalidated the deed of trust finding that it was the equivalent of a testamentary devise,

    > The interest attempted to be conveyed was not a vested right in the property to any of the beneficiaries named in the trust deed, but a contingent interest subject to the right of the grantor to direct a conveyance of the entire property to others at any time during the grantor's life . . . If the property was, and continued to be, in fact and in law, a homestead, the alleged trust deed, not being an absolute conveyance of any vested estate in the land to take effect during the grantor's lifetime, is apparently ineffectual for the purpose designed.

  ▪ The Supreme Court of Florida also stressed that it would not allow the grantor to accomplish the goal of avoiding the homestead devise restrictions indirectly if he could not accomplish the same goal directly,

> That which the law forbids to be done directly
> cannot lawfully be done by indirection. If an
> attempted conveyance of homestead real estate is,
> in legal and practical effect, an operation a
> will, it may not be effective when the owner of
> the homestead leaves a wife or child.

- Estate of Johnson, 397 So. 2d 970 (Fla. 4th DCA 1981).

    - In *Johnson*, a decedent was survived by five children (one of whom was a minor). The decedent had executed an inter vivos revocable trust under which the decedent was the trustee and lifetime beneficiary of the trust. Decedent thereafter conveyed his homestead property to his revocable trust. Under the terms of the trust, the homestead property was to be conveyed to one of the grantor's adult children upon his death.

    - The court, relying on *Johns* invalidated the attempted disposition of the property, "Just as in the *Johns* case, it is obvious that the decedent here, as the settlor, was retaining all equitable right, title, possession and interest in the property until his death."

    - Just as in *Johns*, the court in *Johnson* recognized that the settlor retained the power to direct the conveyance of the entire interest in the property to anyone including the settlor. Therefore, the settlor had not truly parted with his ownership interest in the homestead property.

    - The holding in this case was later codified in F.S. 732.4015(2) that defines the "owner" of homestead for purposes of the homestead devise restrictions as the grantor of a revocable trust as defined under F.S. 733.707(3) and further provides that a "devise" includes a devise from a such a trust.

b.  ANALYSIS OF F.S. 732.4017

- Subsection (1) of the new statute sets forth two essential requirements which if met will allow the owner of homestead property to successfully avoid the homestead devise restrictions found in Article X, Section 4(c) of the Florida Constitution while still retaining certain rights in the homestead property:

    - There must be a valid inter vivos conveyance of an interest in the homestead property to one or more persons other than the homestead owner (can be in trust or outright transfer), and

- The homestead owner cannot have the power, acting in any capacity, whether alone or in conjunction with another person, to revoke the interest that is conveyed, or to revest the interest in the owner.

- Subsection (2) only applies to conveyances made in trust, and provides the general definition of the term "transfer in trust". If the definition of "transfer in trust" is satisfied, then the transfer of the homestead property to the trust will not be treated as an attempted devise of the property upon the death of the grantor, effectively avoiding the devise restrictions.

  - The term "transfer in trust" refers to a trust under which the transferor (whether alone or in conjunction with any person) does not the right to revoke the trust as defined in F.S. 733.707(3)(e).

  - While a right of revocation may not be retained, it is permissible to retain a power to alter the beneficial use and enjoyment of the interest held in the trust as long as three limitations are observed:

    - The right to alter the beneficial use or enjoyment can only be exercised within a class of beneficiaries identified in the trust instrument.

      - For example, if the trust is a discretionary trust for the benefit of the owner's descendants living from time to time, the owner can exercise a power to exclude a child of the owner as a beneficiary, or to change the ages specified for outright distributions, but the owner could not direct that distributions be made to the owner's spouse or to anyone else not a descendant of the owner.

    - The right cannot be exercised in favor of the owner, the owner's creditors, the owner's estate, or the creditors of the owner's estate, or in a manner that would discharge a legal obligation of the owner.

    - The power can be only be exercised during the owner's lifetime, and thus cannot be exercised by will.

  - Retention of such a power usually will be necessary in order to avoid immediate gift tax consequences upon the transfer of an interest in the homestead property, even if the owner retains a separate interest in the property (because of the rules under section 2702 of the federal Internal Revenue Code).

- For example, if the owner of homestead property conveys the homestead property to an irrevocable discretionary sprinkling trust for the benefit of the owner's descendants living from time to time, the full fair market value of the property will be subject to gift tax even if the owner retains a life estate in the homestead (because under section 2702 there is no offset for any interest retained by the owner other than an annuity or unitrust interest). Retention of a power to alter the beneficial use or enjoyment of the interest conveyed (whether the power is limited in scope or is unlimited) will eliminate immediate gift tax consequences even if the power is limited in its scope, by utilizing the incomplete gift rules under section 2511 of the Internal Revenue Code.

- The last sentence of subsection (2) clarifies that, "This subsection does not create an inference that a power not described in this subsection is a power to revoke or revest and interest in the transferor."

- Subsection (3) makes it clear that if an inter vivos conveyance satisfies the requirements of subsection (1), the owner can retain separate interests in the homestead property, such as a life estate (which would be desirable if the owner intends to continue to occupy the homestead property and wishes to retain homestead property tax benefits such as the Save Our Homes cap on increases in assessed taxable value) or a term of years.

  - Interests that satisfy the requirements of subsection (1) will not be treated as testamentary in nature even if they are future interests, such as a remainder interest following a life estate retained by the homestead owner.

  - Furthermore, an interest that satisfies the requirements of subsection (1) is not testamentary in nature even if the interest is subject to extinction upon the occurrence of an irrevocably specified event or contingency, such as the owner being alive on a date when all of the owner's children have reached the age of majority (at which time the constitutional restrictions on devise would no longer exist).

- The following are examples of qualifying inter vivos conveyances that are not subject to the constitutional and statutory restrictions on the devise of homestead property (whether or not the owner is survived by a spouse or minor child, assuming that all other conveyancing requirements have been met):

  1. An inter vivos conveyance to a qualified personal residence trust (within the meaning of section 2702 of the Internal Revenue Code).

2. An inter vivos conveyance of a remainder interest in homestead property (whether outright or in trust) following a life estate retained by the owner.

3. An inter vivos conveyance of a remainder interest in homestead property that is subject to complete divestment if the owner of the homestead property survives to a date that is specified in the instrument of conveyance, or if the conveyance is in trust, to a date that is specified in the trust instrument.   (Example: a vested remainder interest that is subject to divestment with a reversion back to the homestead owner if he or she is still alive on a specified date, or that is subject to divestment with a reversion back to the owner's estate if he or she is not survived by a minor child upon his or her death).

## IV.   WAIVER OF HOMESTEAD RIGHTS

- If a homestead owner is married and wishes to utilize F.S. 732.4017 or otherwise alienate the homestead property during his or her lifetime, it is imperative that the owner's spouse either sign the deed alienating the homestead property or validly waive his or her homestead rights.  See Article X, Section 4(c) which provides in pertinent part, "The owner of homestead real estate, joined by the spouse if married, may alienate the homestead . . .".

### a.   STATUTORY GUIDANCE – F.S. 732.702

- Chapter 732 contains a general waiver statute concerning the waiver of "spousal rights" which is found in F.S. 732.702:

> The rights of a surviving spouse to an elective share, intestate share, pretermitted share, **homestead,** exempt property, family allowance, and preference in appointment as personal representative of an intestate estate or any of those rights, may be waived . . .

- The waiver of these rights may be before or after marriage and must be done through a "contract, agreement, or waiver" signed by the waiving spouse in the presence of two subscribing witnesses.

- A waiver of "all rights" in the property or estate of a present or prospective spouse, or a complete property settlement entered into after, or in anticipation of separation, dissolution of marriage, or divorce, is deemed a waiver of homestead rights by that spouse.

- If the "agreement, contract or waiver" is executed **after** the marriage, each spouse must make "fair disclosure" to the other of that spouse's estate. No disclosure is required if the "agreement, contract or waiver" is executed **prior** to marriage.

- No consideration other than the agreement itself is required for the waiver to be valid.

b.   RECENT CASE LAW ON TRUSTS AND WAIVER OF HOMESTEAD



*Lyons v. Lyons*, 155 So.3d 1179 (Fla. 4th DCA 2014).

- ■ Richard and Norma Lyons owned a residence in Fort Lauderdale as husband and wife (TBE). In 1993, Richard and Norma quit claimed the residence to Norma. On the same day, Norma (without Richard's joinder) quit claimed the residence to a qualified personal residence trust (QPRT) in which Norma was the grantor and under which she retained an interest for 15 years or until the settlor's death, whichever occurred first.

- ■ In 2002, Richard executed a Last Will and Testament in which he acknowledged the QPRT and then in 2007 Richard passed away survived by Norma and five children.

- ■ In 2010, after the expiration of the 15 year retained term in the QPRT, Norma executed a quit claim deed attempting to convey the residence to herself and her daughter, Valerie, even though the property had previously been conveyed to Norma's QPRT and had been administered by the trustees of the QPRT since 1993.

- ■ Upon learning of this attempted transfer by Norma, the trustees of the QPRT filed a complaint seeking to set aside the 2010 deed on the grounds that Norma did not own the residence at the time the 2010 deed was executed as title was held by the trustees of the QPRT.

- ■ The trial court entered summary judgment in favor of Norma and Valerie finding that the 2010 deed from Norma to Norma and Valerie was valid because Norma, not the trustees of the QPRT, owned the residence in 2010.

    • Specifically, the trial court held that the 1993 deed from Norma to the trustees of the QPRT was invalid as Richard did not join in the deed. See Article X, Section 4(c) which provides, "The owner of the homestead real estate, *joined by the spouse if married*, may alienate the homestead by mortgage, sale or gift and, if married, may by deed transfer the title to an estate by the entirety with the spouse." (emphasis provided).

*[handwritten notes in margin and bottom]: Johnson v. Townsend, 259 So. 155 (Fla. 1914); Bowden reversed it to appoint a receiver to sell; Properly Reviewed @ pg. 707; Passing*

*[handwritten at bottom]: Surviving spouse may petition to partition as T/C*

- The 4th DCA reversed the summary judgment holding that Norma Lyons did not have standing to assert the homestead rights of Richard after his death in order to defeat a deed that Norma Lyons had executed prior to Richard's death. It was Richard's rights that were being effected by the deed, not Norma's.

- In reaching this result the 4th DCA correctly pointed out that the homestead provisions were designed to protect minor children and non-owner surviving spouses from having the homestead property alienated away from them without the consent of the non-owner spouse, "The entire provision hinges on the conduct of the owner spouse, and the resultant protections to the non-owner surviving spouse."

- The 4th DCA pointed out that, ". . . it would be absurd for the party who created the alleged infirmities in the quit claim deed to be able to attack the viability of the same quit claim deed.  In other words, Norma should not be able to attack the quit claim deed as void ab initio, where she drafted, relied on, and was the sole signatory to it."

- Instead of Norma using the homestead protections as a shield, she was attempting to use them as a sword to undo a situation that she herself had created prior to Richard's death.

*Habeeb v. Linder*, 36 FLW D300 (February 9, 2011).

- The Personal Representative of the Estate of Mitchell Habeeb appealed an order finding that a warranty deed executed by Mitchell and his spouse, Virginia, constituted a waiver of all of the homestead rights Mitchell had in the property upon Virginia's death.

- Mitchell and Virginia took title to their Florida condominium as TBE in 1973.  In 1979, Mitchell and Virginia executed a warranty deed granting Virginia a fee simple interest in the homestead property.

- There was no language indicating that there was any specific waiver of homestead rights pursuant to F.S. 732.702 but the form was a Ramco Form 01 which provided that the grantor "grants, bargains, sells, aliens, remises, releases, conveys and confirms . . . all tenements, hereditaments and appurtenances thereto . . .".

- Virginia predeceased Mitchell and her Will devised the condo with a life estate to Mitchell and the remainder to her sister Betty.  Mitchell subsequently died and the Personal Representative of the Estate of Mitchell Habeeb challenged the validity of the devise under Betty's Will finding that it violated the devise restrictions under Article X, Section 4(c) of the Florida Constitution.

- If Mitchell did not waive his homestead rights in the condominium, the devise would fail and Mitchell's estate would receive a fee simple interest in the condominium instead of the property passing to Betty upon Mitchell's death.

- The Court found there was a waiver of homestead rights in the execution of the deed because, "In this case the term 'hereditaments' in the 1979 warranty deed encompasses the homestead rights of each grantor as the survivor."

- While there was no specific evidence of "fair disclosure" of the estate of Virginia to Mitchell when the deed was signed by Mitchell as specifically required under F.S. 732.702, the 3rd DCA implied such disclosure because it was a "long term marriage" and Mitchell signed a Petition for Administration upon Virginia's death indicating that the condominium passed pursuant to the devise in Virginia's Will.

- This case cannot be cited as authority because on May 17, 2011, in a sua sponte Order, the 3rd District Court of Appeals withdrew the *Habeeb* decision via this order:

    > Upon the Court's own motion, and upon consideration of a settlement of this appeal before the issuance of a final opinion, the non-final opinion issued February 9, 2011, 36 Fla. L. Weekly D300, is hereby withdrawn.

*Stone v. Stone*, 157 so.3d 295 (Fla. 4th DCA 2015).

- Habib lives!

- This is the first case in which an appellate court analyzes F.S. 732.4017.

  *[handwritten: upheld retroactive app.]*

- Jerome Stone and his wife, Alma, owned a residence as tenants by the entireties (TBE). On March 27, 2000, Jerome and Alma executed a warranty deed conveying the property to themselves as tenants in common (TIC).

- On the same day Jerome executed the Jerome M. Stone Qualified Personal Residence Trust (QPRT) and then Jerome (joined by Alma) executed a warranty deed conveying his ½ TIC interest in the residence to Jerome and Alma as co-trustees of the QPRT. Alma also created a QPRT and executed a warranty deed (joined by Jerome) conveying her ½ TIC interest in the residence to Jerome and Alma as co-trustees of her QPRT.

*[handwritten marginal notes: "Cy 3 of Sable harbor followings common law", "each had ½ interest not w/ts", "Transfer not w/s", "QPR TC's do", "examine prior deeds to make sure no inadvertent waivers of homestead between spouses"]*

- The retained term of Jerome's QPRT was the earlier of five years or Jerome's death, and if Jerome died prior to the end of the five year term, the property would revert to Jerome's estate.

- Jerome died prior to the conclusion of the five year term survived by Alma and his two adult children, Ross and Nancy. Jerome's Will was a pour over will which devised all property into Jerome's Revocable Trust which provided that the assets were held in continuing trust for the remainder of Alma's lifetime. Upon Alma's death, the trust was to be terminated in favor of Nancy (excluding Ross as a beneficiary).

- Nancy and Ross became involved in a dispute in Jerome's estate as to whether the residence was Jerome's homestead, and therefore devise restricted (which would result in Ross receiving ½ of the remainder interest), or whether the property was not Jerome's homestead upon his death and the devise under Jerome's revocable trust was valid (which would result in Nancy receiving the entire remainder interest upon Alma's death).

- The 4th DCA correctly pointed out that although F.S. 732.4017 applied to the initial transfer of the residence into the QPRT, that statute does not address the result if the grantor of a QPRT fails to survive the retained term of years and the terms of the QPRT provide for a reversion to the grantors' estate,

  ```
  If Jerome had survived the stated term of he
  QPRT, the transfer would have been completed and
  the property would have passed to Nancy through
  the trust pursuant to its terms. However, since
  Jerome died before the term of the QPRT, it is as
  if the QPRT never existed, at least for this
  purpose.
  ```

- The technical issue that has created significant dispute among estate planning attorneys in Florida is whether the reversion from the QPRT into the grantor's estate upon the grantor's death will then be treated as owned by the grantor at the moment of his death (which would then be subject to the homestead devise restrictions) or is it something that happens subsequent to the moment of death, and therefore, does not subject the interest in the residence to the homestead devise restrictions.

  - DRAFTING LESSON – If you are funding QPRTs with homestead property in Florida, you may not want to provide for a reversion of the property to the grantor's estate upon the death of the grantor. If the

property is devised through the QPRT (as opposed to reverting to the grantor's estate), then pursuant to F.S. 732.4017, the homestead devise restrictions will not apply.

- The 4th DCA held that upon the reversion from the QPRT to Jerome's estate on his death, the property was then subject to the homestead devise restrictions,

> We hold that when a homeowner transfers property to a QPRT pursuant to section 732.4017 and the property later reverts back to the homeowner's estate because the homeowner fails to survive the term of the QPRT, a subsequent disposition of the property pursuant to the homeowner's will is a devise.

- But even though the residence was subject to devise restrictions upon Jerome's death (and would have failed as an improper devise), the 4th DCA upheld the devise in Jerome's Revocable Trust based on a waiver of Alma of her homestead rights pursuant to F.S. 732.702. Specifically, the 4th DCA found that Alma, ". . . waived her homestead rights by executing the march 27, 2000 warranty deed splitting the property into two one-half tenancy in common interests and then transferring her interest into her QPRT."

  - This is the same rational used by the *Habib* court to find a "waiver" when property was deeded from both spouses into the name of one spouse. In *Stone*, the deed contained language providing that Alma, ". . . 'grants bargains, sells, aliens, remises, releases, conveys, and confirms' the property 'together with all the tenements, *hereditaments*, and appurtenances thereto belonging or in anywise appertaining.'"

  - There is no discussion of any type of "fair disclosure" by Jerome of his estate to Alma at the time the deed was signed.

V.  CONCLUSION

- When preparing an estate plan for a client or administering an estate or trust, all estate and trust practitioners should be aware of homestead property and how the devise restrictions on that property could disrupt the intentions of our clients with regarding the disposition of their property. If a client is contemplating marriage and has children from a prior marriage or the client (whether contemplating marriage or already married) has a fixed intention to devise his or her homestead property to someone other than their spouse, you need to be aware of the provisions of both F.S. 732.4017 and F.S. 732.702.

- The current trend of the appellate courts appears to be a more favorable view of waivers of homestead rights as opposed to a strict adherence to statutory requirements. This is especially applicable when there has been any type of severance of the homestead property by spouses prior to death in order to fund irrevocable trusts as provided in F.S. 723.4017.



Estate of Johnson
397 So2d 970 (Fla 4th DCA 1981)

Can't retain right to revoke
transfer or will lose homestead
exemption, remainder interest
can devise remainder interest

IRC § 2702 — no offset
for retained interest other than
annuity or unitrust

IRC § 25-11 — retention of it to not
alter beneficial use to enjoyment
makes it an incomplete gift

QPRT or transfer of remainder
interest in cen. trust if devise be
for life estate, if gone, property
restrictions are — vest in to another
must be — vest in to another of
control of transferor.

732.702 —
Spouse may
waive in presence
writing in presence
of 2 wits
if after marriage
spouse & witness
disclose assets

***Shane Kelley*** practices law with The Kelley Law Firm, P.L., located in Ft. Lauderdale, Florida, and concentrates his practice in probate, trust and guardianship administration and litigation, and estate planning. Mr. Kelley is Board Certified by The Florida Bar as a Wills, Trusts and Estates Lawyer, has an LL.M. in Taxation from the University of Florida Graduate Tax Program, and is also certified by the Florida Supreme Court as a Circuit Civil Mediator. Mr. Kelley is a fellow of the American College of Trust and Estates Counsel (ACTEC), is AV rated by Martindale-Hubbell, has been listed in Best Lawyers in America since 2012, has been selected as a Super Lawyer by Super Lawyers Magazine since 2006, and has been listed in the Florida Legal Elite by Florida Trend Magazine since 2011. Mr. Kelley is a member of the Real Property, Probate and Trust Law Section of The Florida Bar and is the current Co-Chair of the Homestead Issues Study Committee. Mr. Kelley was appointed as a member of the Probate Rules Committee of the Florida Bar in 2001 and is a past Chairman of that committee. Mr. Kelley's publications include Chapter 4 "Functions of Lawyers And Personal Representatives" of the Florida Bar Publication *Practice Under Florida Probate Code,* 4th Edition (2012); and Chapter 1 "Procedural Considerations" of the Florida Bar Publication *Litigation Under Florida Probate Code*, 6th Edition (2011). Mr. Kelley is also a frequent lecturer on topics relating to wills, trusts and estates and fiduciary litigation. Further information regarding Shane Kelley and his qualifications can be found at www.estatelaw.com.



STATE OF FLORIDA, INDIAN RIVER COUNTY
I hereby certify that the foregoing is a true copy of the proven Last Will and Testament, as filed in my office, said Will has not been admitted to probate.

This 13 day of April 19 9?
J.K. BARTON,
Clerk of Circuit Court
By _____ Deputy Clerk

### LAST WILL AND TESTAMENT

I, RAYMOND STUART, of Vero Beach, Florida, make this my last Will, hereby revoking all Wills and Codicils heretofore made by me.

FIRST:  My tangible personal property owned by me at the time of my death, including furniture, jewelry, automobiles, clothing, silver, books, pictures, china, and articles of household use or ornament (and all policies of insurance on such tangible personal property), excepting therefrom, however, any tangible personal property of mine regularly used in connection with commercial property, and not including money, securities or the like, I give absolutely to my wife, MARION C. STUART, if she survives me by thirty (30) days and is married to me at my death, and if she does not so survive me by thirty (30) days or is not so married to me, to my issue who so survive me by thirty (30) days, such issue to take per stirpes.

I express the hope that my said wife or my said issue will dispose of said tangible personal property according to my wishes, however my wishes may be made known to her or to them, but I expressly declare that I do not intend to create any trust in law or in equity with respect to said tangible personal property.

In the event that my said wife does not survive me by thirty (30) days or is not so married to me and more than one issue of mine do so survive me, so that a division of my said tangible personal property into shares is required by the provisions of this Article FIRST, said issue shall agree among themselves as to the division.  If they do not agree as to the division, the following steps shall be taken to accomplish such division:

1.  My executors shall place a value on each item of my tangible personal property disposed of by this Article FIRST.

2.  Each issue of mine entitled to a share (or such persons as may be designated by my executors to represent such issue) shall alternately select the item of tangible personal

property he or she desires, with the order of the selection to be determined by a lottery devised by my executors.

3.   When an issue of mine entitled to a share (or such issue's representative) has selected items of personal property which total in value his or her share, he or she shall have no further right of selection.

4.   Items of tangible personal property not selected by the above method shall be sold by my executors (issue of mine to have the first right of purchase at such sale) and the net proceeds of the sale shall be divided among my issue so that the cash plus the items of tangible personal property selected by an issue of mine will total in value such issue's share.

Property and cash distributable to a minor under this Article FIRST may be distributed by my executors to such minor personally, or to such minor's legal guardian, or to some other person selected by my executors to receive such property for such minor, and the receipt of such minor, or such minor's legal guardian, or such other person shall be a complete discharge of my executors in regard to such distribution.

The person to whom property is distributed under this Article FIRST for the benefit of a minor shall decide from time to time whether such property shall be retained for eventual distribution to the minor or whether some or all of it shall be sold and the proceeds of the sale held for the minor.   Such person's decision in this regard shall be conclusive on all concerned.

The cost of moving any tangible personal property disposed of under this Article FIRST to the destination desired by the beneficiary shall be borne by the beneficiary.

SECOND:   References to "child" or "children" mean lawful blood descendants in the first degree of the parent designated, and references to "issue" mean lawful blood descendants in the first, second or any other degree of ancestry designated, provided always, however, that:

-2-

(a)  An adopted child and such adopted child's lawful blood descendants shall be considered as lawful blood descendants of the adopting parent or parents and of anyone who is by blood or adoption an ancestor of the adopting parent or of either of the adopting parents and shall not be considered descendants of the adopted child's natural parents, except where a child is adopted by a spouse of one of his or her natural parents such child shall be considered a descendant of such natural parent as well as a descendant of the adopting parent; and

(b)  A child born to persons who are openly living together as husband and wife after the performance of a marriage ceremony between them and such child's lawful blood descendants shall be considered as lawful blood descendants of such child's parents and of any ancestor of such child's parents, regardless of the fact that a purported divorce of one or both of such persons with reference to a prior marriage is invalid.

(c)  Whenever distribution is to be made to designated "issue" on a _per stirpes_ basis, the property shall be distributed to the persons and in the proportions that personal property of the named ancestor would be distributed under the laws of the State of Florida in force at the time stipulated for the distribution if the named ancestor had died intestate at such time, domiciled in such State, not married and survived only by such issue.

THIRD:  All the rest and residue of my property of whatever kind and wherever located that I own at my death including any of the foregoing gifts in this Will which for any reason fail to take effect, all of which is herein referred to as my residuary estate, but not including any property with respect to which I have a power of appointment, I give, devise and bequeath to the J. RAYMOND STUART REVOCABLE TRUST, which was created by an indenture of trust dated _January 2, 1990_, to be held and disposed of in accordance with the provisions thereof and as the same shall be amended from time to time. To whatever extent it is necessary, in order to give validity to this pourover from

-3-

my said Will to said trust, that changes made in said trust not be applicable to the poured over property, such changes shall be inapplicable.

FOURTH:   I give my executors the following powers and discretions:

1.   If my executors in good faith decide that there is uncertainty as to the inclusion of particular property in my gross estate for federal estate tax purposes, they shall exclude such property from my gross estate in the estate tax return.   My executors shall not be liable for any loss to my estate or to any beneficiary, if such loss results from their decision made in good faith that there is uncertainty as to the inclusion of a particular property in my gross estate.

2.   The decision of my executors as to the date which should be selected for the valuation of property in my gross estate for federal estate tax purposes shall be conclusive on all concerned.

3.   When a choice is available as to whether certain deductions shall be taken as income tax deductions or estate tax deductions, the decision of my executors in this regard shall be conclusive on all concerned and no adjustment of income and principal accounts in the estate shall be made as a result of such decision.

My executors are authorized to make partial or complete distributions to estate beneficiaries from time to time during administration;   to distribute unequal amounts to similar beneficiaries from time to time during administration;   and to make such other distributions during administration as they may determine.   Nothing contained in this paragraph shall be construed as authorizing my executors to vary the dispositive provisions in this Will.

FIFTH:   In extension and not in limitation of the powers given by law or other provisions of this Will, my executors shall have the following powers with respect to the settlement of my estate:

-4-   J. Raymond Stewart

1.   To retain indefinitely any investments and to invest and reinvest in stocks, shares or obligations of corporations, or unincorporated association or trusts and of investment companies, or in a common trust fund without giving notice to any beneficiary, or in other kinds of personal or real property, notwithstanding the fact that any or all of the investments made or retained are of a character or size which but for this express authority would not be considered proper for executors;

2.   To sell, to exchange, to lease and to make contracts concerning real or personal property for such considerations and upon such terms as to credit or otherwise as my executors may determine, which leases and contracts may extend beyond the term of the settlement of my estate; to give options therefore; to execute deeds, transfers, leases and other instruments of any kind;

3.   To hold bonds, shares or other securities, in bearer form, or in the name of the executors or in the name of one of the executors or in the name of a nominee, without indication of any fiduciary capacity; to deposit cash in a checking or savings account in a bank, without indication of any fiduciary capacity;

4.   To give general or specific proxies or powers of attorney for voting or acting in respect of shares or securities, which may be discretionary and with power of substitution; deposit shares or securities with, or transfer them to, protective committees or similar bodies;  to join in any reorganization and to pay assessments or subscriptions called for in connection with shares or securities held by my executors;

5.   To improve or develop real estate; to construct, alter or repair buildings or structures on real estate; to partition and to join with co-owners and others in dealing with real estate in any way;

6.   To employ investment counsel, custodians of estate property, brokers, agents and attorneys;

-5-

7.   When paying legacies or dividing or distributing my estate to make such payments, division or distribution wholly or partly in kind by allotting and transferring specific securities or other personal or real property or undivided interests therein as a part or the whole of any one or more payments or shares at current values;

8.   To keep any or all of the estate property at any place or places in Florida or elsewhere within the United States or abroad or with a depository or custodian at such place or places.

SIXTH:   I authorize and empower my executors to join with my said wife and her executor or administrator, in filing a joint federal or state income tax return of the income of my said wife and myself for any period or periods for which such a return may be permitted.   I further authorize and empower my executors to agree with my said wife or her executor or administrator:

1.   As to how the burden of the liability for federal or state income tax, or interest thereon, arising out of the filing of a joint return by my executors and my said wife or her executor or administrator, shall be borne as between my estate and my said wife or her estate, and

2.   As to who, as between my said wife or her estate and my estate shall be entitled:

(a)   To any refund or credit of any federal or state income tax, or interest thereon, based on the filing of a joint return by my said wife and myself or by my executor and my said wife or her executor or administrator.

(b)   To any refund or credit of any amount paid on account of any joint declaration of estimated federal or state income tax filed by my said wife and myself, and of the interest on any such refund, and

(c)   To the benefit of any payment made by my said wife or myself on account of any joint or separate declaration of estimated federal or state income tax.

-6-

My executors may exercise the foregoing powers in such manner as they shall in their absolute and uncontrolled discretion deem best, whether in the interest of my said wife or her estate or in the interest of my estate.

I authorize and empower my executors to consent for federal gift tax purposes to gifts made by my said wife as having been made one-half by me and one-half by her.

I intend that the election under Section 2652 (a)(3) of the Internal Revenue Code of 1986 be exercised, partially exercised, or not exercised as the Executors of my estate shall determine in my Executors' good faith discretion to be in the best interest of my estate and my beneficiaries as a group. The Trustees of the J. RAYMOND STUART REVOCABLE TRUST shall cooperate with and assist my Executors in connection with the election under Section 2652 (a)(3) and my trustees and executors are authorized to create separate trusts in order to effectuate a partial election.

My Executors shall have the power to allocate any portion of my generation-skipping tax exemption under Internal Revenue Code Section 2631 which is remaining at my death to any property with respect to which I am the transferor. I request, but do not require, that my Executors allocate the exemption to property that the Executors believe will appreciate over time, rather than to property the value of which will remain the same or depreciate over time.

SEVENTH: I name PAMELA B. STUART to serve as executrix of my will. If she is unwilling or unable or ceases to serve, I name Catherine S. Ryan and Deborah A. Stuart or such of them as shall be willing and able to serve to be executors. No bond shall be required of my said executors or if a bond is required by law, no surety of such bond shall be required.

No one dealing with my executors need inquire concerning the validity of anything that they purport to do or need see to the application of any money paid or any property transferred to or upon the order of my executors.

-7-

An executor shall be responsible only for such executor's own acts and omissions in bad faith. Furthermore, a successor executor shall not be liable for any action taken by the executors prior to the time such successor executor becomes an executor.

An executor may delegate any powers and discretions which he has as executor to a co-executor by an instrument in writing.

I hereby dispense with the necessity of a guardian ad litem for the protection of interests of persons who would be otherwise entitled thereto.

IN WITNESS WHEREOF, I hereunto set my hand this _2nd_ day of _January_ 19_90_. For identification I have signed each of the pages of this Will, which consists of eight pages.

*J. Raymond Stuart*

The foregoing instrument consisting of this and seven preceding typewritten pages was subscribed, published and declared by the above-named, J. RAYMOND STUART, the testator, as and for his last Will, in the presence of us three who, at his request, in his presence and in the presence of one another, hereto subscribe our names as witnesses thereof, all on the date last written, and each of us hereby declares that in his or her opinion that said J. RAYMOND STUART is of sound and disposing mind and memory.

_Neola N. Denlinger_ residing at _10018 Boynton Pl. Cir #355_
_Boynton Bch, Fl 33437_

_Sandra R. Rivera_ residing at _5302 Sherwood Lane_
_Lake Worth, FL 33467_

_Sandra M. Oleson_ residing at _4131 S Palm Bay Cir_
_St. P. B., Fl 33406_

State of FLORIDA        :ss *Palm Beach*

County of PALM BEACH

   We, J. RAYMOND STUART and _Nicola M. Gealitzki_,

_Sandra M. Rivera_, _Wanda M. Oleson_,

_____, the testator and the

witnesses, respectively, whose names are signed to the attached

(or foregoing) instrument, having been sworn, declared to the

undersigned officer that the testator, in the presence of

witnesses, signed the instrument as his last will, that he

signed, and that each of the witnesses, in the presence of the

testator and in the presence of each other, signed the will as a

witness.

_J. Raymond Stuart_
Testator

_Nicola N. Gealitzki_
Witness

_Sandra R. Rivera_
Witness

_Wanda M. Oleson_
Witness

   Subscribed and sworn to before me by ~~J. Raymond Stuart, Nicola M. Gealitzki~~,

the    testator,    and    by    _Nicola M. Gealitzki_,    and

_Sandra M. Rivera_, _Wanda M. Oleson_, the witnesses, on

this _2nd_ day of _January_, 19_90_.

_J. B. Birth_
NOTARY PUBLIC

My Commission Expires:

JAMES B. BERTLES
MY COMMISSION EXPIRES
January 28, 1994
BONDED THRU NOTARY PUBLIC UNDERWRITERS

-9-

<u>LAST WILL AND TESTAMENT</u>

I, MARION C. STUART, of Vero Beach, Florida, make this my last Will, hereby revoking all Wills and Codicils heretofore made by me.

FIRST:  My tangible personal property owned by me at the time of my death, including furniture, jewelry, automobiles, clothing, silver, books, pictures, china, and articles of household use or ornament (and all policies of insurance on such tangible personal property), excepting therefrom, however, any tangible personal property of mine regularly used in connection with commercial property, and not including money, securities or the like, I give absolutely to my husband, J. RAYMOND STUART, if he survives me by thirty (30) days and is married to me at my death, and if he does not so survive me by thirty (30) days or is not so married to me, to my issue who so survive me by thirty (30) days, such issue to take <u>per stirpes</u>.

I express the hope that my said husband or my said issue will dispose of said tangible personal property according to my wishes, however my wishes may be made known to him or to them, but I expressly declare that I do not intend to create any trust in law or in equity with respect to said tangible personal property.

In the event that my said husband does not survive me by thirty (30) days or is not so married to me and more than one issue of mine do so survive me, so that a division of my said tangible personal property into shares is required by the provisions of this Article FIRST, said issue shall agree among themselves as to the division.  If they do not agree as to the division, the following steps shall be taken to accomplish such division:

1.  My executors shall place a value on each item of my tangible personal property disposed of by this Article FIRST.

2.  Each issue of mine entitled to a share (or such persons as may be designated by my executors to represent such issue) shall alternately select the item of tangible personal

property he or she desires, with the order of selection to be determined by a lottery devised by my executors.

3.    When an issue of mine entitled to a share (or such issue's representative) has selected items of personal property which total in value his or her share, he or she shall have no further right of selection.

4.    Items of tangible personal property not selected by the above method shall be sold by my executors (issue of mine to have the first right of purchase at such sale) and the net proceeds of the sale shall be divided among my issue so that the cash plus the items of tangible personal property selected by an issue of mine will total in value such issue's share.

Property and cash distributable to a minor under this Article FIRST may be distributed by my executors to such minor personally, or to such minor's legal guardian, or to some other person selected by my executors to receive such property for such minor, and the receipt of such minor, or such minor's legal guardian, or such other person shall be a complete discharge of my executors in regard to such distribution.

The person to whom property is distributed under this Article FIRST for the benefit of a minor shall decide from time to time whether such property shall be retained for eventual distribution to the minor or whether some or all of it shall be sold and the proceeds of the sale held for the minor.  Such person's decision in this regard shall be conclusive on all concerned.

The cost of moving any tangible personal property disposed of under this Article FIRST to the destination desired by the beneficiary shall be borne by the beneficiary.

SECOND:  References to "child" or "children" mean lawful blood descendants in the first degree of the parent designated, and references to "issue" mean lawful blood descendants in the first, second or any other degree of ancestry designated, provided always, however, that:

(a)  An adopted child and such adopted child's lawful blood descendants shall be considered as lawful blood descendants

-2-

of the adopting parent or parents and of anyone who is by blood or adoption an ancestor of the adopting parent or of either of the adopting parents and shall not be considered descendants of the adopted child's natural parents, except where a child is adopted by a spouse of one of his or her natural parents such child shall be considered a descendant of such natural parent as well as a descendant of the adopting parent; and

(b)  A child born to persons who are openly living together as husband and wife after the performance of a marriage ceremony between them and such child's lawful blood descendants shall be considered as lawful blood descendants of such child's parents and of any ancestor of such child's parents, regardless of the fact that a purported divorce of one or both of such persons with reference to a prior marriage is invalid.

(c)  Whenever distribution is to be made to designated "issue" on a per stirpes basis, the property shall be distributed to the persons and in the proportions that personal property of the named ancestor would be distributed under the laws of the State of Florida in force at the time stipulated for the distribution if the named ancestor had died intestate at such time, domiciled in such State, not married and survived only by such issue.

THIRD:   All the rest and residue of my property of whatever kind and wherever located that I own at my death including any of the foregoing gifts in this Will which for any reason fail to take effect, all of which is herein referred to as my residuary estate, but not including any property with respect to which I have a power of appointment, I give, devise and bequeath to THE MARION C. STUART REVOCABLE TRUST, which was created by an indenture of trust dated _March 8, 1990_, to be held and disposed of in accordance with the provisions thereof and as the same shall be amended from time to time.  To whatever extent it is necessary, in order to give validity to this pourover from my said Will to said trust, that changes made in said trust not be applicable to the poured over property, such changes shall be inapplicable.

-3-

FOURTH:   I give my executors the following powers and discretions:

1.   If my executors in good faith decide that there is uncertainty as to the inclusion of particular property in my gross estate for federal estate tax purposes, they shall exclude such property from my gross estate in the estate tax return.   My executors shall not be liable for any loss to my estate or to any beneficiary, if such loss results from their decision made in good faith that there is uncertainty as to the inclusion of a particular property in my gross estate.

2.   The decision of my executors as to the date which should be selected for the valuation of property in my gross estate for federal estate tax purposes shall be conclusive on all concerned.

3.   When a choice is available as to whether certain deductions shall be taken as income tax deductions or estate tax deductions, the decision of my executors in this regard shall be conclusive on all concerned and no adjustment of income and principal accounts in the estate shall be made as a result of such decision.

My executors are authorized to make partial or complete distributions to estate beneficiaries from time to time during administration; to distribute unequal amounts to similar beneficiaries from time to time during administration; and to make such other distributions during administration as they may determine.   Nothing contained in this paragraph shall be construed as authorizing my executors to vary the dispositive provisions in this Will.

FIFTH:   In extension and not in limitation of the powers given by law or other provisions of this Will, my executors shall have the following powers with respect to the settlement of my estate:

1.   To retain indefinitely any investments and to invest and reinvest in stocks, shares or obligations of corporations, or unincorporated association or trusts and of investment companies, or in a common trust fund without giving

-4-

notice to any beneficiary, or in other kinds of personal or real property, notwithstanding the fact that any or all of the investments made or retained are of a character or size which but for this express authority would not be considered proper for executors;

2.    To sell, to exchange, to lease and to make contracts concerning real or personal property for such considerations and upon such terms as to credit or otherwise as my executors may determine, which leases and contracts may extend beyond the term of the settlement of my estate; to give options therefore; to execute deeds, transfers, leases and other instruments of any kind;

3.    To hold bonds, shares or other securities, in bearer form, or in the name of the executors or in the name of one of the executors or in the name of a nominee, without indication of any fiduciary capacity; to deposit cash in a checking or savings account in a bank, without indication of any fiduciary capacity;

4.    To give general or specific proxies or powers of attorney for voting or acting in respect of shares or securities, which may be discretionary and with power of substitution; deposit shares or securities with, or transfer them to, protective committees or similar bodies;  to join in any reorganization and to pay assessments or subscriptions called for in connection with shares or securities held by my executors;

5.    To improve or develop real estate; to construct, alter or repair buildings or structures on real estate; to partition and to join with co-owners and others in dealing with real estate in any way;

6.    To employ investment counsel, custodians of estate property, brokers, agents and attorneys;

7.    When paying legacies or dividing or distributing my estate to make such payments, division or distribution wholly or partly in kind by allotting and transferring specific

interests therein as a part or the whole of any one or more payments or shares at current values;

8.   To keep any or all of the estate property at any place or places in Florida or elsewhere within the United States or abroad or with a depository or custodian at such place or places.

SIXTH:   I authorize and empower my executors to join with my said husband and his executor or administrator, in filing a joint federal or state income tax return of the income of my said husband and myself for any period or periods for which such a return may be permitted.  I further authorize and empower my executors to agree with my said husband or his executor or administrator:

1.   As to how the burden of the liability for federal or state income tax, or interest thereon, arising out of the filing of a joint return by my executors and my said husband or his executor or administrator, shall be borne as between my estate and my said husband or his estate, and

2.   As to who, as between my said husband or his estate and my estate shall be entitled:

(a)   To any refund or credit of any federal or state income tax, or interest thereon, based on the filing of a joint return by my said husband and myself or by my executor and my said husband or his executor or administrator.

(b)   To any refund or credit of any amount paid on account of any joint declaration of estimated federal or state income tax filed by my said husband and myself, and of the interest on any such refund, and

(c)   To the benefit of any payment made by my said husband or myself on account of any joint or separate declaration of estimated federal or state income tax.

My executors may exercise the foregoing powers in such manner as they shall in their absolute and uncontrolled discretion deem best, whether in the interest of my said husband or his estate or in the interest of my estate.

-6-

I authorize and empower my executors to consent for federal gift tax purposes to gifts made by my said husband as having been made one-half by me and one-half by him.

I intend that the election under Section 2652 (a)(3) of the Internal Revenue Code of 1986 be exercised, partially exercised, or not exercised as the Executors of my estate shall determine in my Executors' good faith discretion to be in the best interest of my estate and my beneficiaries as a group. The Trustees of THE MARION C. STUART REVOCABLE TRUST shall cooperate with and assist my Executors in connection with the election under Section 2652 (a)(3) and the trustees and executors are authorized to create separate trusts in order to effectuate a partial election.

My Executors shall have the power to allocate any portion of my generation-skipping tax exemption under Internal Revenue Code Section 2631 which is remaining at my death to any property with respect to which I am the transferor. I request, but do not require, that my Executors allocate the exemption to property that the Executors believe will appreciate over time, rather than to property the value of which will remain the same or depreciate over time.

SEVENTH: I name J. RAYMOND STUART to serve as executor of my will. If he is unwilling, or unable or ceases to serve, I name Pamela B. Stuart to be executrix. If she shall be unwilling or unable or ceases to serve, I name Catherine C. Ryan and Deborah A. Stuart to serve. No bond shall be required of my said executors or if a bond is required by law, no surety of such bond shall be required.

No one dealing with my executors need inquire concerning the validity of anything that they purport to do or need see to the application of any money paid or any property transferred to or upon the order of my executors.

An executor shall be responsible only for such executor's own acts and omissions in bad faith. Furthermore, a successor executor shall not be liable for any action taken by

-7-



## DEED OF GIFT

I, J. RAYMOND STUART, settlor of the J. RAYMOND STUART REVOCABLE TRUST, hereby transfer all of my right, title and interest in and to the following assets to J. Raymond Stuart and Pamela B. Stuart, Trustees of said trust:

All of my right, title and interest in any and all accounts being held in my name or for my benefit at Shearson Lehman Hutton, Inc.

Said trustees are to hold and dispose of said assets in accordance with the terms of said trust.

_____January 2, 1990_____     _____
Date                                              J. RAYMOND STUART


COUNTY OF PALM BEACH
STATE OF FLORIDA

Then personally appeared the aforementioned J. Raymond Stuart known to me as the person described in and who executed the foregoing instrument at Palm Beach, Florida on January 2, 1990, and acknowledged the foregoing to be his free act and deed.

_____
Notary Public

**JAMES B. BERTLES**
MY COMMISSION EXPIRES
January 28, 1994
BONDED THRU NOTARY PUBLIC UNDERWRITERS

STUART:WS:deed:dg:1/2/90:d1



*FAIR MARKET VALUE*
*APPRAISAL*

**ESTATE OF**
**ESTATE OF MARION C. STUART**

Effective Date 04/29/12

Prepared by:

Stuart P. Whitehurst

**Diane Marvin Appraisal Services, Inc.**
2336 S. East Ocean Boulevard, #359
Stuart, Florida 34996

772-463-4440
954-968-0003

## TABLE OF CONTENTS

COVER LETTER.................................................................. 1-3

DESCRIPTIONS AND VALUES......................................... 4-12

SUMMARY ............................................................................ 13

APPRAISER'S QUALIFICATIONS.................................. 14-18

PHOTOGRAPHS ........................................... ADDENDUM

MARION C. STUART FAIR MARKET VALUE SELF-CONTAINED APPRAISAL / EFFECTIVE DATE 04/29/12

# FAIR MARKET VALUE APPRAISAL REPORT

July 3, 2012

Pamela Stuart, Esq.
4731 North Highway A1A, 2nd
Vero Beach, FL  32963

RE: ESTATE OF MARION C. STUART

Dear Ms. Stuart:

At your request, on June 21, 2012, an appraisal inspection was conducted of the personal property located at 101 S. Catalina Court, Vero Beach, FL  32963. The property was represented as belonging to the estate of Marion C. Stuart, deceased on April 29, 2012. The inspection was conducted in your presence by Stuart P. Whitehurst. The values set forth in this report are effective as of the date of death. This appraisal assignment has been undertaken to determine the FAIR MARKET VALUE of the personal property described hereinafter for the purpose of estate settlement. Any other use renders this appraisal null and void. This self-contained appraisal report is intended to be used by you and your agents. Use of this report by others is not intended.

**The fair market value of the appraised items listed is: $26,970.00** This report follows the guidelines set forth by Internal Revenue Code, Section 20.2031-6(b) for reporting tangible personal property under Federal Estate Tax Return #706, Schedule F.

Fair Market Value as set forth in the Internal Revenue Code; Section 20.2031-1(b) is defined as:

"The price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. The Fair Market Value of a particular item of property includible in the decedent's gross estate is not to be determined by a forced sale price. Nor is the Fair Market Value of an item of property to be determined by the sale price of an item in a market other than that in which such an item is most commonly sold to the public, taking into consideration the location of the item wherever appropriate." (ISA Core Course Manual)

For this appraisal, values have been determined by using the sales comparison approach. This method of valuation involves comparing the property with similar items that have sold within the market that are considered to be the most common for each item. The income approach and the cost approach were considered, but were not used. The markets considered and the recent sales prices reviewed for items comparable to those listed include antique shops, antique shows, consignment stores, used furniture and estate sales, specialty dealers available on the Internet, and local (and regional/national) auction houses where such property is commonly sold to the public. Sources of data used to determine values also include invoices, receipts, recognized price guides, subscription Internet databases, sales by dealers, and other personal observations. Markets analyzed appeared stable: values were neither falling nor rising. Because quality, condition, and desirability affect the appropriate market where the public would purchase items, different markets may have been considered for different items of personal property depending on the above factors.

There are items listed in this report, although used and showing ordinary wear and tear, which are desirable to collectors and considered to be appreciable contents such as antique furniture, fine and decorative art, sterling silver, collectibles and some ceramics and glassware. For these items, we considered antique shops, antique shows, specialty dealers available on the Internet and local and regional/national auction houses where comparable items are most commonly sold to the public.

1 of 18

MARION C. STUART FAIR MARKET VALUE SELF-CONTAINED APPRAISAL / EFFECTIVE DATE 04/29/12

In general, the condition of the items examined was good. Any alterations from original condition or damage beyond what is usual and common for items of similar age are indicated in the report. The appraiser makes every effort to report damage, restoration, and repair, however, on site time constraints and other factors may limit the appraiser's ability to detect condition problems. If condition problems are discovered after the completion of this report, the appraiser reserves the right to alter or amend the value conclusions of the property affected.

Unless otherwise stated herein, the appraisal is based only on the readily apparent identity of the items appraised. In our opinion no further guarantee of authenticity, genuineness, attribution or authorship is necessary. If relevant information is discovered or becomes available after the completion of this report, the appraisers reserve the right to alter or amend the value conclusions of the property affected.

Unless otherwise stated herein, works of art were not examined out of frame and electronic equipment is assumed to be in working order.

The values stated for the items listed do not include any additional costs that may be incurred in the sale of the items, such as advertising costs, fees, commissions, packing and shipping, etc.

The appraised values are based upon the whole interest and possessory interest of the deceased, undiminished by any liens, fractional interests or any other form of encumbrance or alienation.

This appraisal is not an indication or certificate of title or ownership. The identification of the interest of the deceased has been represented to me by the client, and no further inquiry or investigation will be made nor is any opinion to be given as to the truth of such representation.

The value conclusions expressed herein are based on our best judgment and opinion, and are not a representation or warranty that the items will realize those values if offered for sale at auction or otherwise. The values expressed are based on current information on the date the appraisal was made. No opinion is expressed as to any past value, nor, unless otherwise stated, as to any future value.

We certify that, to the best of our knowledge and belief:

- The statements of fact contained in this report are true and correct.

- Stuart P. Whitehurst has personally inspected the listed property that is the subject of this report. Diane Marvin, ISA CAPP was not present during the inspection but has reviewed all of the notes, information, research and images pertaining to this report.

- The reported analyses, opinions and conclusions are limited only by the reported critical assumptions and limiting conditions, and are our personal, impartial and unbiased, professional analyses, opinions and conclusions.

- We have no undisclosed past, present or contemplated future interest in the property that is the subject of this report, and no personal interest with respect to the parties involved.

- We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

- Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

2 of 18

MARION C. STUART FAIR MARKET VALUE SELF-CONTAINED APPRAISAL / EFFECTIVE DATE 04/29/12

- The compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal. The fee for this assignment was based on an hourly rate.

- Unless noted elsewhere, no one else provided significant professional assistance to the persons signing this report.

- This appraisal has been prepared in conformity with and is subject to the current version of the International Society of Appraisers *Appraisal Report Writing Standard* and *Code of Ethics*. In addition, my analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the current version of The Appraisal Foundation's *Uniform Standard of Professional Appraisal Practice (USPAP)*.

With the exception of yourself, possession of this report or its copy does not carry with it the right of publication, nor may this report be used for any purpose by anyone other than yourself or authorized users without my previous written consent. If this report is reproduced, copied or otherwise used, it must be done so in the report's entirety including the cover document and all attachments. Furthermore, no change to any item in this appraisal shall be made by anyone other than Diane Marvin, ISA CAPP. The appraisers shall have no responsibility for any unauthorized change.

Should you or your agents request additional services in conjunction with this appraisal (such as for added time researching for other value purposes, pretrial conferences, court appearances, court preparations, etc.), compensation for same shall be at the customary hourly rate charged by the appraiser at that time, and shall be paid by the client immediately upon receipt of a statement for said work.

We regard all information concerning this appraisal as confidential. A copy of this document along with the original notes and images has been retained in our work file. We will not allow others to have access to these records without your written permission unless so ordered by a court of law.

Diane Marvin, ISA CAPP is a certified member of the International Society of Appraisers. Stuart P. Whitehurst is a nationally recognized appraiser of antiques and personal property. Our qualifications to conduct this appraisal are listed in the attached Professional Qualifications. Additionally, photographs of the items appraised have been provided and are appended to this report.

Sincerely,

Diane Marvin, ISA CAPP
Certified Member International Society of Appraisers

Stuart P. Whitehurst
Appraiser

MARION C. STUART FAIR MARKET VALUE SELF-CONTAINED APPRAISAL / EFFECTIVE DATE 04/29/12

## DESCRIPTIONS AND VALUES

Any damages will be noted in the appraisal report. Measurements, if provided, are in the order of HEIGHT first, WIDTH second, and DEPTH third. Measurements are approximate. The appraiser has seen all of the items listed.

|  | **ENTRYWAY** |  |  |
|---|---|---|---|
| 1. | TALL CASE CLOCK<br>New England, c. 1810, maple case with painted face, long case with shaped feet |  | $2,200.00 |
| 2. | FRAMED REPRODUCTION<br>19th century picture frame, with Renoir photo reproduction |  | 20.00 |
| 3. | CHEST OF DRAWERS<br>New England, c. 1860, birchwood, with four drawers |  | 150.00 |
| 4. | OIL LAMPS (2)<br>Opaline glass with brass fittings, reeded stems |  | 40.00 |
| 5. | MIRROR<br>19th century, double mirror plate, gold painted |  | 30.00 |
| 6. | DROP LEAF TABLE<br>New England, c. 1850, cherrywood, shaped corners, drop leaves |  | 200.00 |
| 7. | LAMP<br>Modern, pineapple stem, black fabric shade |  | 10.00 |
| 8. | MIRROR<br>19th century, pine, ogee borders |  | 50.00 |
|  | **TOTAL FOR ENTRYWAY:** |  | **$2,700.00** |
|  | **DEN** |  |  |
| 9. | LAMPS (2)<br>Blue ceramic, hexagonal base |  | $50.00 |
| 10. | DECORATOR TABLE<br>Modern, particle board with silk tablecloth |  | 15.00 |
| 11. | WALL ART (8)<br>Framed Norman Rockwell reproductions, modern, embossed paper, maple frames |  | 120.00 |
| 12. | SOFA<br>Modern, checkered fabric with floral sprays, (7) pillows |  | 50.00 |

MARION C. STUART FAIR MARKET VALUE SELF-CONTAINED APPRAISAL / EFFECTIVE DATE 04/29/12

| 13. | LOW TABLE<br>Modern, white-painted cane with glass top and circular legs | | 50.00 |
|---|---|---|---|
| 14. | LAMP TABLE<br>Modern, painted tin with stenciled decoration | | 25.00 |
| 15. | MISCELLANEOUS POTTERY AND PORCELAINS<br>- (2) blue transfer decorated pattern pieces, bowl and warming dish<br>- (2) Staffordshire teapots and a creamer<br>- Mason's ironstone pitcher with Blue Willow pattern<br>- (2) covered vegetable tureens<br>- (3) other pieces | 45.00<br><br>125.00<br>60.00<br>50.00<br>30.00 | 310.00 |
| 16. | BOOKS<br>Approximately (100), mostly hardbound, some antique references | | 30.00 |
| 17. | ARM CHAIR<br>White-painted country-style, red silk cushions | | 10.00 |
| 18. | HIGHBOY<br>Modern, maple, Queen Anne-style, by Whitney | | 300.00 |
| 19. | PERSONAL AWARDS, PAPERS AND PHOTOGRAPHS<br>No commercial value | | 0.00 |
| 20. | ROLLTOP DESK<br>Modern, pickled oak, jasper cabinet | | 100.00 |
| 21. | MISCELLANEOUS FURNITURE<br>- pine country-style clerk's desk<br>- 19th century rush seat side chair<br>- filing cabinet with two drawers | 20.00<br>10.00<br>5.00 | 35.00 |
| 22. | MISCELLANEOUS<br>- (2) small Royal Doulton figurines<br>- (4) pairs of decorative bookends<br>- framed reproduction art<br>- modern barometer<br>- office equipment<br>- small set of postal scales<br>- small quantity of table articles | 75.00<br>100.00<br>5.00<br>15.00<br>25.00<br>25.00<br>10.00 | 255.00 |
| | **TOTAL FOR DEN:** | | **$1,350.00** |
| | **GUEST BEDROOM** | | |
| 23. | SMALL OCCASIONAL TABLE<br>Maple, New England Queen Anne-style, by Ethan Allen | | $20.00 |
| 24. | CHEST OF DRAWERS<br>New England, c. 1780, Chippendale, curly maple | | 1,800.00 |

MARION C. STUART FAIR MARKET VALUE SELF-CONTAINED APPRAISAL / EFFECTIVE DATE 04/29/12

| 25. | LAMP<br>Chinese Export porcelain, vasiform, decorated with a figure | | 75.00 |
|---|---|---|---|
| 26. | PRINTS (3)<br>Botanical, taken from early 19th century English books | | 150.00 |
| 27. | MIRROR<br>American, c. 1850, mahogany veneer, rectangular | | 25.00 |
| 28. | SCULPTURE – 24" X 8' X 3"<br>Erik Erikson (American, 20th century)<br>Mixed media assemblage, titled "Ancient Sounds Present", identified by label on reverse, Elaine Baker Gallery, Boca Raton | | 150.00 |
| 29. | MISCELLANEOUS BEDROOM FURNITURE<br>-   white painted wicker arm chair<br>-   decorator table with blue cotton tablecloth<br>-   pair of modern brass and white enamel twin beds<br>-   white painted side table<br>-   green painted side table<br>-   card table | 10.00<br>10.00<br>50.00<br>5.00<br>10.00<br>5.00 | 90.00 |
| 30. | BLANKET CHEST<br>19th century, pine, rectangular case | | 250.00 |
| 31. | SIDE TABLE<br>American, c. 1840, maple and cherrywood, single drawer and circular legs | | 200.00 |
| 32. | WASH STAND<br>American, c. 1860, maple, two towel bars, porcelain knob, circular legs | | 100.00 |
| 33. | PRINTS (2)<br>19th century, German, framed decorative botanical prints | | 150.00 |
| 34. | PRINTS (2)<br>Framed French botanical reproductions, bird's eye maple frames | | 80.00 |
| 35. | MISCELLANEOUS<br>-   (3) lamps, various media<br>-   Staffordshire pottery water pitcher<br>-   (3) desk clocks<br>-   small group of miscellaneous table articles | 60.00<br>15.00<br>15.00<br>40.00 | 130.00 |
| | **TOTAL FOR GUEST BEDROOM:** | | **$3,220.00** |
| | **TELEVISION ROOM** | | |
| 36. | ENTERTAINMENT CABINET<br>Modern, American country-style, pine, two pairs of doors | | $150.00 |

MARION C. STUART FAIR MARKET VALUE SELF-CONTAINED APPRAISAL / EFFECTIVE DATE 04/29/12

| | | | |
|---|---|---|---|
| 37. | **ELECTRONICS**<br>RCA tube-type television, Pioneer VHS player, and Memorex DVD player | | 40.00 |
| 38. | **MISCELLANEOUS FURNITURE**<br>- pair of swiveling club chairs<br>- Queen Anne-style maple side table, by Ethan Allen<br>- pair of Ethan Ellen single drawer end tables<br>- three-cushion cotton-upholstered sleeper sofa (no commercial value)<br>- small Queen Anne-style maple footstool | 20.00<br>20.00<br>40.00<br>0.00<br><br>20.00 | 100.00 |
| 39. | **LOW TABLE**<br>19th century, pine, rectangular top and circular legs | | 150.00 |
| 40. | **PRINTS (4)**<br>After Pu Qua and Dadley, book plates, taken from a c.1800 treatise on Chinese life, framed | | 400.00 |
| 41. | **MISCELLANEOUS**<br>- framed botanical reproduction<br>- (2) modern ceramic lamps<br>- small quantity of porcelain table articles<br>- small quantity of miscellaneous table articles | 5.00<br>40.00<br>15.00<br>10.00 | 70.00 |
| | **TOTAL FOR TELEVISION ROOM:** | | **$910.00** |
| | **MASTER BEDROOM** | | |
| 42. | **MISCELLANEOUS BEDROOM FURNITURE**<br>- small 19th century thumb-back rush seat side chair<br>- white painted wicker tall chest<br>- pair of cherrywood American-style twin beds<br>- white-painted tray table/night stand<br>- night table with drawer and door, by Pennsylvania House<br>- white-painted wicker single-drawer night table<br>- pair of white-painted wicker blanket chests<br>- white-painted six drawer tall chest<br>- blue and white painted four drawer chest<br>- white wicker side table and circular side table | 10.00<br>40.00<br>100.00<br>25.00<br>20.00<br><br>25.00<br>70.00<br>30.00<br>20.00<br>60.00 | $400.00 |

MARION C. STUART FAIR MARKET VALUE SELF-CONTAINED APPRAISAL / EFFECTIVE DATE 04/29/12

| 43. | MISCELLANEOUS | | 245.00 |
|---|---|---|---|
| | - brass and ruby glass lamp | 40.00 | |
| | - Asian-style porcelain lamp | 20.00 | |
| | - pair of framed botanical reproductions | 75.00 | |
| | - white ceramic lamp | 5.00 | |
| | - wicker mirror | 10.00 | |
| | - RCA tube-type television, and RCA VHS player | 10.00 | |
| | - small quantity of table decorations | 10.00 | |
| | - brass and ruby glass oil lamp base | 75.00 | |
| | **TOTAL FOR MASTER BEDROOM:** | | **$645.00** |
| | | | |
| | **LIVING ROOM** | | |
| 44. | TALL CHEST<br>New England, c. 1780, Chippendale, maple, rectangular case and five drawers | | $2,400.00 |
| 45. | CANDLESTICKS AND SHADES<br>Weighted sterling silver candlesticks with cranberry glass hurricane shades | | 175.00 |
| 46. | MIRROR<br>Late 19th century, gold leaf, molded frame, rectangular mirror plate | | 50.00 |
| 47. | BANJO CLOCK<br>American Federal period, painted glass panels, retro-fitted with barometer | | 700.00 |
| 48. | PRINTS (2)<br>19th century, pair of framed botanical engravings | | 200.00 |
| 49. | ARM CHAIR<br>19th century, American, "birdcage" back Windsor arm chair | | 225.00 |
| 50. | MIRROR<br>Victorian, rectangular frame with molded edge | | 75.00 |
| 51. | SIDE CHAIR<br>American, birchwood, rush seat | | 15.00 |
| 52. | SLANT LID DESK<br>New England, maple, Chippendale-style, fitted interior, four drawers | | 600.00 |
| 53. | SMALL LAMP<br>Chinese Export, cylindrical form, foliate painted | | 40.00 |
| 54. | WING CHAIRS (2)<br>Modern, floral chintz-upholstery, Queen Anne-style | | 250.00 |

MARION C. STUART FAIR MARKET VALUE SELF-CONTAINED APPRAISAL / EFFECTIVE DATE 04/29/12

| | | | |
|---|---|---|---|
| 55. | CANDLESTAND<br>New England, 19th century, walnut, rectangular top and tripod base | | 150.00 |
| 56. | CANDLESTAND<br>Reproduction, Queen Anne-style, with brass gallery | | 20.00 |
| 57. | FIREPLACE EQUIPMENT<br>Including serpentine fender and set of fire tools | | 150.00 |
| 58. | CHILD'S CHAIR<br>19th century, maple with rush seat and turned legs | | 25.00 |
| 59. | URNS (2)<br>Japanese, modern, ribbed design with dragons and Phoenix birds | | 80.00 |
| 60. | CANDLESTAND<br>19th century, New England, maple with cherrywood inlay, cut corners and tripod base | | 275.00 |
| 61. | WICKER FURNITURE (3)<br>White-painted, comprising rocking chair, arm chair and glass-top low table | | 160.00 |
| 62. | END TABLES (2)<br>White painted faux bamboo with glass tops | | 80.00 |
| 63. | SOFA<br>Modern, floral chintz upholstery, (3) cushions | | 100.00 |
| 64. | PRINTS (6)<br>Early 19th century, framed English botanicals, embroidered mats | | 450.00 |
| 65. | MISCELLANEOUS<br>- (2) pairs of reproduction brass candlesticks<br>- small group of ceramic table articles<br>- small group of glass table articles<br>- pair of blue ceramic lamps<br>- brass standing lamp | 30.00<br>10.00<br>10.00<br>40.00<br>10.00 | 100.00 |
| | **TOTAL FOR LIVING ROOM:** | | **$6,320.00** |
| | | | |
| | **DINING ROOM** | | |
| 66. | DROP LEAF TABLE<br>New England, 18th century, serpentine drop leaves and square legs | | $400.00 |

MARION C. STUART FAIR MARKET VALUE SELF-CONTAINED APPRAISAL / EFFECTIVE DATE 04/29/12

| | | | |
|---|---|---|---|
| 67. | MISCELLANEOUS<br>- Staffordshire teapot without lid<br>- pair of reproduction glass dolphin candlesticks<br>- pair of brown painted tin candlesticks, and a bowl<br>- pair of white ceramic angels<br>- Classical style split baluster mirror<br>- miscellaneous table porcelains and glassware in various patterns | 10.00<br>10.00<br>20.00<br>5.00<br>20.00<br>130.00 | 195.00 |
| 68. | CORNER CABINET<br>Modern, Chippendale-style, green/blue painted, white interior | | 250.00 |
| 69. | RUBY / CRANBERRY GLASS ARTICLES (16)<br>Collection of table articles, 19th and 20th century, pitchers, vases, cups, serving pieces, and a bell | | 320.00 |
| 70. | DINING TABLE AND CHAIRS (8)<br>Modern, by Drexel-Heritage, cherrywood, Queen Anne-style, (2) arm chairs and (6) side chairs, table with leaves | | 450.00 |
| 71. | HUTCH<br>Modern, by Pennsylvania House, pine, three glass doors, three drawers and three doors | | 250.00 |
| 72. | STAFFORDSHIRE TEAWARE PORCELAINS<br>Early 19th century, table articles, pink luster, various patterns | | 75.00 |
| 73. | PRINTS (2)<br>19th century, framed natural history prints of hermit crabs | | 150.00 |
| | **TOTAL FOR DINING ROOM:** | | **$2,090.00** |
| | **KITCHEN** | | |
| 74. | MISCELLANEOUS FURNITURE<br>- pine open bookcase with three drawers<br>- (3) thumb-back rush seat side chairs<br>- small footstool | 50.00<br>45.00<br>10.00 | $105.00 |
| 75. | DROP LEAF TABLE<br>Circular drop leaf table with turned legs, with (2) leaves | | 200.00 |
| 76. | FRAMED WALL ART<br>- (4) photographs of English landscapes<br>- (2) early 19th century English botanicals<br>- reproduction of a Howarth etching | 20.00<br>100.00<br>5.00 | 125.00 |
| 77. | MISCELLANEOUS PORCELAINS AND GLASSWARE<br>Including Blue Danube "Onion" pattern, Wedgwood "Potpourri" tableware for twelve, and a variety of mismatched pieces | | 225.00 |

MARION C. STUART FAIR MARKET VALUE SELF-CONTAINED APPRAISAL / EFFECTIVE DATE 04/29/12

| | | | |
|---|---|---|---|
| 78. | MISCELLANEOUS KITCHENWARE<br>Pots and pans; service pieces; small electric appliances | | 30.00 |
| 79. | RADIO<br>Bose Wave, white case | | 50.00 |
| 80. | MIRROR<br>Modern, pine, carved Classical-style frame | | 30.00 |
| | **TOTAL FOR KITCHEN:** | | **$765.00** |
| | **JEWELRY** | | |
| 81. | ENGAGEMENT RING<br>14K yellow gold, prong-set with single, round brilliant cut, diamond solitaire, approximately 1.00 carat | | $1,800.00 |
| 82. | WEDDING BAND<br>14K yellow gold, prong-set with five round brilliant diamonds, each approximately 0.10 ct. | | 600.00 |
| 83. | RINGS (5)<br>- yellow gold and stone-set floriform cocktail ring, set with diamonds and garnets (judged), with central round garnet, surrounded by twelve smaller stones (six each diamond and garnets)<br>- yellow gold and opal cocktail ring, the openwork mounting set with five small round and four small oval opals<br>- yellow gold and stone-set cocktail ring, with textured openwork branch or snake-style curved bands set 8 small emeralds (judged)<br>- yellow gold and single pearl-mounted ring, the central pearl, in textured floriform mounting<br>- white gold and stone-set ring, with emerald-cut blue topaz (judged), with four diamond melee at shoulders, white gold hinged shank | 350.00<br><br>250.00<br><br>350.00<br><br>225.00<br>175.00 | 1,350.00 |
| 84. | COSTUME JEWELRY<br>Large and varied collection including bracelets, necklaces, pins, earrings and watches, mainly gold-tone, some rhinestone-set items, group of bead, shell, and faux pearl necklaces | | 250.00 |

MARION C. STUART FAIR MARKET VALUE SELF-CONTAINED APPRAISAL / EFFECTIVE DATE 04/29/12

| | | | |
|---|---|---|---|
| | **TOTAL FOR JEWELRY:** | | **$4,000.00** |
| | **"Judged" indicates the appraiser's opinion, without benefit of gemological testing, as to the identification of stones listed herein. All sizes listed are approximate. It is strongly recommended that an inspection of the items be conducted by a gemologist appraiser using specific gemology equipment for final determinations of stone identity and size. Should this information become available, the appraiser reserves the right to ament this report with that further information.** | | |
| | **GARAGE AND GROUNDS** | | |
| 85. | GARAGE CONTENTS<br>Old suitcases; used exercise bicycle; walker; assortment of small gardening tools | | $45.00 |
| 86. | OUTDOOR FURNITURE<br>Glass-top circular table; mismatched plastic and aluminum chairs including (2) chaise lounges and (4) arm chairs | | 75.00 |
| | **TOTAL FOR GARAGE AND GROUNDS:** | | **$120.00** |
| | **AUTOMOBILE** | | |
| 87. | 2002 CADILLAC SLS<br>White, four door sedan with cloth top, 32V Northstar engine, odometer reading 42,129, VIN:1G6KS5Y52U121833<br>CONDITION: Running condition, very good overall | | $4,850.00 |
| | **TOTAL FOR AUTOMOBILE:** | | **$4,850.00** |
| | **REPORT TOTAL:** | | **$26,970.00** |

MARION C. STUART FAIR MARKET VALUE SELF-CONTAINED APPRAISAL / EFFECTIVE DATE 04/29/12

**SUMMARY**

| | |
|---|---|
| ENTRYWAY | $2,700.00 |
| DEN | 1,350.00 |
| GUEST BEDROOM | 3,220.00 |
| TELEVISION ROOM | 910.00 |
| MASTER BEDROOM | 645.00 |
| LIVING ROOM | 6,320.00 |
| DINING ROOM | 2,090.00 |
| KITCHEN | 765.00 |
| JEWELRY | 4,000.00 |
| GARAGE AND GROUNDS | 120.00 |
| AUTOMOBILE | 4,850.00 |
| **REPORT TOTAL:** | **$26,970.00** |

# *STUART P. WHITEHURST*

**EXPERIENCE**     **Diane Marvin Appraisal Services, Inc.**, 2011-present

*Personal Property Appraiser*
Conducts appraisals for estate tax, insurance, donation and dissolution of marriage purposes. Range of materials evaluated includes antique and used furniture, fine and decorative arts, silver, porcelain, glass, paintings, prints, rugs, collectibles, books and manuscripts. The age range of appraised material dates from Antiquity to the present day.

**Skinner Inc., Appraisers and Auctioneers**, 1995-2011
**Vice-President and Senior Appraiser**

*Senior Appraiser*, 1995-2011
Responsible for approximately 75% of all written appraisals generated by Skinner, Inc. annually, including appraisals for estate tax, insurance, donation and dissolution of marriage. Range of materials evaluated included antique and used furniture, fine and decorative arts, silver, porcelain, glass, paintings, prints, rugs, collectibles, books and manuscripts. The age range of appraised material dates from Antiquity to the present day.

*Director of Fine Books and Manuscripts Department*, 1997-2011
Responsible for annual sales featuring approximately 600-800 lots of manuscripts, books, maps and natural history prints. Responsible for evaluation of all paper material submitted to Skinner, Inc. throughout the year. Annual sales averaged approximately $1 million. Responsibilities included Internet inquiries, correspondence, off-premises property evaluations, catalog preparation, condition reports, and all sale preparation.

*Specialist, European Furniture and Decorative Arts Department*, 1995-2010
Responsible for cataloging and preparing four sales of fine furniture and decorative works of art annually. Additional appraisal and departmental responsibilities included Internet inquiries, correspondence, general inquiries, condition reports, quality opinions, gallery walks and lectures, and all sale preparation.

**Auctioneer**, 1995-2011
Principal auctioneer for approximately twelve to fifteen Skinner sales annually.  Numerous engagements as auctioneer for benefit auction events throughout New England, and the East Coast.

**Marketing and Public Appearances**, 1995-2011
Responsible for approximately thirty to forty public appearances annually including evaluation events, benefit auctions, and lectures.

MARION C. STUART FAIR MARKET VALUE SELF-CONTAINED APPRAISAL / EFFECTIVE DATE 04/29/12

**Leslie Hindman Auctioneers, 1991-1995, Chicago, Illinois and Palm Beach, Florida**

***Personal Property Appraiser and Florida Representative***, 1991-1995
Responsible for personal property appraisals for the purpose of estate tax, equitable distribution, insurance, damage/loss claims and dissolution of marriage. Additional duties included acting as the liaison between the auction house and the legal and banking communities and the cataloging and shipment of property from Florida to Chicago for inclusion in various sales.

**Sotheby's, Inc., 1984-1991, New York, New York**

***Senior Cataloger, English Furniture and Decorations***, 1989-1991
***Cataloger, Arcade Furniture and Decorations***, 1986-1989
***Administrator, Division of Decorative Arts***, 1985-1986
***Cataloger, Latin American Paintings and Drawings***, 1985
***Administrator, Print Department***, 1984

**MEDIA**

* ***Antiques Roadshow***, WGBH, Boston, Public Broadcasting System, **1996-present**
* ***It's Worth What?***, National Broadcasting Corporation, Los Angeles, **2011**
* ***The Today Show***, National Broadcasting Corporation, New York, **2008**
* ***The Ellen Degeneres Show***, Warner Brothers, Burbank California, **2007**
* ***Oprah: The Oprah Winfrey Show***, Harpo Productions, Chicago, **Illinois**
* ***Weekend Edition***, National Public Radio
* **Various Boston, Massachusetts-area television, radio and newspapers, 1995-2011**

**ORGANIZATIONS**   *The Manuscript Society, 1997-present
*Massachusetts Auctioneers Association, 2004-present

**EDUCATION**   **USPAP – Uniform Standards of Professional Appraisal Practice**
Successfully completed a 15-hour course and examination on the Uniform Standards of Professional Appraisal Practice (USPAP), the Congressionally-recognized set of appraisal standards promulgated by The Appraisal Foundation. Completed March 9, 2011, effective through March 9, 2016.

**University of Virginia, Charlottesville, Virginia
Bachelor of Arts Degree (1984)**

MARION C. STUART FAIR MARKET VALUE SELF-CONTAINED APPRAISAL / EFFECTIVE DATE 04/29/12

# Diane Marvin, ISA CAPP

*Certified Appraiser of Personal Property*
*2336 S. East Ocean Boulevard, #359 • Stuart, Florida 34996*

*Martin Co.  (772) 463-4440*
*Broward Co.  (954) 968-0003*
*Palm Beach Co.  (561) 703-5155*

---

**Certifications**

**Certified Appraiser of Personal Property (CAPP)**
Awarded the CAPP designation in Antiques and Residential Contents (ARC) by the International Society of Appraisers (ISA). CAPP is the Society's highest level of recognition, and fewer than 150 appraisers in the US and Canada have attained this professional achievement. Certified appraisers must complete a long-term, intensive course study in appraisal principles, pass the examinations on the theory and practice of professional appraising, as well as ethical standards of practice and legal considerations.  (January 2008)

**USPAP - Uniform Standards of Professional Appraisal Practice**
Successfully completed a 15-hour course and examination on the Uniform Standards of Professional Appraisal Practice (USPAP), the Congressionally-recognized set of appraisal standards promulgated by The Appraisal Foundation. Completed in February 2008, effective through February 2013.

**Education**

**International Society of Appraisers - Core Courses**
Course 101 - Appraisal Theory & Principals, Value & Market Definition Appraisal Uses, Federal Regulations
Course 102 - Appraisal Ethics, USPAP, ISA Appraisal Report Writing Standard, Identification & Authentication, Market & Value Research, Legal Issues
Course 103 - Business Practices, Appraisal Techniques, Practical Appraisal Report Writing
Course 104 - Advanced Appraisal Theory and Report Writing

Asian Art Seminar (2009)

The Appraisal of Antiques and Residential Contents
ISA Professional Development Program  (2003)

The Appraisal of Oriental Rugs  (2003)

Mandatory ISA Re-qualification Program, successful completion (2001) (2006)

ISA Re-qualification Core Course Review (2000) (2006)

**American Society of Appraisers**
Annual Conference, attended one day, Orlando, FL (2009)
Course 303 - Appraisers As Expert Witnesses (2002)
Appraising Oriental Rugs (2001)
Antique Clocks & Watches (2001)

**New Orleans Antiques Forum (2009)**

MARION C. STUART FAIR MARKET VALUE SELF-CONTAINED APPRAISAL / EFFECTIVE DATE 04/29/12

| | |
|---|---|
| **Education Continued** | **Tuscaloosa Antiques Symposium (2007, 2009)** |

**Whitehall at the Villa Antiques Seminar**
Wood Identification (2007)

**Annual Conference Attendance - International Society of Appraisers**

| | |
|---|---|
| Nashville, TN (2011) | Atlanta (2004) |
| Toronto, Canada (2010, 2000) | Philadelphia, PA (2003, 1990) |
| Charleston, SC (2009) | Washington, D.C. (1997) |
| Baltimore, MD (2008) | Boston, MA (1994) |
| Fort Worth, TX (2007) | Chicago, IL (1992) |
| Santa Fe, NM (2006) | |

**Bloomsburg University, Bloomsburg, Pennsylvania**
**Bachelor of Arts Degree (1979)**

**Experience**

**Personal Property Appraiser  (1989 - Present)**
Specialty: Antiques and Residential Contents (ARC), antique and used furniture, fine and decorative art, crystal, silver, porcelain, textiles, collectibles, office equipment, liquidations, consultations. Appraisals prepared for estate purposes including estate tax, probate and equitable distribution, dissolution of marriage, donation, damage claims, insurance, and bankruptcy

**Auction Gallery of the Palm Beaches, West Palm Beach**
Observed the sale of furniture, antiques, art and collectibles in the South Florida market place

Guest Appraiser
Boca Raton Children's Museum; Hibel Museum of Art, Jupiter; The von Liebig Art Center, Naples; Delray Beach Historical Society; City of Pembroke Pines

Antique Shop Owner  (1984 - 1991)
Specializing in American antique furniture, American textiles, silver, ceramics and decorative arts

Assistant Curator
Barrington Museum of American Folk Art, Delray Beach, Florida
Special Exhibits and School Programs

**Organizations Memberships**

**International Society of Appraisers**
Certified Member, ISA-CAPP (2008 - Present)
Accredited Member International Society of Appraisers, ISA-AM (2003 - 2008)
Member International Society of Appraisers  (1989 - 2003)

**Foundation for Appraisal Education (2009 - Present)**
Vice President of the FAE Board and Scholarship Director
The Foundation for Appraisal Education is a not-for-profit organization formed to promote the advancement of education related to personal property appraising

MARION C. STUART FAIR MARKET VALUE SELF-CONTAINED APPRAISAL / EFFECTIVE DATE 04/29/12

| | |
|---|---|
| **Organizations Memberships Continued** | Member South Florida / Greater Miami Chapter, ISA (1990 - Present)<br>Vice President / Program Chairman (1990 – 1992) (2004)<br>Past President (1992 - 1993) |
| | Other<br>International Ivory Society<br>The National Association of Watch & Clock Collectors, Inc.<br>The International Paperweight Society |
| **Qualified as Expert Witness** | **Federal Bankruptcy Court - Fort Lauderdale, Florida**<br>**Circuit Civil Court Broward County**<br>**Circuit Civil Court Palm Beach County**<br>• Main Judicial Complex, West Palm Beach<br>• North County Courthouse, Palm Beach Gardens<br>• South County Courthouse, Delray Beach |
| **Lectures** | Topics:<br>• "Issues Affecting Appraisers and Their Clients"<br>• "When Do You Need an Appraiser?"<br>• "How to Advise Clients to Prepare a Separate Writing"<br>• "History and Valuation of Dedham Pottery"<br>• "History and Valuation of Antique and Contemporary Glass Paperweights"<br>• "American Quilts: 18th – 20th Century"<br>• General antiques and collectibles; antique textiles; American pottery |
| | Venues:<br>• Historical Museum of Southern Florida, Miami<br>• Boca Raton Historical Society<br>• ISA Fort Lauderdale / Palm Beach Chapter<br>• ISA Miami Chapter (currently South Florida Chapter)<br>• South Broward Estate Planning Council<br>• Northern Trust Bank, Sun Trust Bank, Wachovia Bank<br>• Palm Beach Guardianship Association<br>• Guest lecturer at ISA 1992 and 1994 Annual Conferences<br>• Various organizations in the South Florida area, lectures delivered to attorneys, accountants, bank trust officers, appraisers and individuals |
| **Media Publications** | HDTV, Auction HD, "Treasure Seekers", featured specialist, January 2005 |
| | Value This with Brian and Leon, Radio WRNJ, October 2004 |
| | "How To Get An Accurate Appraisal" - *Quilt Almanac 1992* |
| | "The Care and Preservation of Antique Quilts" - *Quilt Magazine 1986* |






Upon Cathy's
graduat[ion] from
(musical school)
pleas[e] give her
the above
ring with 3 Diamonds
If Cathy does
Not smoke until she
graduates, please see
to it that she has a
New car — a HEAVY
one so that she
Stand a chance in all
accidents. If she
does smoke, give
it to her where
she gives up and

also a hug & kiss
& pat on the back
from me.
      Since Pam had
a 2nd hand car
and had to buy
most of a new
one, give Pam
the mink coat.
Unless, of course,
she had one or
doesn't want it
or Cath or Deb
really, really want
it.

I aim to please.

Pam

Amythyst Jellesby
___ ring
      (4 or 5 Tems)
the Pin ___
to Aunt Marian
His ___
Nana's ___
(Extra Pin (Round) to Cathy)
③ Pearl ___ ring
      (Taken to Spain)

④ Gold thimble
(Nana wanted Pam
to have this — she
already has the Pearls)



7 - Pearl + Go...
bracelet
8 - Cluster pearl
+ gold earrings
from Daddy to me.



I asked over a little more money for the bracelet.

Also Nana's heavy gold brooch
④ This also belonged to Aunt Marcia

⑤ Silver thimble

⑥ Wide Two-Toned Gold filigree Bracelet

⑦ real gold bangle bracelet (does NOT open up)

8 - turquoise + gold bracelet (Nana's) in drawer in jewelry case (may not be real)

Anything Marked Hyde should go to Kathy
1 - Drawing Hug
2 - Silver Drawer Set (Nana wanted her to have this)





5 - short gold chain
(Taking to Spain)

6 - small gold
bangle bracelet -
(opens up to put on)

7 - Any turquoise
+ silver jewelry
that Debby wants

8 - Gold filigree
ear-rings (real)
(I forgot to put
them in bank - in
jewelry case) Can be
made into pierced!

Dave, Corley, Debby
My diamond
engagement ring
present I would
like you girls
to hold in reserve
and, if any of
you marry a man
who cannot afford
to buy a ring
(minister) or
a professor),
then the diamond
ring should go
to her. Or if one of
you does not get married
Nana's gold
watch should go

to Cathy Cofer
Nana gave Cathy
another gold
watch but a
Burglar stole it

If Cathy Debby,
gets an M.A. or
more graduate
degree, please
buy her a
lovely ring from
me 🙂

Please divide
up all other
jewelry evenly.

and also my
clothes equally.
I know Deb
doesn't care for
my taste but
maybe she will
leave - ha ha!

Also the
household items.

Do NOT sell
any of Nana's +
Grandpa's rugs
and furniture
if you do NOT
want it, give



it to Carroll
+ Jim or Ruth
+ Gene and
their children
(Jimmy Jr, Cathy
Beth, Susan + Joe)
    Give Aunt
Carroll + Uncle
Jim first choice
because Aunt
Ruthie took a
lot of stuff to
Georgia.
    However please
keep these things.
These little maple
push chairs are

quite valuable, +
also the couch, etc.
    I have a
check coming
from a factory
in Mineola in
April for $1000.
Daddy planned to
put it in the
stocks account.

    I also have
$1270.33 in
the Suburbia Bank

        (over)

Nana's earrings are in a plastic bag (all of them are costume jewelry) Please give them to Pam & ask her to distribute a few to Ruth & Susan & Carroll & Cathy & Beth — also Aunt Dixie if she wants a pair.

The silver pin & earrings from Nana (all round with pearls) are "real" — but I can't think who would want them.

There is also a little double circle gold pin which I would like to give to that Kay. It belonged to Nana. I don't know whether it's real but I think it is.

Nana had some imitation pearls — I took some to spare.

I loved them all

because they
were here.

Anything
that has Hyde
on it (shaving
mug + silver
dresser set) should
go to Cathy.

I bought some
things in Majorca
for Christmas:

Pearls - Cathy
Pearls - Debby
Pearl Earrings - Pam
* Anything at Prig - Cathy
* Pearl Thing - Me
   (Cross to ~~Deb~~)

From Wise - silver
sugar + creamer
for Pam's Xmas.

* At Garden City
  Jewelers



Post script

(Before England)

I Think Deb
should have
The aquamarine
ring with
diamonds since
I bought Cath
the amythyst &
pearl ring in Spain



**THE J. RAYMOND STUART REVOCABLE TRUST**

## TABLE OF CONTENTS

| ARTICLE | Page |
|---|---|
| ARTICLE FIRST:  NAME OF TRUST ...................... | 1 |
| ARTICLE SECOND:  DISPOSITION OF INCOME AND PRINCIPAL DURING J. RAYMOND STUART'S LIFETIME ................. | 1 |
| ARTICLE THIRD:  REVOCATION, AMENDMENT OR ALTERATION OF TRUST BY J. RAYMOND STUART ...................... | 1 |
| ARTICLE FOURTH:  BINDING EFFECT OF TRUSTEES' ACTIONS DURING J. RAYMOND STUART'S TRUSTEESHIP ............. | 2 |
| ARTICLE FIFTH:  MARITAL DEDUCTION TRUST FOR MARION C. STUART ........................................... | 2 |
| ARTICLE SIXTH:  GIFTS TO SETTLOR'S ISSUE, AND CHARITIES, AND NIECES AND NEPHEWS .................... | 5 |
| ARTICLE SEVENTH:  PERPETUITIES SAVINGS CLAUSE ......... | 7 |
| ARTICLE EIGHTH:  QUARTERLY PAYMENTS OF INCOME ......... | 7 |
| ARTICLE NINTH:  SPENDTHRIFT PROVISIONS ................ | 8 |
| ARTICLE TENTH:  RETENTION OF AMOUNTS PAYABLE TO MINOR ................................................. | 8 |
| ARTICLE ELEVENTH:  CO-MINGLING OF TRUSTS ............. | 8 |
| ARTICLE TWELFTH:  DEFINITIONS OF "CHILD" AND "ISSUE" .. | 9 |
| ARTICLE THIRTEENTH:  DEFINITION OF "SPOUSE" AND "MINOR" AND STATUS OF CHILD IN GESTATION ............ | 9 |
| ARTICLE FOURTEENTH:  DEFINITION OF ISSUE PER STIRPES .. | 10 |
| ARTICLE FIFTEENTH:  AUTHORITY OF TRUSTEES TO ENTER INTO CERTAIN TRANSACTIONS WITH SETTLOR'S ESTATE OR OTHER TRUSTS ESTABLISHED BY SETTLOR ................. | 10 |
| ARTICLE SIXTEENTH:  POWERS OF TRUSTEES RESTRICTED WITH RESPECT TO MARITAL DEDUCTION TRUST ............. | 11 |
| ARTICLE SEVENTEENTH:  ANNUAL ACCOUNTINGS ............. | 11 |
| ARTICLE EIGHTEENTH:  ADMINISTRATIVE POWERS OF TRUSTEES ............................................. | 11 |
| ARTICLE NINETEENTH:  TRUSTEE'S EXERCISE OF POWER RESTRICTED BY TAX CONSEQUENCES ..................... | 14 |
| ARTICLE TWENTIETH:  BONDS OF TRUSTEES ................. | 14 |
| ARTICLE TWENTY-FIRST:  APPOINTMENT OF SUCCESSOR TRUSTEES, AND ADDITIONAL TRUSTEES AND COMPENSATION OF TRUSTEES ........................................ | 14 |
| ARTICLE TWENTY-SECOND:  RELIANCE ON COPIES OF INSTRUMENT ......................................... | 15 |
| ARTICLE TWENTY-THIRD:  AUTHORITY OF TRUSTEES TO BORROW ............................................. | 15 |
| ARTICLE TWENTY-FOURTH:  RESIGNATION OF TRUSTEES ....... | 16 |

ARTICLE TWENTY-FIFTH:  TRUSTEES ACT BY UNANIMOUS
    VOTE .................................................   16

ARTICLE TWENTY-SIXTH:  POWERS OF SUCCESSOR TRUSTEES ...   16

ARTICLE TWENTY-SEVENTH:  THIRD PARTY DEALINGS WITH
    TRUSTEES ............................................   16

ARTICLE TWENTY-EIGHTH:  LIABILITY OF TRUSTEE FOR
    ACTIONS OF OTHER TRUSTEES ..........................   16

ARTICLE TWENTY-NINTH:  DELEGATION OF POWERS TO OTHER
    TRUSTEES ............................................   17

ARTICLE THIRTIETH:  MARGIN ACCOUNT .....................   17

ARTICLE THIRTY-FIRST:  AUTHORITY OF ONE TRUSTEE TO
    ACT .................................................   17

ARTICLE THIRTY-SECOND:  NON-PROBATE TRUST .............   17

## THE J. RAYMOND STUART REVOCABLE TRUST

J. Raymond Stuart, of the City of Vero Beach, in the County of Indian River, State of Florida (hereinafter called the "settlor"), transfers the property listed in Schedule A attached hereto to J. Raymond Stuart and Pamela B. Stuart (hereinafter called the "trustees") and at the request of the settlor, the trustees agree to hold said property, and all additions thereto, in trust, as follows:

### ARTICLE FIRST:  NAME OF TRUST

This trust may be known as "THE J. RAYMOND STUART REVOCABLE TRUST" and it can be amended, altered, revoked or terminated by the settlor in the manner hereinafter described.

### ARTICLE SECOND:  DISPOSITION OF INCOME AND PRINCIPAL DURING J. RAYMOND STUART'S LIFETIME

The trustees shall dispose of the net income and principal as the settlor may direct the trustees from time to time provided always, however, that if, in the opinion of all the other trustees, the settlor is incapacitated through illness, age or other cause, the other trustees shall, in their discretion, from time to time, while they believe such incapacity continues, apply all or any part of the net income and/or principal toward the support, care and maintenance of the settlor and the settlor's spouse and the settlor's issue in such amount or amounts and in such manner as they may determine (but they shall take into consideration in exercising this discretion the settlor's other means or other means of the settlor's spouse and the settlor's issue).  Any net income in any year which is not disposed of by the terms of the preceding sentence shall be added to the principal of the trust at the end of each year.

### ARTICLE THIRD:  REVOCATION, AMENDMENT OR ALTERATION OF TRUST BY J. RAYMOND STUART

The settlor reserves the right at any time or times to amend, alter, revoke or terminate this trust, in whole or in

part, or any provision thereof, by an instrument in writing signed by the settlor and delivered to the trustees in the lifetime of the settlor.  The revocation shall take effect upon the delivery of the required writing to the trustees.  On the revocation of this trust in its entirety, or in part, the trustees shall pay or transfer to the settlor, or as the settlor may direct in the instrument of revocation, all or such part of the trust fund.

If there is any alteration, amendment or revocation of this instrument, the settlor's Will should be examined to determine what changes, if any, should be made in the settlor's will in the light of such alteration, amendment or revocation of this instrument.

### ARTICLE FOURTH:  BINDING EFFECT OF TRUSTEES' ACTIONS DURING J. RAYMOND STUART'S TRUSTEESHIP

While the settlor is acting as a trustee, all actions taken by the trustees shall be binding upon all persons who are then or may thereafter become entitled to the income or principal and such persons shall have no recourse against said trustees.

### ARTICLE FIFTH: MARITAL DEDUCTION TRUST FOR MARION C. STUART

On the death of the settlor, if the settlor's spouse, Marion C. Stuart (hereinafter referred to as "Marion"), survives him and is married to him at the time of his death, the remaining principal and undistributed income shall be held in a separate trust for the benefit of Marion.

During the lifetime of the spouse, Marion, the trustees shall pay to or apply for the benefit of the settlor's spouse, Marion, all of the net income of this separate trust.  In addition, the trustees shall, in their discretion, from time to time, pay to or apply for the benefit of Marion, such portions or all of the principal as the trustees may determine to be necessary for her health, care, support and maintenance and to maintain her in her accustomed mode of living.  In exercising this discretion, the trustees shall consider the other resources

-2-

available to the spouse. The power shall not be exercisable by Marion if she is a trustee. Even though this power is not exercisable by Marion, the settlor requests (without imposing any binding obligation on the trustees to follow any suggestions or requests made by Marion) that the trustees consult with Marion with respect to her needs for health, care, support and maintenance and the amount needed to maintain her in her accustomed mode of living.

It is the settlor's understanding that the provisions of the Internal Revenue Code may permit an election to be made to qualify this separate trust for the marital deduction. It is the settlor's intent and desire that such an election be available to his estate. The settlor's executors, in their uncontrolled discretion, shall determine whether an election shall be made to qualify the trust or a portion thereof for the marital deduction. To that end, and notwithstanding any other provisions of law or of this instrument, none of the powers conferred upon the trustees, shall be exercisable with respect to the trust under this article to the extent that it would disqualify it for the marital deduction.

Notwithstanding anything else appearing herein, the provisions made herein for the surviving spouse shall not terminate upon the surviving spouse's remarriage.

Notwithstanding anything else appearing herein, the amount to be placed in a trust which may qualify for the marital deduction shall not exceed an amount needed to result in the lowest amount of federal and state estate taxes payable with respect to the settlor's estate after all deductions, credits, exemptions and other tax benefits available to his estate are taken into account, with the excess, if any, nevertheless being disposed of in accordance with the provisions of this section except as provided herein. Such excess shall be referred to as the "non-marital deduction trust." The trust which is qualified for the marital deduction shall be referred to as the "marital deduction trust."

-3-

If a separate trust is qualified for the marital deduction and the trust owns any personal residence, the surviving spouse shall, during her lifetime, have the exclusive and unrestricted right to use such property as she may see fit (including the right to continue to occupy the property as a personal residence or to have the property rented and to receive the income therefrom).

There shall not be allocated to a trust which will be qualified for the marital deduction any property, or the proceeds of any property, which do not qualify for the estate tax marital deduction or which are subject to foreign death taxes. In place of that which would be allocated to such a trust, but for the exclusion directed by the preceding sentence, there shall be allocated other property of equivalent value.

The settlor intends that the value for federal estate tax purposes of the property of a trust hereunder which is qualified for the marital deduction shall be available for the marital deduction allowed by the federal estate tax law applicable to his estate and all questions applicable to this trust shall be resolved accordingly. To this end, the powers and discretion of the trustees with respect to the property in the trust qualified for the marital deduction shall not be exercised or exercisable, during the period that the settlor's spouse, Marion, survives him, except in a manner consistent with the settlor's intentions as expressed in the preceding sentence. Specifically, as an illustration of the foregoing, the separate trust which is qualified for the marital deduction shall not be subject to the payment of estate or inheritance or death taxes or the payment of debts of the settlor and of the settlor's estate.

For the purposes of Article FIFTH, in determining whether the settlor's said spouse survives him, if the order of their deaths cannot be established by proof, the settlor's said spouse, Marion, shall be deemed to have survived him.

On the death of the settlor's spouse, Marion, the remaining principal and undistributed income of the trusts under

-4-

this article (but not including the undistributed income of a trust which is qualified for the marital deduction which shall be paid to the spouse's estate), shall be held and disposed of in accordance with the provisions of Article SIXTH.

### ARTICLE SIXTH:  GIFTS TO SETTLOR'S ISSUE, AND CHARITIES, AND NIECES AND NEPHEWS

On Marion's death, or on the settlor's death if Marion does not survive him or is not married to him at the time of his death, the trustees shall hold and dispose of the remaining principal and undistributed income (but not including the undistributed income of the marital deduction trust which shall be paid to Marion's estate), herein referred to as "the fund", as follows:

1.   CHARITABLE GIFTS.

The trustee shall pay, outright, the following sums to the following organizations, provided, that an organization shall receive any such payment only if it is then in existence and is an organization a gift to which would be deductible for federal gift, estate and income tax purposes:

a.   Ten thousand dollars ($10,000.00) or two percent (2%) of the fund, whichever is less, shall be paid to the GARDEN CITY COMMUNITY CHURCH, Garden City, Long Island, New York, to be used for such of its charitable, educational and religious purposes as may be determined by its governing body.

b.   Five-Thousand dollars ($5,000.00) or one percent (1%) of the fund, whichever is less, shall be paid to the UNIVERSITY OF NEW MEXICO, New Mexico, to be held as a permanent fund, and the annual income of which shall be awarded as a prize to the senior student determined by a committee (established as said University may see fit) as having excelled in the field of Economics.

c.   Five-Thousand dollars, or one per cent (1%) of the fund, whichever is less, shall be paid to HARVARD UNIVERSITY, Cambridge, Massachusetts, to be added to its permanent endowment and the income thereof shall be used for the educational purposes

-5-

of the HARVARD GRADUATE SCHOOL OF BUSINESS ADMINISTRATION as the governing body of said graduate school may, from time to time, determine.

d.    Five-Thousand dollars ($5,000.00) or one percent (1%) of the fund, whichever is less, shall be paid to WELLS COLLEGE, Aurora, New York, to be used for such of its educational purposes as its governing body may determine.   Said governing body shall, in an appropriate manner, acknowledge that this gift was made in honor of Marion C. Stuart.

To the extent that there are sufficient funds in the principal of the marital deduction trust to pay the aforementioned charitable gifts, the charitable gifts shall be paid out of the principal of the marital deduction trust and the balance of the fund shall be used to pay the charitable gifts if the principal of the marital deduction trust is insufficient.

2.    GIFTS TO NIECES AND NEPHEWS

The trustees shall pay, outright, free and clear of any trust, five hundred dollars ($500.00) to each nephew and niece of the settlor (who are defined herein as a child of the settlor's brothers and sisters and as a child of Marion C. Stuart's brother and sisters) who is alive on the date of the execution of this trust and who is living at the time referred to in the first paragraph of this Article.   Notwithstanding the foregoing, the aggregate amount to be paid to all of the nieces and nephews shall not exceed the sum of twelve-thousand dollars ($12,000.00) or one percent (1%) of the fund, whichever is less, and the amount to be paid to each nephew and niece shall be equally reduced, to the extent necessary, to avoid such excess occurring.

3.    GIFTS TO ISSUE.

The remainder of the fund shall be paid, outright, free and clear of all trusts, to the issue of the settlor who are living at the time referred to in the first paragraph of this Article, such issue to take per stirpes.   If there are no such issue then living, it shall be paid, outright, free and clear of

-6-

all trusts, to those persons who would have inherited the settlor's personal estate, under the laws of Florida in force at that time, and in the proportions specified in said laws, if he had died at that time, intestate, unmarried, without issue, and a resident of Florida.

### ARTICLE SEVENTH:  PERPETUITIES SAVINGS CLAUSE

Notwithstanding the directions heretofore given to the trustees as to the distribution of income and principal under the terms of this instrument, any trust established under this instrument shall terminate, if it has not previously terminated, twenty-one (21) years after the death of the survivor of the following persons:

1. J. Raymond Stuart, settlor and trustee;
2. Marion C. Stuart, wife of the settlor;
3. Issue of the settlor living at the date the period of perpetuities commences to run (the word "living" refers to issue);

and the trustees of such trust shall pay the then remaining principal and undistributed income of such trust outright, free and clear of all trusts, in equal shares, to the persons to whom the income of said trust could have been distributed immediately prior to its termination.

Furthermore, each power to appoint given under the provisions of this instrument shall be exercisable by the designated donee if, and only if, the power is exercised prior to the termination of the trust under this Article SEVENTH.

### ARTICLE EIGHTH:  QUARTERLY PAYMENTS OF INCOME

Income payments which the trustees are required to make to a beneficiary under the provisions of this instrument shall be made at times fixed by the trustees but at least as often as quarterly.

-7-

## ARTICLE NINTH:  SPENDTHRIFT PROVISIONS

The interest of each beneficiary in the income or principal of a trust under this instrument shall be free from the control or interference of any creditor of a beneficiary or of any spouse of a married beneficiary and shall not be subject to attachment or susceptible of anticipation or alienation.  Nothing contained in this paragraph shall be construed as restricting in any way the exercise of any power of appointment granted hereunder.

## ARTICLE TENTH:  RETENTION OF AMOUNTS PAYABLE TO MINOR

Notwithstanding anything else appearing herein, whenever any payment hereunder is required to be made to a minor, the interest so required to be paid shall be indefeasibly vested in the minor but the trustees may retain the amount payable until the minor attains his majority or dies, whichever first occurs, and the trustees shall pay the income to the minor or apply it for the benefit of the minor and, in addition, the trustees may, in their uncontrolled discretion, from time to time, pay such portion or all of the principal to the minor or apply it for the benefit of the minor as the trustees deem appropriate.  When and if the minor attains his majority, the trustees shall pay the then remaining principal and undistributed income to him, and if the minor dies before attaining his majority, then on the minor's death the trustees shall pay the remaining principal and undistributed income to the minor's estate.

## ARTICLE ELEVENTH:  CO-MINGLING OF TRUSTS

The trustees are authorized to mingle the trust property of the separate trusts established by this instrument, but not including the marital deduction trust established under Article FIFTH, allotting to each separate trust an undivided interest in the mingled funds, that shall be equal to that trust's proportionate contribution (as adjusted from time to time as a result of accumulations of income, payments of principal and additions to principal) to the mingled funds.

-8-

## ARTICLE TWELFTH:  DEFINITIONS OF "CHILD" AND "ISSUE"

References in this instrument to "child", "children," "son," and "daughter" mean lawful blood descendants in the first degree of the parent designated, and references to "issue" mean lawful blood descendants in the first, second, or any other degree of the ancestor designated, provided always, however, that:

1.   An adopted child and such adopted child's lawful blood descendants shall be considered in this instrument as lawful blood descendants of the adopting parent or parents and of anyone who is by blood or adoption an ancestor of an adopting parent or of either of the adopting parents and shall not be considered descendants of the adopted child's natural parents, except that where a child is adopted by a spouse of one of his natural parents such child shall be considered a descendant of such natural parent as well as descendant of the adopting parent; and

2.   A child born to persons who are openly living together as husband and wife after the performance of a marriage ceremony between them and such child's blood descendants shall be considered in this instrument as lawful blood descendants of such child's parents and of any ancestor of such child's parents, regardless of the fact that a purported divorce of one or both of such persons with reference to a prior marriage is invalid.

## ARTICLE THIRTEENTH:  DEFINITION OF "SPOUSE" AND "MINOR" AND STATUS OF CHILD IN GESTATION

References in this instrument to a "spouse" mean the person who answers to such description on the assumption that all decrees of divorce rendered by a court of record wherever located are valid.  Furthermore, a decision of the trustees made in good faith as to whether a person meets such description shall be conclusive for all purposes.

A child in gestation, who is later born alive, shall be regarded in this instrument as a child in being during the period of gestation, in determining whether any person had died without

-9-   _J. Raymond Stuart_

leaving issue surviving him or her, and in determining, on the termination of any trust hereunder, whether such child is entitled to share in the disposition of the then remaining principal and undistributed income of such trust, but for other purposes such child's rights shall accrue from the date of birth.

References in this instrument to a "minor" mean a person under the age of twenty-one (21) years.

## ARTICLE FOURTEENTH:  DEFINITION OF ISSUE PER STIRPES

Whenever distribution is to be made to a designated "issue" on a per stirpes basis, the property shall be distributed to the persons and in the proportions that personal property of the named ancestor would be distributed under the laws of Florida in force at the time stipulated for distribution if the named ancestor had died intestate at such time, domiciled in such State, not married and survived only by such issue.

## ARTICLE FIFTEENTH:  AUTHORITY OF TRUSTEES TO ENTER INTO CERTAIN TRANSACTIONS WITH SETTLOR'S ESTATE OR OTHER TRUSTS ESTABLISHED BY SETTLOR

Subject to the directions given to the trustees as to the distribution of income and principal in Article SEVENTH, the trustees are authorized in their uncontrolled discretion to use the income and principal of each separate trust and of each distributable share hereunder (but not including the marital deduction trust under Article FIFTH) (provided that the same proportionate amount is taken from each separate trust and from each distributable share) from time to time as follows:

1.  To purchase and to retain as investments any securities or other property, real or personal, belonging to the estate of the settlor or other trusts established by the settlor.

2.  To make loans to the settlor's executors or administrators on such terms as the trustees deem advisable.

-10-

### ARTICLE SIXTEENTH:
### POWERS OF TRUSTEES RESTRICTED WITH
### RESPECT TO MARITAL DEDUCTION TRUST

Any power conferred upon the trustees by this instrument, or incorporated by reference herein, or existing by law, shall not be exercisable with respect to the marital deduction trust under Article FIFTH to the extent that it would prevent the trust from qualifying for the marital deduction.

### ARTICLE SEVENTEENTH:  ANNUAL ACCOUNTINGS

After the death of the settlor, the trustees shall each year render an account (prepared under the supervision of a certified public accountant) of their administration of each trust under this instrument to the oldest living beneficiary (or his or her guardian) to whom income of such trust may be distributed.  Such person's (or the guardian's) written approval of such account shall, as to all matters and transactions stated therein or shown thereby, be final and binding upon all persons (whether in being or not) who are then or may thereafter become interested in or entitled to share in, either the income or the principal of such trust, provided always, however, that nothing contained in this Article shall be deemed to give such person acting alone or in conjunction with the trustees the power to alter, amend, revoke, or terminate such trust.

### ARTICLE EIGHTEENTH:  ADMINISTRATIVE POWERS OF TRUSTEES

In extension and not in limitation of the powers given them by law (it being the settlor's intent to incorporate them by reference herein) or other provisions of this instrument (but subject to the restrictions of Article SIXTEENTH), the trustees of each trust established hereunder shall have the following powers with respect to such trust and its property, in each case to be exercised from time to time in the discretion of the trustees and without order or license of court:

1.  To retain indefinitely any investments and to invest and reinvest in stocks, shares and obligations of corporations, of unincorporated associations or trusts and of

-11-

investment companies, or in a common trust fund without giving notice to any beneficiary, or any other kind of personal or real property, notwithstanding the fact that any or all of the investments made or retained are of a character or size which but for this express authority would not be considered proper for trustees.

2. To make loans with adequate interest and with adequate security.

3. To sell, exchange, to lease and to make contracts concerning real or personal property for such considerations and upon such terms as to credit or otherwise as the trustees may determine, which leases and contracts may extend beyond the term of any trust; to give options therefor; to execute deeds, transfers, leases and other instruments of any kind.

4. To hold bonds, shares or other securities in bearer form, or in the name of the trustees or in the name of one of the trustees or in the name of a nominee; to deposit cash in a checking or savings account in a bank, in the name of the trustees or in the name of one of the trustees.

5. To give general or special proxies or powers of attorney for voting or acting in respect of shares or securities, which may be discretionary and with power of substitution; to deposit shares or securities with, or transfer them to, protective committees or similar bodies; to join in any reorganization and to pay assessments or subscriptions called for in connection with shares or securities held by them.

6. To improve or develop real estate; to construct, alter or repair buildings or structures on real estate; to settle boundary lines and easements and other rights with respect to real estate; to partition and to join with co-owners and others in dealing with real estate in any way.

7. To employ investment counsel, custodians of trust property, brokers, agents and attorneys.

-12-

8.   To receive additions to any trusts under this instrument by gift or will or otherwise and to hold and administer the same under the provisions hereof.

9.   To pay as income the whole of the interest, dividends, rent or similar receipts from property, whether wasting or not and although bought or taken at a value above par, but if they see fit when property is bought or taken at a value above par, they may retain a portion of the income to offset such loss to the principal; to treat as income or principal or to apportion between them stock dividends, extra dividends, rights to take stock or securities, and proceeds from the sale of real estate, although such real estate may have been wholly or partly unproductive; to charge to income or principal or to apportion between them investment counsels' compensation, custodians' compensation, brokers' commissions, agents' compensation, attorneys' fees, insurance premiums, repairs or improvements, taxes (income, estate, inheritance or any other taxes), depreciation charges and trustees' compensations; and generally to determine all questions as between income and principal and to credit or charge to income or principal or to apportion between them any receipt or gain and any charge, disbursement or loss as deemed advisable in the circumstances of each case as it arises, notwithstanding any statute or rule for distinguishing income from principal or any determination of the courts.

10.  When dividing or distributing any trust fund, to make such division or distribution wholly or partly in kind by allotting and transferring specific securities or other personal or real property or undivided interests therein as a part or the whole of any one or more shares or payments at current values.

11.  To keep any or all of the trust property at any place or places in Florida or elsewhere within the United States or abroad or with a depository or custodian at such place or places.

-13-

12. To enter into voting trusts and similar arrangements and to have any stock owned by the trust voted by others.

13. While the settlor is acting as a trustee, the settlor is empowered to act on behalf of the trust and the settlor may sign all instruments on behalf of the trust without the other trustees signing such instruments.

### ARTICLE NINETEENTH: TRUSTEE'S EXERCISE OF POWER RESTRICTED BY TAX CONSEQUENCES

Notwithstanding anything appearing herein, to the extent that the existence of any power or any discretion granted the trustees under any provision of this instrument or the provisions of the governing law, would result in the includibility of any portion of the trust property in the estate of a trustee (other than the settlor) for federal estate tax purposes or any portion of the income or the property in the gross income of a trustee (other than the settlor) for federal income tax purposes, said power shall not be exercisable by said trustee, but only by the other trustees.

### ARTICLE TWENTIETH: BONDS OF TRUSTEES

No bond shall be required of the original trustees hereunder or of any successor or additional trustee, or if a bond is required by law, no surety on such bond shall be required.

### ARTICLE TWENTY-FIRST: APPOINTMENT OF SUCCESSOR TRUSTEES, AND ADDITIONAL TRUSTEES AND COMPENSATION OF TRUSTEES

Vacancies in trusteeships shall be filled by such persons (including a corporate trustee) as the remaining trustees shall, by an instrument in writing, designate (and the remaining trustees shall determine the compensation to be paid to such persons).

Normally, there shall be no more than two trustees in office at any one time. Notwithstanding the foregoing, as soon as the trustees have determined they will exercise their discretion under Article SECOND, but in any event, no later than

-14-

the time when the trustees are holding the remaining principal and undistributed income under the provisions of Article FIFTH, at least one of the trustees then in office must be a person who is not eligible to receive any income or principal, either presently or in the future, (other than the compensation of a trustee) under the trust and whose spouse, issue, dependents and ancestors are not eligible to receive such benefits.  To the extent necessary to achieve the foregoing objective, but only to that extent, the remaining trustees shall, by an instrument in writing, designate a person (including a corporate trustee) to serve as an additional trustee.  A person is qualified to serve as an additional trustee if said person is not eligible to receive any such benefits under the trust (other than the compensation of a trustee) and said person's spouse, issue, dependents, and ancestors are not eligible to receive such benefits.  A person who meets the qualifications of an additional trustee may be referred to herein as an independent trustee.  If a vacancy occurs and there are two remaining trustees in office, one of whom is an independent trustee, the vacancy shall not be filled.

### ARTICLE TWENTY-SECOND:
### RELIANCE ON COPIES OF INSTRUMENT

To the same effect as if it were the original, anyone may rely upon a copy certified by a notary public to be a counterpart of this instrument (and of the writings, if any, endorsed thereon or attached thereto).  Anyone may rely upon any statement of fact certified by anyone who appears from the original document or a certified copy to be a trustee hereunder.

### ARTICLE TWENTY-THIRD:
### AUTHORITY OF TRUSTEES TO BORROW

With respect to any liability which must be satisfied out of the property held in trust hereunder, the amount necessary to satisfy such liability may be obtained by borrowing, and pledging or mortgaging trust property to secure the sum borrowed, or by selling trust property, or both methods.

-15-

## ARTICLE TWENTY-FOURTH:  RESIGNATION OF TRUSTEES

A trustee may resign at any time by an instrument in writing delivered to the remaining trustees, and if there is no remaining trustee, by an instrument in writing delivered to the oldest living issue of the settlor or such issue's guardian.

## ARTICLE TWENTY-FIFTH:
## TRUSTEES ACT BY UNANIMOUS VOTE

Except as otherwise provided herein, a unanimous vote of the trustees in the office shall be required in order to act in any matter affecting the trust.  If a vacancy in the office of trustee exists, the trustee or trustees in office may act pending the filling of the vacancy.

## ARTICLE TWENTY-SIXTH:
## POWERS OF SUCCESSOR TRUSTEES

References in this instrument to "trustees" shall be deemed to include not only the original trustees but also any successor or additional trustee, and all powers and discretion vested in the trustees shall be vested in and exercisable by any such successor or additional trustee.

## ARTICLE TWENTY-SEVENTH:
## THIRD PARTY DEALINGS WITH TRUSTEES

No one dealing with the trustees need inquire concerning the validity of anything they purport to do, or need see to the application of any money paid or any property transferred to or upon the order of the trustees.

## ARTICLE TWENTY-EIGHTH:  LIABILITY OF
## TRUSTEE FOR ACTIONS OF OTHER TRUSTEES

No trustee shall be responsible for the acts or omissions of another of the trustees or for the allowing of another of the trustees to have custody or control of the funds, securities, or property.  Each of them shall be responsible only for his, her, or its acts or omissions in bad faith.  Furthermore, a successor or additional trustee shall not be liable for any action taken by the trustees prior to the time such successor or additional trustee becomes a trustee.

-16-

## ARTICLE TWENTY-NINTH:
### DELEGATION OF POWERS TO OTHER TRUSTEES

A trustee may, by an instrument in writing, delegate all or any powers and discretion to a co-trustee or to co-trustees for a period of one (1) year or less at a time and may renew such delegation from time to time.

## ARTICLE THIRTIETH:  MARGIN ACCOUNT

Subject to the restrictions of Article SIXTEENTH, the trustees are authorized to establish and maintain a margin account for the purpose of acquiring, possessing and transferring and generally dealing in and with any and all forms of securities including, but not by way of limitation, shares, stocks, bonds, notes, debentures, option warrants, certificate of deposits, mortgages, and municipal and government securities.

## ARTICLE THIRTY-FIRST:
### AUTHORITY OF ONE TRUSTEE TO ACT

While the settlor is acting as a trustee, the settlor may act on behalf of the trust and issue instructions for the purchase, sale, transfer and/or delivery of securities or other assets to or from the trust account as if said instructions were issued by all of the trustees hereof and is authorized to execute any documents necessary and required to maintain any account on behalf of the trust.  In the event of the death or disability of the settlor, the other trustees may confer upon any other single trustee all of the aforementioned powers and authority.

## ARTICLE THIRTY-SECOND:  NON-PROBATE TRUST

Even though this instrument is executed with all of the formalities required for the execution of a will, it shall be deemed to have legal existence as of the date of its execution, is shall not have to be probated, and it shall not be subject to the jurisdiction of the probate court.

-17-  *J. Reginald Stuart*

IN WITNESS WHEREOF, J. Raymond Stuart, as settlor, and J. Raymond Stuart and Pamela B. Stuart, in token of their acceptance of the trusts herein created, set their hand and seals.

*January 3, 1991*                          *J. Raymond Stuart*
Date

_____          _____
Date

The foregoing instrument, The J. RAYMOND STUART REVOCABLE TRUST, was subscribed, published and declared by the above-named, J. Raymond Stuart as settlor and trustee and as for a revocable trust, in the presence of us three who, at his request, in his presence and in the presence of one another, hereto subscribe our names as witnesses thereof, all on the date last written, and each of us hereby declares that in his or her opinion that said J. Raymond Stuart is of sound and disposing mind and memory.

NAME                                      ADDRESS

*Nicola M. Denletzkie*          *10018 Boynton Pl. Cir #335*
                                          *Boynton Bch, Fl 33437*

*Sandra R. Ruscia*              *5302 Harwood Lane*
                                          *Lk. Worth, Fl 33467*
*Sandra M. Oleson*              *4131 B Palm Bay Cir*
                                          *N.P.B., Fl 33406*

STATE OF FLORIDA      )
                      )  ss.: Palm Beach
COUNTY OF Palm Beach  )

    I, J. Raymond Stuart, settlor and trustee, and Nicola M. Gerlitzki , Sandra M. Rivera , and Wanda M. Oleson , the witnesses, whose names are signed to the attached (or foregoing) instrument, having been sworn, declared and acknowledged to the undersigned officer that the settlor and the trustee, in the presence of the witnesses, signed the instrument as his revocable trust, that the settlor and trustee signed, and that each of the witnesses, in the presence of the settlor and trustee, and in the presence of each other, signed the trust as a witness and each of said persons acknowledged before me that such acts were their free acts and deeds.

_____
Settlor and Trustee

_____
Trustee

_____
Witness

_____
Witness

_____
Witness

    Subscribed and sworn to before me by J. Raymond Stuart, settlor and trustee, and by Nicola M. Gerlitzki , Sandra M. Rivera , and Wanda M. Oleson , the witnesses, on this 2nd day of January, 1990.



_____
Notary Public,
State of Florida at Large

My Commission Expires:

JAMES B. BERTLES
MY COMMISSION EXPIRES
January 28, 1994
BONDED THRU NOTARY PUBLIC UNDERWRITERS

-19-

STATE OF
COUNTY OF

       Then personally appeared before me the aforementioned

_____ known to me as the person described in and

who executed the foregoing instrument at _____ on

_____ and acknowledged the foregoing to be _____

free act and deed.

                          _____

                          Notary Public



# STAFFORD & TONER LLP

## ATTORNEYS AND COUNSELORS AT LAW
### 55 HILTON AVENUE
### GARDEN CITY, NEW YORK 11530

TEL: (516) 741-0600
FAX: (516) 741-0974

GERARD H. TONER (NY)
MICHAEL F. STAFFORD (NY & FL)

FLORIDA OFFICE:
WOOLBRIGHT CORPORATE CENTER
1901 S. CONGRESS AVE. SUITE 340
BOYNTON BEACH, FLORIDA 33426
(561) 272-3114

October 7, 1998

Fax: (202) 835-2202

Pamela B. Stuart, Esquire
888 Sixteenth Street, NW
Suite 5032
Washington, D.C.  20002

Post-It® Fax Note 7671

To Pam Stuart
Co./Dept.
Phone # (202) 835-2200
Fax # (202) 835-2202

Date 10/7/98  # of pages ▶ 2
From Michael Stafford
Stafford & Toner
Phone # 741-0600
Fax # 741-0974

**Re:    Estate of J. Raymond Stuart**

Dear Pam:

As a follow up to our discussion regarding fees for Trustees, Florida statutes allow "reasonable" compensation for trustees, but really don't define "reasonable" any further than that.

In Trust Administration situations (as opposed to the ongoing management of a continuing trust), it might be instructive to look at the statute setting the fees for personal representatives' services in probate estates. FS 733.617 sets the basic personal representative fee at 3% of probate assets up to $1 million, and 2.5% on assests between $1 million and $3 million.

You would not be out of line setting a fee for yourself at that level, particularly since Lew has declined to accept a fee, which has the right to do.  Under the personal representative statute, two PR's would each be entitled to a full fee.

You also might draw some instruction from the attorney's fees statute (FS 737.2041), which defines a reasonable attorney's fee in Trust administration as 75% of the reasonable fee as defined in a probate matter.

On the attorney fee side, FS 733.6171 defines a reasonable attorney fee in probate estates as 3% of the probate assets up to $1 million, and, 2.5% of assests between $1 million and $3 million.  As noted above, the statute sets 75% of that as the reasonable fee for Trust administration.  In addition, an attorney

who prepares the 706 is allotted an additional 1/2 of 1% of the gross estate for that service.

Given all of the above, your "reasonable" fee would be at least $75,000 and mine would be approximately $70,000.

You have been assisting in the attorney's work regarding the administration, and so I would suggest a fee of $12,000 for me, subject to the approval of the Trustees.  If there are extraordinary services such as representation in an Estate Tax audit or transfer of real estate, additional fees would have to be discussed.

And in view of the fact that you have been assisting in the attorney's work, it would be perfectly appropriate for you to compensate yourself for the additional attorney's fees I am not requesting.

Please call if you have any questions about any of this.  Whatever you and Lew decide to pay you as Trustee, you can take a portion of it now and the balance when we complete administration in 1999, or you can take it all in 1999 if you wish.

If you decide to pay me something now, please don't pay more than half.  I work better when I'm owed money, and will take the balance after the administration phase is over.

Hope you have a great trip. I'll file the automatic extension request while you're gone, and will talk with you when you get back.

Sincerely,

*Michael P. Stafford*

Michael P. Stafford

MPS/sr

# STAFFORD & TONER LLP

## ATTORNEYS AND COUNSELORS AT LAW
### 55 HILTON AVENUE
### GARDEN CITY, NEW YORK 11530

TEL: (516) 741-0600
FAX: (516) 741-0974

GERARD H. TONER (NY)
MICHAEL P. STAFFORD (NY & FL)

FLORIDA OFFICE:
WOOLBRIGHT CORPORATE CENTER
1901 S. CONGRESS AVE. SUITE 240
BOYNTON BEACH, FLORIDA 33426
(561) 272-3114

October 7, 1998

Fax: (202) 835-2202

Pamela B. Stuart, Esquire
888 Sixteenth Street, NW
Suite 5032
Washington, D.C. 20002

Re:   Estate of J. Raymond Stuart

Dear Pam:

As a follow up to our discussion regarding fees for Trustees, Florida statutes allow "reasonable" compensation for trustees, but really don't define "reasonable" any further than that.

In Trust Administration situations (as opposed to the ongoing management of a continuing trust), it might be instructive to look at the statute setting the fees for personal representatives' services in probate estates. FS 733.617 sets the basic personal representative fee at 3% of probate assets up to $1 million, and 2.5% on assests between $1 million and $3 million.

You would not be out of line setting a fee for yourself at that level, particularly since Lew has declined to accept a fee, which has the right to do. Under the personal representative statute, two PR's would each be entitled to a full fee.

You also might draw some instruction from the attorney's fees statute (FS 737.2041), which defines a reasonable attorney's fee in Trust administration as 75% of the reasonable fee as defined in a probate matter.

On the attorney fee side, FS 733.6171 defines a reasonable attorney fee in probate estates as 3% of the probate assets up to $1 million, and, 2.5% of assests between $1 million and $3 million. As noted above, the statute sets 75% of that as the reasonable fee for Trust administration. In addition, an attorney

who prepares the 706 is allotted an additional 1/2 of 1% of the gross estate for that service.

Given all of the above, your "reasonable" fee would be at least $75,000 and mine would be approximately $70,000.

You have been assisting in the attorney's work regarding the administration, and so I would suggest a fee of $12,000 for me, subject to the approval of the Trustees.  If there are extraordinary services such as representation in an Estate Tax audit or transfer of real estate, additional fees would have to be discussed.

And in view of the fact that you have been assisting in the attorney's work, it would be perfectly appropriate for you to compensate yourself for the additional attorney's fees I am not requesting.

Please call if you have any questions about any of this.  Whatever you and Lew decide to pay you as Trustee, you can take a portion of it now and the balance when we complete administration in 1999, or you can take it all in 1999 if you wish.

If you decide to pay me something now, please don't pay more than half.  I work better when I'm owed money, and will take the balance after the administration phase is over.

Hope you have a great trip. I'll file the automatic extension request while you're gone, and will talk with you when you get back.

Sincerely,

Michael P. Stafford

MPS/sr



*Pamela B. Stuart*

ATTORNEY AND COUNSELLOR AT LAW

*Suite 5032*
*888 Sixteenth Street, N.W.*
*Washington, D.C. 20006*
*Telephone: (202) 835-2200*

MEMBER DC, FL, MD, NY, AND VA BARS

October 7, 1998

TELECOPIER: (202) 835-2202
E-MAIL: pamstuart@aol.com

Mr. Lewis L. Smith, Jr.
175 Egret Lane
Vero Beach, Florida   32963

Dear Lew:

I tried to reach you at Terry and Cynthia's without success. As you probably know, my mother and I are taking off on Thursday for a Greek Islands cruise. She called me last night and asked me to call you because she got a bill for the Vero Beach home insurance that was $1400. This apparently includes the antiques and may include the personal liability umbrella insurance. She has not yet learned how to use the fax machine that is built into the new printer we (the trust) bought for her use for trust business, so I have not seen it. She would like you to look it over and advise whether she needs to change insurance companies, etc. It does seem a little steep to me. She has left the insurance bill in the draw on the right hand side of the desk where she usually places things she wants you to look at.

Along the same lines, I left the documents that you had gathered for me to send to Cherry Valley (the copy of the court order appointing me personal representative, etc.) in the same drawer. Would you please send them to me? Sorry. I just forgot to take it the last time I was in Vero Beach.

Mike Stafford and I decided to file for a sixty day extension on the estate tax return as there are still some valuation issues to be resolved. He will do that before October 18th and then we will wrap it up upon my return. Call me and I'll fill you in.

Mike has suggested taking a fee prior to filing the return which makes sense because the fee for services of a "personal representative" are different than those of a trustee and, at least for this year, you and I have been acting as much as personal representatives as trustees. The personal representative is basically responsible for administration of the estate, paying all claims, paying for taxes and administration, arriving at a plan of distribution, paying expenses, etc. I asked Mike to prepare an

Mr. Lewis L. Smith, Jr.
October 7, 1998
Page 2

*Pamela B. Stuart*
ATTORNEY AND COUNSELLOR AT LAW

opinion letter setting out what a reasonable fee would be for us.
I have enclosed his letter.

Florida law (copy attached) permits the personal
representative of the estate, without order of the court, to take
a fee of 3% of the estate assets up to $1 million and 2.5% of the
amount over $1 million up to $5 million.  The law also permits the
personal representative, if a member of the Florida Bar, to take a
fee for legal services rendered on top of the fee for the personal
representative.

I consulted not only Mike but my accountant as to how to best
handle this issue.  Both advise taking the maximum fee as the name
of the game at this point is to get money out of the estate that
would otherwise remain subject to estate tax at 50-55% at the time
that my mother passes away which hopefully will not be for a good
long while.  She is too valuable as an investment adviser for one
thing!  Incidentally, she loves the new computer that the trust
bought for her in her capacity as investment adviser.

I do not feel badly about this since (1) this was basically my
dad's intent as expressed to me numerous times that he wanted and
expected me to get a fee for being his executor/trustee (although
he probably had no idea of how much in fees the law allowed), (2)
thanks to my mother's and my investment of the excess cash in my
dad's account we increased the value of the account by about
$180,000 between February and now (less the $86,000 worth of checks
we have written for expenses, income to Marion, etc.), and (3) I
think I earned it!  The work on the trust matters greatly disrupted
my law practice this year as you might imagine.

You certainly earned the right to a fee, too.  I understand
that it is your wish to waive or disclaim the right you have to
take a fee from the estate.  This is totally up to you.  I would be
happy to see you get appropriate compensation for the many, many
hours you have devoted to taking care of all sorts of matters for
my mother and me.  We can never possibly repay all of the many
kindnesses you have bestowed upon us in our hours (our year) of
need.

Obviously, I do not expect or wish to jeopardize my mother's
life style or income in any way and never would do so.  It is my
judgment that the trust can afford to pay these fees without
substantially affecting my mother's income (and would have had to
do so in any case).  Because the trust will pay the expenses on the
Garden City house in perpetuity and has paid the expenses on the
Vero Beach house up until the time it is transferred to her, she is

Mr. Lewis L. Smith, Jr.
October 7, 1998
Page 3

*Pamela B. Stuart*
ATTORNEY AND COUNSELLOR AT LAW

not hurting for cash.  Also, she has about $800,000 in her brokerage account that is in her name.

So, as an interim measure, I, with your anticipated blessing, will write myself a check for $30,000.  The final amount (2.5% of the trust assets above the first $1 million) depends upon the final determination of the value of the estate.  Mike also suggests adding in some for "legal fees" to me since I did a fair amount of the legal work he would otherwise have done.  I think his proposed fee for his work is eminently fair (representing about 40 hours work at $300 per hour which is about the going rate these days). Should you disagree with this plan of action in any way, the money can always be returned to the trust.

I sent separately for your signature and return to Walt Engels one of the two documents needed to change the title on my mother's brokerage account so that your name is added to it.  I did not realize that it need not be notarized and so, in the interim, Smith Barney issued a new client agreement form.  That will come to you for signature later after I receive it from Walt.

I hope you and Hazel had a great summer and a nice trip to Florida.  I look forward to seeing you at Thanksgiving time.  Let me know if you have any thoughts or questions on all of this.

Best regards,

Pamela B. Stuart

Enclosures

# STAFFORD & TONER LLP

## ATTORNEYS AND COUNSELORS AT LAW
### 55 HILTON AVENUE
### GARDEN CITY. NEW YORK 11530
#### TEL: (516) 741-0600
#### FAX: (516) 741-0974

GERARD H. TONER (NY)
MICHAEL P. STAFFORD (NY & FL)

FLORIDA OFFICE:
WOOLBRIGHT CORPORATE CENTER
1901 S. CONGRESS AVE. SUITE 360
BOYNTON BEACH. FLORIDA 33466
(561) 272-3114

October 7, 1998

Fax: (202) 835-2202

Pamela B. Stuart, Esquire
888 Sixteenth Street, NW
Suite 5032
Washington, D.C. 20002

Re:   Estate of J. Raymond Stuart

Dear Pam:

As a follow up to our discussion regarding fees for Trustees, Florida statutes allow "reasonable" compensation for trustees, but really don't define "reasonable" any further than that.

In Trust Administration situations (as opposed to the ongoing management of a continuing trust), it might be instructive to look at the statute setting the fees for personal representatives' services in probate estates. FS 733.617 sets the basic personal representative fee at 3% of probate assets up to $1 million, and 2.5% on assests between $1 million and $3 million.

You would not be out of line setting a fee for yourself at that level, particularly since Lew has declined to accept a fee, which has the right to do. Under the personal representative statute, two PR's would each be entitled to a full fee.

You also might draw some instruction from the attorney's fees statute (FS 737.2041), which defines a reasonable attorney's fee in Trust administration as 75% of the reasonable fee as defined in a probate matter.

On the attorney fee side, FS 733.6171 defines a reasonable attorney fee in probate estates as 3% of the probate assets up to $1 million, and, 2.5% of assests between $1 million and $3 million. As noted above, the statute sets 75% of that as the reasonable fee for Trust administration. In addition, an attorney

who prepares the 706 is allotted an additional 1/2 of 1% of the gross estate for that service.

Given all of the above, your "reasonable" fee would be at least $75,000 and mine would be approximately $70,000.

You have been assisting in the attorney's work regarding the administration, and so I would suggest a fee of $12,000 for me, subject to the approval of the Trustees. If there are extraordinary services such as representation in an Estate Tax audit or transfer of real estate, additional fees would have to be discussed.

And in view of the fact that you have been assisting in the attorney's work, it would be perfectly appropriate for you to compensate yourself for the additional attorney's fees I am not requesting.

Please call if you have any questions about any of this. Whatever you and Lew decide to pay you as Trustee, you can take a portion of it now and the balance when we complete administration in 1999, or you can take it all in 1999 if you wish.

If you decide to pay me something now, please don't pay more than half. I work better when I'm owed money, and will take the balance after the administration phase is over.

Hope you have a great trip. I'll file the automatic extension request while you're gone, and will talk with you when you get back.

Sincerely,

Michael P. Stafford

MPS/sr

1ST DOCUMENT of Level 1 printed in FULL format.

FLORIDA STATUTES 1998

*** THIS DOCUMENT IS CURRENT THROUGH THE 1998 LEGISLATIVE SESSION ***

TITLE XLII  ESTATES AND TRUSTS
CHAPTER 733  PROBATE CODE: ADMINISTRATION OF ESTATES
PART VI  DUTIES AND POWERS OF PERSONAL REPRESENTATIVE

Fla. Stat. § 733.617 (1998)

733.617 Compensation of personal representative.

(1)   As compensation for its ordinary services, a personal representative shall be entitled, without order of court unless otherwise stated, to a commission payable from the estate assets. Such commission shall be based upon the probate estate's value as determined finally for probate inventory purposes and as accounted for by the personal representative, which value shall include all property, real or personal, tangible or intangible, and all income earned thereon.

(2)   Upon the probate estate's value as defined in subsection (1), such commission shall be computed as follows:

(a)   At the rate of 3 percent for the first $ 1 million.

(b)   At the rate of 2.5 percent for all above $ 1 million and not exceeding $ 5 million.

(c)   At the rate of 2 percent for all above $ 5 million and not exceeding $ 10 million.

(d)   At the rate of 1.5 percent for all above $ 10 million.

(3)   In addition to the aforesaid commission, a personal representative shall be allowed such further compensation as the court may deem just and reasonable for any extraordinary services including, but not limited to:

(a)   The sale of real or personal property.

(b)   The conduct of litigation on behalf of or against the estate.

(c)   Involvement in proceedings for the adjustment or payment of any taxes.

(d)   The carrying on of the decedent's business.

(e)   Any other special services which may be necessary for the personal representative to perform.

(4)   If a decedent's will provides that a personal representative's compensation shall be based upon specific criteria, other than a general reference to commissions allowed by law or words or similar import, including, but not limited to, rates, amounts, commissions, or reference to the personal

Fla. Stat. § 733.617 (1998)

representative's regularly published schedule of fees in effect at the decedent's date of death, or words of similar import, then a personal representative shall be entitled to compensation in accordance with such $provision. However, except for such references in a decedent's will to the personal representative's regularly published schedule of fees in effect at the decedent's date of death, or words of similar import, if there is no written contract with the decedent regarding compensation, a personal representative may renounce the provisions contained in the will and be entitled to compensation hereunder. A personal representative may also renounce its right to all or any part of the compensation.

(5)   If the probate estate's value as defined in subsection (1) is $ 100,000 or more, and there are two representatives, each personal representative is entitled to the full commission allowed to a sole personal representative. If there are more than two personal representatives and the probate estate's value is more than $ 100,000, the compensation to which two would be entitled must be apportioned among the personal representatives. The basis for such apportionment shall be one full commission allowed to the personal representative who has possession of and primary responsibility for administration of the assets and one full commission among the remaining personal representatives according to the services rendered by each of them respectively. If the probate estate's value is less than $ 100,000 and there is more than one personal representative, then one full commission allowed herein to a sole personal representative must be apportioned among the personal representatives according to the services rendered by each of them respectively.

(6)   If the personal representative is a member of The Florida Bar and has rendered legal services in connection with the administration of the estate, then in addition to a fee as personal representative, there also shall be allowed a fee for the legal services rendered.

(7)   The compensation for a personal representative as set forth in subsections (2) and (3) may, upon petition of any interested person, be increased or decreased by the court. In determining whether to increase or decrease the compensation for ordinary services, the court must consider each of the following factors, giving each such weight as it determines to be appropriate:

(a)   The promptness, efficiency, and skill with which the administration was handled by the personal representative;

(b)   The responsibilities assumed by and the potential liabilities of the personal representative;

(c)   The nature and value of the assets that are affected by the decedent's death;

(d)   The benefits or detriments resulting to the estate or its beneficiaries from the personal representative's services;

(e)   The complexity or simplicity of the administration and the novelties of the issues presented;

(f)   The personal representative's participation in tax planning for the

Fla. Stat. § 733.617 (1998)

estate and the estate's beneficiaries and in tax return preparation, review, or approval;
$

   (g)   The nature of the probate, nonprobate, and exempt assets; the expenses of administration; the liabilities of the decedent; and the compensation paid to other professionals and fiduciaries;

   (h)   Any delay in payment of the compensation after the services were furnished; and

   (i)   Any other relevant factors.

HISTORY:   s. 1, ch. 74-106; s. 80, ch. 75-220; s. 1, ch. 76-172; s. 5, ch. 88-340; s. 1, ch. 90-129; s. 10, ch. 93-257; s. 1, ch. 95-401.

NOTES:

   Created from former s. 734.01.

1ST DOCUMENT of Level 1 printed in FULL format.

FLORIDA STATUTES 1998

*** THIS DOCUMENT IS CURRENT THROUGH THE 1998 LEGISLATIVE SESSION ***

TITLE XLII  ESTATES AND TRUSTS
CHAPTER 733  PROBATE CODE: ADMINISTRATION OF ESTATES
PART VI  DUTIES AND POWERS OF PERSONAL REPRESENTATIVE

Fla. Stat. § 733.6171 (1998)

733.6171 Compensation of attorney for the personal representative.

(1)   Attorneys for personal representatives shall be entitled to reasonable compensation for their services payable from the assets of the estate without court order.

(2)   The attorney, the personal representative, and persons bearing the impact of the compensation may agree to compensation determined in a different manner than provided in this section. Compensation may also be determined in a different manner than provided in this section if the manner is disclosed to the parties bearing the impact of the compensation in the petition for discharge or final accounting and there is no objection filed pursuant to s. 733.901.

(3)   Compensation provided in the following schedule for ordinary services based upon the inventory value of the estate assets and the income earned by the estate during the administration is presumed to be reasonable compensation for attorneys in formal estate administration:

(a)   One thousand five hundred dollars for estates having a value of $ 40,000 or less.

(b)   An additional $ 750 for estates having a value of more than $ 40,000 and not exceeding $ 70,000.

(c)   An additional $ 750 for estates having a value of more than $ 70,000 and not exceeding $ 100,000.

(d)   For estates having a value in excess of $ 100,000, at the rate of 3 percent on the next $ 900,000.

(e)   At the rate of 2.5 percent for all above $ 1 million and not exceeding $ 3 million.

(f)   At the rate of 2 percent for all above $ 3 million and not exceeding $ 5 million.

(g)   At the rate of 1.5 percent for all above $ 5 million and not exceeding $ 10 million.

(h)   At the rate of 1 percent for all above $ 10 million.

(4)   In addition to the attorney's fees for ordinary services, the attorney

Fla. Stat. § 733.6171 (1998)

for the personal representative shall be allowed further reasonable compensation for any extraordinary service. What is an extraordinary service may vary depending on many factors, including the size of the estate. Extraordinary §services may include, but are not limited to:

(a)   Involvement in a will contest, will construction, a proceeding for determination of beneficiaries, a contested claim, elective share proceeding, apportionment of estate taxes, or any other adversarial proceeding or litigation by or against the estate.

(b)   Representation of the personal representative in audit or any proceeding for adjustment, determination, or collection of any taxes.

(c)   Tax advice on postmortem tax planning, including, but not limited to, disclaimer, renunciation of fiduciary commission, alternate valuation date, allocation of administrative expenses between tax returns, the QTIP or reverse QTIP election, allocation of GST exemption, qualification for Internal Revenue Code ss. 6166 and 303 privileges, deduction of last illness expenses, fiscal year planning, distribution planning, asset basis considerations, handling income or deductions in respect of a decedent, valuation discounts, special use and other valuation, handling employee benefit or retirement proceeds, prompt assessment request, or request for release of personal liability for payment of tax.

(d)   Review of estate tax return and preparation or review of other tax returns required to be filed by the personal representative.

(e)   Preparation of the estate's federal estate tax return. If this return is prepared by the attorney, a fee of one-half of 1 percent up to a value of $ 10 million and one-fourth of 1 percent on the value in excess of $ 10 million of the gross estate as finally determined for federal estate tax purposes, is presumed to be reasonable compensation for the attorney for this service. These fees shall include services for routine audit of the return, not beyond the examining agent level, if required.

(f)   Purchase, sale, lease, or encumbrance of real property by the personal representative or involvement in zoning, land use, environmental, or other similar matters.

(g)   Legal advice regarding carrying on of decedent's business or conducting other commercial activity by the personal representative.

(h)   Legal advice regarding claims for damage to the environment or related procedures.

(i)   Legal advice regarding homestead status of real property or proceedings involving that status.

(j)   Involvement in fiduciary, employee, or attorney compensation disputes.

(k)   Proceedings involving ancillary administration of assets not subject to administration in this state.

(5)   Upon petition of any interested person, the court may increase or

Fla. Stat. § 733.6171 (1998)

decrease the compensation for ordinary services of the attorney or award compensation for extraordinary services if the facts and circumstances of the particular administration warrant. In determining reasonable compensation, the court shall consider all of the following factors giving such weight to each §as it may determine to be appropriate:

(a)   The promptness, efficiency, and skill with which the administration was handled by the attorney.

(b)   The responsibilities assumed by, and potential liabilities of, the attorney.

(c)   The nature and value of the assets that are affected by the decedent's death.

(d)   The benefits or detriments resulting to the estate or its beneficiaries from the attorney's services.

(e)   The complexity or simplicity of the administration and the novelty of issues presented.

(f)   The attorney's participation in tax planning for the estate and the estate's beneficiaries and tax return preparation or review and approval.

(g)   The nature of the probate, nonprobate, and exempt assets, the expenses of administration and liabilities of the decedent, and the compensation paid to other professionals and fiduciaries.

(h)   Any delay in payment of the compensation after the services were furnished.

(i)   Any other relevant factors.

(6)   The court may determine reasonable attorney's compensation without receiving expert testimony. Any party may offer expert testimony after notice to interested persons. If expert testimony is offered, an expert witness fee may be awarded by the court and paid from the assets of the estate. The court may, in its discretion, direct from what part of the estate it shall be paid.

(7)   If a separate written agreement regarding compensation exists between the attorney and the decedent, the attorney shall furnish a copy to the personal representative prior to commencement of employment, and, if employed, shall promptly file and serve a copy on all interested persons. Neither a separate agreement nor a provision in the will suggesting or directing the personal representative to retain a specific attorney will obligate the personal representative to employ the attorney or obligateorney to accept the representation, but if the attorney who is a party to the agreement or who drafted the will is employed, the compensation paid shall not exceed the compensation provided in the agreement.

(8)   Court proceedings to determine compensation, if required, are a part of the estate administration process, and the costs, including fees for the personal representative's attorney, shall be determined by the court and paid from the assets of the estate unless the court finds the request for attorney's

Fla. Stat. § 733.6171 (1998)

fees to be substantially unreasonable. The court shall direct from which part of the estate they shall be paid.

(9)   The amount and manner of determining compensation for attorneys for personal representatives must be disclosed in the final accounting, unless the §disclosure is waived in writing signed by the parties bearing the impact of the compensation and filed with the court. No such waiver shall be valid unless it contains language declaring that the waiving party has actual knowledge of the amount and manner of determining such compensation and, in addition, expressly acknowledging either one of the following two elements:

(a)   That the waiving party has agreed to the amount and manner of determining such compensation and is waiving any objections to payment of such compensation; or

(b)   That the waiving party has the right under subsection (5) to petition the court to decrease such compensation and is waiving that right.

The requirements of this subsection shall not apply if the full amount of such compensation has previously been determined by order of the court after notice. A waiver of the final accounting shall not be effective if it does not meet the requirements of this subsection.

(10)   This section shall apply to estates in which an order of discharge has not been entered prior to its effective date but not to those estates in which attorney's fees have previously been determined by order of court after notice.

HISTORY:   s. 4, ch. 93-257; s. 2, ch. 95-401.

11TH DOCUMENT of Level 1 printed in FULL format.

FLORIDA STATUTES 1998

*** THIS DOCUMENT IS CURRENT THROUGH THE 1998 LEGISLATIVE SESSION ***

TITLE XLII   ESTATES AND TRUSTS
CHAPTER 737   TRUST ADMINISTRATION
PART II   JURISDICTION OF COURTS

Fla. Stat. § 737.2041 (1998)

737.2041 Trustee's attorney's fees.

   (1)   If the trustee of a trust described in s. 733.707(3) retains an
attorney to render legal services in connection with the initial administration
of the trust, the attorney is entitled to reasonable compensation for those
legal services, payable from the assets of the trust without court order. If the
trustee of a trust described in s. 733.707(3) retains an attorney to render
legal services in connection with the initial administration of a trust, the
trustee and the attorney may agree to compensation that is determined in a
manner or amount other than the manner or amount provided in this section. The
agreement is not binding upon a person who bears the impact of the compensation
unless that person is a party to or otherwise consents to be bound by the
agreement. The agreement may provide that the trustee is not individually liable
for the attorney's fees and costs.

   (2)   Unless otherwise agreed, compensation based upon the value of the trust
assets immediately following the settlor's death and the income earned by the
trust during initial administration at the rate of 75 percent of the schedule
provided in s. 733.6171(3)(a)-(h) is presumed to be reasonable total
compensation for ordinary services of all attorneys employed generally to advise
trustees concerning their duties in initial trust administration.

   (3)   An attorney who is retained to render only limited and specifically
defined legal services shall be compensated as provided in the retaining
agreement. If the amount or method of determining compensation is not provided
in the agreement, the attorney is entitled to a reasonable fee, taking into
account the factors set forth in subsection (6).

   (4)   Ordinary services of the attorney in an initial trust administration
include legal advice and representation concerning the trustee's duties relating
to:

   (a)   Review of the trust instrument and each amendment for legal sufficiency
and interpretation.

   (b)   Implementation of substitution of the successor trustee.

   (c)   Persons who must or should be served with required notices and the
method and timing of such service.

   (d)   The obligation of a successor to require a former trustee to account.

Fla. Stat. § 737.2041 (1998)

(e)   The trustee's duty to protect, insure, and manage trust assets and the trustee's liability relating to these duties.
$

(f)   The trustee's duty regarding investments imposed by the prudent investor rule.

(g)   Contributions due to the personal representative of settlor's estate for payment of administrative expenses or creditor claims and estate taxes.

(h)   The trustee's obligation to inform and account to beneficiaries and the method of satisfaction of these obligations; the liability of the trust and trustee to the settlor's creditors; the advisability or necessity for probate proceedings to bar creditors; and the contribution requirements to the settlor's probate estate.

(i)   Identifying tax returns required to be filed by the trustee, the trustee's liability for payment of taxes, and the due date of returns.

(j)   Obtaining nontaxable certificate and receipt, if not done by a personal representative.

(k)   Order of payment of expenses of administration of the trust and order and priority of abatement of bequests and legacies in the trust.

(l)   Distribution of income or principal to beneficiaries or funding of further trusts provided in the governing instrument.

(m)   Preparation of any legal documents required to effect distribution.

(n)   Fiduciary duties, avoidance of self-dealing, conflicts of interest, duty of impartiality, and obligations to beneficiaries.

(o)   If there is a conflict of interest between a trustee who is a beneficiary and other beneficiaries of the trust, advice to the trustee on limitations of certain authority of the trustee regarding discretionary distributions or exercise of certain powers and alternatives for appointment of an independent trustee and appropriate procedures.

(p)   Procedures for trustee's discharge from liability for administration of trust upon termination or resignation.

(5)   In addition to the attorney's fees for ordinary services, the attorney for the trustee shall be allowed further reasonable compensation for any extraordinary service. What is an extraordinary service may vary depending on many factors, including the size of the trust. Extraordinary services may include, but are not limited to:

(a)   Involvement in a trust contest, trust construction, a proceeding for determination of beneficiaries, a contested claim, elective share proceedings, apportionment of estate taxes, or other adversary proceedings or litigation by or against the trust.

(b)   Representation of the trustee in audit or any proceeding for adjustment, determination, or collection of any taxes.

Fla. Stat. § 737.2041 (1998)

(c)   Tax advice on postmortem tax planning, including, but not limited to, disclaimer, renunciation of fiduciary commission, alternate valuation date, allocation of administrative expenses between tax returns, the QTIP or reverse §QTIP election, allocation of GST exemption, qualification for Internal Revenue Code ss. 303 and 6166 privileges, deduction of last illness expenses, distribution planning, asset basis considerations, throwback rules, handling income or deductions in respect of a decedent, valuation discounts, special use and other valuation, handling employee benefit or retirement proceeds, prompt assessment request, or request for release of personal liability for payment of tax.

(d)   Review of estate tax return and preparation or review of other tax returns required to be filed by the trustee.

(e)   Preparation of decedent's federal estate tax return. If this return is prepared by the attorney, a fee of one-half of 1 percent up to a value of $ 10 million and one-fourth of 1 percent on the value in excess of $ 10 million, of the gross estate as finally determined for federal estate tax purposes, is presumed to be reasonable compensation for the attorney for this service. These fees shall include services for routine audit of the return, not beyond the examining agent level, if required.

(f)   Purchase, sale, lease, or encumbrance of real property by the trustee or involvement in zoning, land use, environmental, or other similar matters.

(g)   Legal advice regarding carrying on of decedent's business or conducting other commercial activity by the trustee.

(h)   Legal advice regarding claims for damage to the environment or related procedures.

(i)   Legal advice regarding homestead status of trust real property or proceedings involving the status.

(j)   Involvement in fiduciary, employee, or attorney compensation disputes.

(k)   Considerations of special valuation of trust assets, including discounts for blockage, minority interests, lack of marketability, and environmental liability.

(6)   Upon petition of any interested person in a proceeding to review the compensation paid or to be paid to the attorney for the trustee, the court may increase or decrease the compensation for ordinary services of the attorney for the trustee or award compensation for extraordinary services if the facts and circumstances of the particular administration warrant. In determining reasonable compensation, the court shall consider all of the following factors giving such weight to each as it may determine to be appropriate:

(a)   The promptness, efficiency, and skill with which the initial administration was handled by the attorney.

(b)   The responsibilities assumed by, and potential liabilities of, the attorney.

tax closing letter or other evidence of termination of the estate tax

Fla. Stat. § 737.2041 (1998)

(11)   This section shall apply to **trusts** of settlors who die on or after July 1, 1995.

HISTORY:   s. 4, ch. 95-401; s. 5, ch. 97-240.

3RD DOCUMENT of Level 1 printed in FULL format.

FLORIDA RULES OF COURT SERVICE
Copyright (c) 1972-1997 by D & S/Butterworth Legal Publishers
All rights reserved

\*\*\* THIS DOCUMENT REFLECTS CHANGES RECEIVED THROUGH SUPPLEMENT 98-3,
AUGUST 1998

\*\*\*

FLORIDA PROBATE RULES
PART I -- GENERAL

Fla. Prob. R. 5.180 (1998)

<=A1>  Review Court Orders which may amend this Rule.

Rule 5.180. WAIVER AND CONSENT

(a) Waiver. An interested person, including a guardian ad litem,
administrator ad litem, guardian of the property, or, if none, the natural
guardian, personal representative, trustee, or other fiduciary, or a sole holder
or all co-holders of a power of revocation or a power of appointment, may in
writing.

(1) waive:

(A) formal notice;

(B) informal notice;

(C) service including service of notice of administration;

(D) disclosure of the amount of compensation either paid to or to be paid to
the personal representatives, attorneys, accountants, appraisers, or other
agents employed by the personal representative;

(E) disclosure of prior or proposed distribution of assets;

(F) any right or notice or the filing of any document, exhibit, or schedule
required to be filed; and

(G) any other proceedings or matters permitted to be waiver by law or by
these rules; and

(2) waive or consent on the person's own behalf and on behalf of those the
person represents to the extent there is no conflict of interest.

(b) Contents of Waiver. A waiver of disclosure of the amount of, or manner of
determining, compensation shall be signed by each party bearing the impact of
the compensation and shall be filed with the court. The waiver shall contain
language declaring that the waiving party has actual knowledge of the amount and
manner of determining the compensation and, in addition, either:

Fla. Prob. R. 5.180 (1998)

    (1) that the party has agreed to the amount and manner of determining that
compensation and waives any objection to payment; or
    (2) that the party has the right to petition the court to decrease the
compensation and waives that right.

NOTES:

Committee Notes

    One person who serves in two fiduciary capacities may not waive or consent to
the person's acts without the approval of those whom the person represents. This
rule represents a rule implementation of the procedure found in section 731.302,
Florida Statutes.

    Rule History.

    1977 Revision: Extends right of waiver to natural guardian; clarifies right
to waive service of notice of administration.

    1984 Revision: Extends waiver to disclosure of compensation and distribution
of assets. Committee notes revised.

    1988 Revision: Procedure from section 731.302, Florida Statutes, inserted as
new (1)(f), and a new requirement that the waiver be in writing has been added.
Editorial changes. Committee notes expanded. Citation form changes in committee
notes.

    1992 Revision: Editorial changes. Committee notes revised. Citation form
changes in committee notes.

    1996 Revision: Addition of specific fee waiver disclosure requirements found
in 733.6171(9), Florida Statutes, and expanded to cover all fees.

    Statutory References.

    731.302, FLA. STAT. Waiver and consent by interested person.

    731.303, FLA. STAT. Representation.

    733.6171, FLA. STAT. Compensation of attorney for the personal
representative.

    733.901, FLA STAT. Distribution; final discharge.

    ch. 737, FLA. STAT. Trust administration.

    744.301, FLA. STAT. Natural guardians.

    Rule References.

    FLA. PROB. R. 5.120 Administrator ad litem and guardian ad litem.

    FLA. PROB. R. 5.400 Distribution and discharge.

Page 16

Fla. Prob. R. 5.180 (1998)

FLA. PROB. R. 5.680 Termination of guardianship.
FLA. PROB. R. 5.695 Annual guardianship reports.